MILBERG LLP
JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
SABRINA S. KIM (SBN 186242)
skim@milberg.com
NICOLE M. DUCKETT (SBN 198168)
nduckett@milberg.com
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975

MILBERG LLP
PETER SAFIRSTEIN
psafirstein@milberg.com
JENNIFER S. CZEISLER
jczeisler@milberg.com
ROLAND RIGGS
rriggs@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY  10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

Counsel for Plaintiff Todd Feinstein and
Lead Class Counsel

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| THE NVIDIA GPU LITIGATION | Case No. C 08-4312 JW |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' OPPOSITION TO BROWN MOVANTS' MOTION FOR PRELIMINARY INJUNCTION |
| ALL ACTIONS. | DATE: March 28, 2011<br>TIME: 9:00 a.m.<br>CTRM: 8, 4th Floor<br>JUDGE: Hon. James Ware |

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ........................................................................................1

II.  THE HP REPLACEMENT MODELS MEET OR EXCEED THE
     REQUIREMENTS OF THE SETTLEMENT AGREEMENT ...........................4

     A.   NVIDIA Proposed The CQ56 To Replace The HP Laptops And The Asus
          To Replace The HP Tablet........................................................................4

     B.   Plaintiffs Hired An Independent Expert To Evaluate The Replacement
          Models....................................................................................................5

          1.   The CQ56 is Similar to or Better Than the Laptops Being Replaced..........6

          2.   An Election Between the CQ56 and the Asus For Tablet Owners
               Complies With the Settlement Agreement ...................................9

     C.   Plaintiffs Insisted On An Election For Tablet Owners ...........................11

     D.   This Settlement Is Very Beneficial To The Class Members...................11

     E.   The Intent Of The Parties Must Be Considered....................................13

     F.   The Brown Movants' Proposed Relief Is Subjective And Arbitrary....................14

III. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ............................15

     A.   Plaintiffs Undertook Significant Efforts to Vet the Suitability of the
          Replacement Models..............................................................................15

     B.   Experienced Counsel Recommend Approval of the Replacements .....................16

     C.   The Class Members' Reaction to the Settlement Relief is Instructive .................16

     D.   The Few Individual Complaints Confirm This Settlement Is Superior To
          Continued Litigation ...............................................................................17

IV.  THE BROWN CLASS MOVANTS' COUNSEL IS NOT MOTIVATED TO
     PROTECT CLASS MEMBERS' INTEREST, BUT RATHER HIS SELF-
     PROFESSED GOAL OF TORT REFORM ...........................................................18

V.   THE BROWN MOVANTS ARE NOT ENTITLED TO INJUNCTIVE RELIEF ..........21

     A.   Likelihood of Irreparable Harm.............................................................21

     B.   Likelihood of Success on the Merits......................................................22

     C.   Balance of Hardships .............................................................................22

     D.   Public Interest ........................................................................................23

VI.  CONCLUSION........................................................................................25

| PLAINTIFFS' OPPOSITION TO BROWN MOVANTS' MOTION FOR PRELIMINARY INJUNCTION | i | Case No. C 08– |
|---|---|---|

DOCS\548711v1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Alliance for the Wild Rockies v. Cottrell*,
No. 09-35756, 2011 U.S. App. LEXIS 1473 (9th Cir. Jan. 25, 2011) ..................................21

*Brooks v. Georgia State Bd. of Elections*,
59 F.3d 1114 (11th Cir. 1995) ...........................................................................................14

*Browning v. Yahoo! Inc.*,
No. C04-01463 HRL, 2007 U.S. Dist. LEXIS 86266 (N.D. Cal. Nov. 16, 2007)..................17

*Davoodi v. Imani*,
No. C 11-0260 SBA, 2011 U.S. Dist. LEXIS 17758 (N.D. Cal. Feb. 9, 2011) ) ...................22

*Fulford v. Logitech, Inc.*,
No. 08-cv-02041 MC, 2010 U.S. Dist. LEXIS 29042 (N.D. Cal. Mar. 5, 2010) ..................15

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ......................................................................................15, 17

*In re Consol. Pinnacle W. Sec. Litig.*,
51 F.3d 194 (9th Cir. 1995) ...............................................................................................15

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
MDL Dkt. No. 901, 1992 U.S. Dist. LEXIS 14337 (C.D. Cal. June 10, 1992).....................16

*In re Warner Commc'ns Sec. Litig.*,
798 F.2d 35 (2d Cir. 1986)..................................................................................................14

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) .....................................................................................16

*Koerner v. Grigas*,
328 F.3d 1039 (9th Cir. 2003) ............................................................................................21

*Language Line Servs. v. Language Servs. Assocs., LLC*,
No. C 10-02605 JW, 2010 U.S. Dist. LEXIS 140350 (N.D. Cal. July 13, 2010) ................3, 4

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ............................................................................................17

*Lydo Enter., Inc. v. Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) .......................................................................................21, 22

*Lundell v. Dell, Inc.*,
   No. C 05-3970 JW/RS, 2006 U.S. Dist. LEXIS 90990 (N.D. Cal. Dec. 4, 2006) ......11, 12, 23

*Maxim Integrated Prods., Inc. v. Quintana*,
   654 F. Supp. 2d 1024 (N.D. Cal. 2009) ....................................................................21, 22, 23

*Mazurek v. Armstrong*,
   520 U.S. 968, 117 S. Ct. 1865 (1997)......................................................................................21

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) .....................................................................................................15

*Torrisi v. Tuscon Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) .......................................................................................................15

*Zamani v. Carnes*,
   491 F.3d 990 (9th Cir. 2007) .....................................................................................................21

**STATE CASES**

*Osumi v. Sutton*,
   151 Cal. App. 4th 1355 (2007) ..................................................................................................13

*Roden v. Bergen Brunswig Corp.*,
   107 Cal. App. 4th 620 (2003) ....................................................................................................13

**STATE STATUTES**

Cal. Civ. Code, § 1636................................................................................................................13

**DOCKETED CASES**

*In re HP Inkjet Printer Litig.*,
   No. C-05-3580 JF (PVT) (N.D. Cal. filed Jan. 17, 2011)......................................................19

*In re HP Laser Printer Litig.*,
   No. 07-0667 AG (C.D. Cal. filed June 6, 2007) (the "HP Printer Case") ........................19, 20

*San Jose Entm't Grp. v. City of San Jose*,
   No. C 11-00207 JW, at 1 (N.D. Cal. Feb. 16, 2011) ..............................................................21

*The Facebook, Inc. v. ConnectU, Inc.*,
   No. C 07-01389 JW (N.D. Cal. June 25, 2008) ..............................................................13, 14

1

## I.        INTRODUCTION

2         On December 20, 2010, this Court granted final approval of this Settlement.  The Court-

3  approved Settlement provides excellent and numerous forms of relief for all Class Members.

4  Under the terms of the Settlement, all qualified claimants with approved claims are eligible to

5  receive either: (i) a repair of their Dell or Apple Class Computer; or (ii) a new replacement

6  computer for HP Class Computers.  In addition, qualified claimants who previously fixed, or

7  would prefer to fix and keep their Class Computers, may also submit claims for reimbursement

8  of repair expenses.  There is no limit on the number of repair, replacement or reimbursement

9  claims a qualified Class Member may submit.  They also can submit claims in any of the

10  categories.  Someone with two computers eligible for repairs, three for replacement, and a

11  reimbursement claim for prior attempts to fix their five computers, can submit up to 10 claims in

12  that scenario.  For example, Movant Brown filed two separate claims determined to be valid and

13  Movant Schneider submitted three claims for replacement computers.  NVIDIA is far along in

14  paying all costs associated with administrative shipping and notice, which were estimated at

15  about $2 million at final approval.  *See* Supplemental Declaration of Katie Horton Re: Notice

16  Procedures (Dkt. 304 ¶ 28).  The claims deadline is March 14, 2011.

17         The Settlement Agreement this Court approved required the parties to "meet and confer

18  in good faith and agree on a suitable replacement of like or similar kind or equal or similar

19  value" for the HP Class Computers.  Settlement Agreement ¶ 2.6.  Following the Court's grant of

20  final approval, the parties continued to meet and confer concerning the various computer models

21  that were to be provided to Class Members as "replacement computer[s]" pursuant to ¶ 2.6 of the

22  Settlement Agreement.  Early in the negotiations, NVIDIA proposed providing Class Members

23  eligible for replacement with a used computer.  After that was rejected by Class Counsel, a new

24  Compaq CQ50 laptop computer (the "CQ50") for laptop Class Computers, and a new ASUS

25  T101MT-EU17-BK tablet computer (the "Asus") for tablet Class Computers.

26         Following Defendants' proposal, Plaintiffs' counsel, out of their own pocket, retained

27  Nader Bagherzadeh, Ph.D. and Professor of Electrical Engineering and Computer Science, at the

28  Henry Samueli School of Engineering at the University of California, Irvine, to evaluate whether

| PLAINTIFFS' OPPOSITION TO BROWN MOVANTS' MOTION FOR PRELIMINARY INJUNCTION | 1 | Case No. C 08-4 |

the two computer models NVIDIA proposed were suitable replacements under ¶ 2.6 of the Settlement Agreement. As he started his review, NVIDIA advised Plaintiffs' counsel that it intended to propose the HP Compaq brand CQ56-115DX (the "CQ56") as a replacement model rather than the CQ50. This was an offer of <u>new</u> computers with full new computer warranties, even though the Settlement Agreement does not anywhere require new computers or full new computer warranties.

Upon completing his evaluation of the two replacement computers proposed by NVIDIA, Dr. Bagherzadeh concluded the CQ56 is "superior in almost all major areas of comparison" to the HP laptops, and an election between the CQ56 and the Asus for HP tablet owners would satisfy the Settlement Agreement. Declaration of Dr. Nader Bagherzadeh ("Bagherzadeh Decl."), Exs. B, C.

Following the completion of Dr. Bagherzadeh's reports, the parties conferred and negotiated further. While NVIDIA initially declined to change its offer, the parties conducted extensive negotiations until the parties agreed that: (i) the CQ56 would be provided as a replacement for eligible laptop Class Computers; and (ii) qualified Class Members would have the option of choosing either the CQ56 or the Asus as a replacement for their tablet Class Computers. The Settlement website was updated accordingly to inform Class Members of the computers provided in the event they elected to replace their Class Computers. Class Members wedded to their particular computers could still seek out individual repairs, until the deadline to submit claims, through HP or any repair shop and submit the bill as a settlement reimbursement claim.

The benefits of the Settlement in its current form are substantiated by the claims made to date. As of February 28, 2011, 18,942 HP Class Members submitted claims to obtain replacement computers. Declaration of Dan Rosenthal filed by NVIDIA on March 4, 2001 ("Rosenthal Decl."), ¶ 6. Significantly, the 18,942 HP replacement claims submitted are over two thirds of the total valid claims submitted — 28,355 claims were filed, meaning the HP replacement claims constitute approximately 70% of the total filed claims, even though a larger number of potential Class Members were entitled to the Apple or Dell repairs, and all Class

1    Members were eligible for reimbursement.  Rosenthal Decl. ¶ 7.  This is significant because the

2    higher claims rate for the replacement option, which was available to 3,435,007 fewer potential

3    Class Members, totally undermines the Brown Movants' speculative assertions that the

4    replacement claims were depressed for any reason.  *See* Decl. of Katie Horton in Support of

5    Final Approval of Settlement (Dkt. 259) ("Horton Decl.") ¶ 8 (explaining that of the 5,123,594

6    Class Members notified, 1,688,587 were HP owners); *see also* Rosenthal Decl. ¶ 12 (explaining

7    rate of claims for this Settlement is typical and in line with his experience).

8            Against the backdrop of this very successful and highly beneficial Settlement, providing

9    completely new replacement computers with new and full warranties, a total of five individuals,

10   the "Brown Movants," filed a Motion to Enforce The Settlement (the "Brown Motion"),

11   claiming the new computer models being used to replace the HP Class Computers are not of

12   "like or similar kind" to the original, older, computers pursuant to the Settlement Agreement.

13   Notably, these five individuals are represented by Ted Frank, a self-proclaimed tort reformer and

14   attorney who is a serial class action objector.  The Brown Motion is accompanied by a report

15   purportedly authored by one of Ted Frank's acquaintances, Michael A. Vlastone ("Vlastone" and

16   the "Vlastone Report"), a self-proclaimed expert, who lacks any formal training or expertise in

17   the area of notebook, laptop or tablet computers.  Even a cursory examination of Mr. Vlastone's

18   "credentials" and his conduct in another matter reveals that he lacks Dr. Bagherzadeh's stature

19   and expertise to render an opinion in this matter.

20           Short on facts, the Brown Movants also fail on the law.  Nowhere in their papers do the

21   Brown Movants even set forth the standard for granting injunctive relief, let alone make the

22   requisite "clear showing" required.  *Language Line Servs. v. Language Servs. Assocs., LLC*, No.

23   C 10-02605 JW, 2010 U.S. Dist. LEXIS 140350, at *5 (N.D. Cal. July 13, 2010).  Even if they

24   could do so, the relief they seek is entirely inappropriate - it amounts to asking the Court to

25   rewrite the terms of a settlement agreement, based on a proposed order with opposing counsel's

26   subjective creation of 27 separate factors, which neither party agreed to, and which are not even

27   adopted by the Vlastone Report.

28

The Brown Motion amounts to nothing more than an attempt by moving counsel to publicize a tort reform agenda at a tremendous expense to Class Members. It is notable that while counsel seeks a mandatory and prohibitory preliminary injunction, the most extreme civil remedies available, he filed a brief which fails to even include or discuss the legal standard for this relief. Meanwhile, he promotes himself on a web blog and to the media for the publicity splash of filing an injunction motion, which has absolutely no injunction legal analysis. The motion should be denied in its entirety.

## II.  THE HP REPLACEMENT MODELS MEET OR EXCEED THE REQUIREMENTS OF THE SETTLEMENT AGREEMENT

The Brown Movants incorrectly assert that the Replacement Models offered to HP Class Members are not of "like or similar kind" to the original computers they are intended to replace, and final implementation of the Settlement should therefore be enjoined. The Brown Movants' argument, however, lacks merit and is belied by the fact that: (i) the HP Replacement Models are new computers with new computer warranties and conform to the requirements of the Settlement, a conclusion reached by Plaintiffs' highly qualified expert; (ii) the Settlement is very beneficial to Class Members and disruption of its administration would be prejudicial to over 26,000 Claimants; and (iii) the Brown Movants do not even mention, let alone satisfy the standard for a preliminary injunction.

### A.  NVIDIA Proposed The CQ56 To Replace The HP Laptops And The Asus To Replace The HP Tablet

The Settlement Agreement requires the parties to "meet and confer in good faith and agree on a suitable replacement of like or similar kind or equal or similar value" for the HP Class Computers. Settlement Agreement ¶ 2.6. Class Computers subject to replacement include (1) several HP Pavillion and Compaq Presario laptop models ("Laptops") and (2) one tablet computer line — the Pavilion Tx1xxx ("Tablet"). *Id*. at Amendment No. 2. NVIDIA proposed the Laptops be replaced with the CQ56, and the Tablet be replaced with the Asus (collectively the "Replacement Models"). Westerman Decl. ¶ 4.

NVIDIA maintained the Replacement Models were in compliance with the Settlement Agreement.  Westerman Decl. ¶ 2.  To support its position, NVIDIA provided Plaintiffs with the Declaration of Keith Katcher, NVIDIA's Vice President of Operations, Assembly/Test, and referred Plaintiffs to the previously filed Declaration of NVIDIA's expert, Jon Peddie from their opposition to class certification.

### B. Plaintiffs Hired An Independent Expert To Evaluate The Replacement Models

Plaintiffs considered the declarations but decided, over NVIDIA's objections, and at Class Counsel's expense, to hire an independent expert to evaluate the Replacement Models to ensure compliance with the Settlement Agreement.  Westerman Decl. ¶ 5.  Plaintiffs retained University of California at Irvine School of Engineering Professor of Electrical Engineering and Computer Science Dr. Nader Bagherzadeh.  Dr. Bagherzadeh was provided with the Katcher and Peddie declarations, as well as the complaints Class Counsel had received to date regarding the Replacement Models, and was instructed to provide his own analysis and opinion.  Westerman Decl. ¶ 5.  After performing his evaluation, Dr. Bagherzadeh concluded the CQ56 is "superior in almost all major areas of comparison" to the Laptops.  *See* A Report On Nvidia Laptop Replacement By Nader Bagherzadeh ("Laptop Report"), Bagherzadeh Decl., Ex. C, at 4.  With respect to the Asus as a replacement for the Tablet, Dr. Bagherzadeh found the Asus has much longer battery life operation than the Tablet, is lighter weight and provides touch screen navigation but has certain disadvantages to the Tablet.  Accordingly, Dr. Bagherzadeh concluded "since the needs of class members may have been different when they purchased their original computers, it is best to provide an option where class members can choose between two different replacements."  *See* A Report On Nvidia Tablet Replacement By Nader Bagherzadeh ("Tablet Report"), Bagherzadeh Decl., Ex. B, at 3.  Dr. Bagherzadeh recommended an election between the CQ56 and the Asus be provided to Class Members owning the Tablet to satisfy the Settlement Agreement.  *Id.*

1

2

### 1.  The CQ56 is Similar to or Better Than the Laptops Being Replaced

Dr. Bagherzadeh examined the CQ56 in comparison to the Laptops and used the following metrics: (1) Graphics Processing Unit (GPU) performance, (2) screen size, (3) Central Processing Unit (CPU) rating, (4) DRAM features, (5) hard disk, (6) Optical Disk Drive (ODD), and (7) WLAN capabilities.  Laptop Report.  Dr. Bagherzadeh was given most, if not all, Replacement Model complaints received by Class Counsel at that time so he could see the concerns of potential Class Members.  Dr. Bagherzadeh concluded the CQ56 is "superior in almost all major areas of comparison."  Although Plaintiffs take issue with the qualifications of Movants' purported "expert," as discussed below, it is worth noting that Dr. Bagherzadeh evaluated essentially the same metrics that Mr. Vlastone's "Executive Summary" says should be evaluated.

As to the GPU (the litigated issue in the underlying case), Dr. Bagherzadeh noted all of the Class Computers he examined used the NVIDIA GeForce GO 6150 (first manufactured in 2005), while the replacement unit uses a Mobility Radeon HD 4250 (first manufactured in 2010).  Further, bus interface - the method by which data is moved back and forth between the GPU and the CPU - in the Laptops is a full generation older than that in the CQ56 (version 3.0 as opposed to version 2.0).  This means the CQ56's GPU interacts with the computer significantly faster than the GPUs in the original Laptops.  In addition, the CQ56's GPU has a dedicated 512 MB of memory, where the Laptops share memory with the CPU, meaning they only have access to 256 MB of memory.  In practice, this means the CQ56 can process data significantly faster, because it will only need to write information to the hard drive half as often as the original models.  Hard drives are significantly slower than RAM, so the fewer times a GPU needs to access the hard drive, the faster that GPU will perform.  Dr. Bagherzadeh also found the CQ56's GPU has faster main and memory clocks than the GPUs it is replacing, including a main clock that is 30% faster than the Class Computers and noted "it is usually a good rule of thumb that a faster clock will improve [] performance."  Laptop Report at 2.  In summary, Dr. Bagherzadeh concluded the replacement GPU is "superior in all aspects of evaluation."  *Id.*

The next factor measured by Dr. Bagherzadeh was the screen size. Dr. Bagherzadeh noted one of the many Laptop models, the Pavilion dv9xxx, has a 17" screen, which is larger than the CQ56's screen. Laptop Report at 4. He found all other models being replaced were either smaller or equal to the CQ56 screen. *Id*. He concluded "[a]lthough the replacement unit has a smaller screen size than laptop a (Pavilion dv9000), having a new computer which meets or exceeds some of the key performance features should be more than adequate to satisfy the settlement agreement." *Id*.

With respect to the computers' CPUs, Dr. Bagherzadeh found the Laptops, with one exception, are equipped with AMD Turion Dual Core TL-64 processors, first manufactured about five years ago. The CQ56 is equipped with a "recently developed" AMD V140 single core processor. Laptop Report at 3. Dr. Bagherzadeh concluded the advantages to having a dual core processor are offset here by the advances in technology that occurred over those five years giving rise to the single core processor in the CQ56. He found "if a program can be parallelized, meaning be able to use both cores to do a computation task", then the dual core is more useful, but that in cases where programs act sequentially, the single core processor is superior. The expert also noted that dual core processors are advantageous for multi-tasking, but this advantage is not absolute and depends on a number of other factors, including memory and CPU speed, areas in which the CQ56 has an advantage. The expert explained "since the DDR2 incorporated in the original laptops is half the speed of the DDR3 in the CQ56, dual core processors of the original laptops will not be able to take advantage of their full potential as compared with the CQ56's single core." *See also,* Bagherzadeh Decl., Ex. D ("Report # 3"), at 1.[1] Further, the CQ56's CPU is more efficient and uses less battery power. On balance, whether one of these processors is superior to another depends on the uses to which it will be put - as Dr. Bagherzadeh noted, it is likely that most Class Members will be using programs designed for single core processors, and therefore, the CQ56's processor is superior. To the extent Class Members seek to multi-task, the advantages of the older dual-core processor are largely offset by the other hardware specifications of the newer CQ56.

---

[1] Dr. Bagherzadeh prepared a Report # 3 to discuss certain issues raised in the moving papers.

Vlastone contends the CQ56 is not a suitable replacement for the Laptops primarily because of the differences in the computers' CPUs.  Vlastone Report at 14.  While Vlastone's conclusion is deficient for several reasons, a primary reason is Vlastone fails to address the effect of the advances in technology that occurred over those five years in single core processors.  Vlastone also ignores the applications in which the CPUs would be put to use and, the impact of the CQ56's newer and better memory.  Unlike Vlastone, Dr. Bagherzadeh did consider all of these factors and concluded that the newer CPU in the CQ56, in conjunction with other features, compared favorably to that in the Laptops.  In summary, despite the Brown Movants' assertions about their older dual core processors, Dr. Bagherzadeh determined the CQ56's CPU sufficiently meets or, depending on the use, exceeds the performance of processors in the Class Computers.

With respect to the DRAM, Dr. Bagherzadeh concluded that the CQ56, which uses a newer generation DRAM, is "superior to all the originals."  Laptop Report at 3.  He found the CQ56's DRAM uses less power and achieves faster speeds than the Laptops.  *Id*.  Specifically, "in terms of power efficiency, the chips used in the original laptops are no match for the CQ56.  This is true for DRAM memory chips as well.  DDR3s consume less power than DDR2s.  In a rough estimate, close to 50% reduction in power can be achieved going from an older technology to a newer one."  *See also*, Bagherzadeh Decl., Ex. D, Report # 3 at 2.

Dr. Bagherzadeh's evaluation of the hard disks reached a similar conclusion.  He found (1) the hard disk space is "similar to most of the originals in terms of size," (2) "[t]he only [Laptop] with half as much disk storage as the [CQ56] was [the F500]", and (3) the CQ56's RPM (the speed at which the hard disk can be accessed) is "as good as the best original."  Laptop Report.  Again, the CQ56 is superior in this category.

Dr. Bagherzadeh found the optical disk drives in both the CQ56 and the Laptops are identical.  All of the optical disk drives are DVR drives with both read and write functions, at 8X speed.[2]  Laptop Report at 3.

---

[2] The Brown Movants refer to a "lightscribe" feature, which labels DVDs.  This convenience feature is not in the CQ56, but the technical features of the drives are the same.

1    Dr. Bagherzadeh also compared the WLAN capabilities of the CQ56 and the Laptops.

2  He concluded that three of the Laptops have Bluetooth capability, which the CQ56 lacks.

3  However, the CQ56 has the most up to date and most popular WiFi standard, 802.11n, which

4  none of the older Laptops support.  Further, Dr. Bagherzadeh noted if a user wants Bluetooth

5  capability, the CQ56 has a USB port compatible with Bluetooth dongles, which cost about $10.

6    Finally, Dr. Bagherzadeh delineated additional benefits to Class Members receiving the

7  CQ56.  The CQ56 supports 64 bits, meaning it can run Windows 7, the newest operating system

8  "considered by many to be more stable and efficient" than the older operating systems on the

9  Laptops (Windows XP and Vista).  Windows 7 was not available until March of 2010, so the

10  vast majority of Class Computers are unlikely to have it.  Thus, most Class Members are

11  receiving an upgraded operating system in addition to the improved hardware described above.

12    Significantly, a new CQ56 "provides a reset on the number of years one could have for a

13  fully functional laptop," because it "clearly increases the life span of the original laptops as far as

14  display, hard drive, keyboard and mother board are concerned, which are usually the first parts

15  on a laptop that fail."  Laptop Report at 3.  The value of providing new, unworn parts that will

16  extend the useful life of a computer cannot be discounted.  Class Computers were purchased as

17  early as March 2006, and are approaching, or already have reached, the end of their useful life

18  cycles, even absent the defective GPUs in this litigation.  Class Members will receive a new

19  computer under HP warranty, with a new expected useful life.  *Id*. at 4.  Based on Dr.

20  Bagherzadeh's conclusions, it is clear the CQ56 is of "like or similar kind" to the Laptops it is

21  intended to replace.[3]

22    **2.    An Election Between the CQ56 and the Asus For Tablet
           Owners Complies With the Settlement Agreement**
23

24    Dr. Bagherzadeh's conclusion with respect to the Asus was "since the needs of class

25  members may have been different when they purchased their original computers, it is best to

26  provide an option where class members can choose between [the] two different replacements."

27  _____

[3] While Class Counsel relied primarily on Dr. Bagherzadeh's report, the information NVIDIA
28  provided via Mr. Katcher's and Mr. Peddie's declarations was also relevant.

Tablet Report at 3.[4]  The expert reasoned that the Asus is superior to the Tablet in terms of portability and battery life, but the CQ56 is superior in terms of computational power.  *Id*.  Thus, depending on the user's preferences, the Asus or the CQ56 will provide a remedy allowing the Class Member to perform basically the same functions as the Tablet.

Dr. Bagherzadeh compared the Asus to the Tablet on the basis of the respective machines' GPU, screen size, CPU, DRAM, hard disk, optical drive, WLAN, camera and power consumption.  Dr. Bagherzadeh's findings in this regard reinforce the conclusion that the Asus is a superior choice for users focused on portability, as it streamlines many features that would be superfluous to such users.  He concluded the Asus GPU uses an advanced fabrication technology which is more efficient and, therefore, preserves battery life, although it does give up some processing power as a result.  Tablet Report at 3.  In short, the Asus's GPU is more suited to portability than to heavy calculations.  Similarly, the Asus's CPU, while not as computationally powerful as the Tablet's, is significantly more efficient, using approximately 1/7 the power that the older Tablet CPU consumes, significantly extending battery life.  *Id*.  Dr. Bagherzadeh also noted the Asus's screen size is a more portable 10", compared to the Tablet's 12".  Also, because the Asus "has touch screen and retractable stylus in addition to the keyboard, it is more in line with the current trend of having the convenience of soft keyboard as demonstrated by recent introduction of iPad from Apple and Samsung's Galaxy." *Id*. at 4.

Regarding hard disks, Dr. Bagherzadeh stated the Tablet's hard disk is slightly larger (200 GB vs. 160 GB), but the Asus's hard disk is faster and improves performance.  Dr. Bagherzadeh found the WLAN capabilities to be similar.  But, due to certain disadvantages of the Asus over the Tablet, Dr. Bagherzadeh recommended Tablet owners receive a choice between the Asus and the CQ56.

Vlastone's lack of expertise is highlighted by the fact that he performed virtually no analysis on the comparability of the Asus and the CQ56.  As Dr. Bagherzadeh explains, the

---

[4] Of note, Dr. Bagherzadeh analyzed the Asus T101 MT-EU17-BK but Class Counsel was recently informed by NVIDIA that the replacement model for the Tablet will be the upgraded, newer Asus T101 MT-EU37-BK.

speed of the CPU is but one factor and any disadvantage arising from technological differences between the Asus and the computers it will be replacing is addressed by the option of the CQ56. Vlastone's analysis, again, fails to take this into consideration.

### C.      Plaintiffs Insisted On An Election For Tablet Owners

Based on their expert's conclusions, Plaintiffs informed NVIDIA that they would agree to the Replacement Models pursuant to the Settlement Agreement provided Tablet users were allowed to choose between the CQ56 and the Asus.  Initially, and for some time, NVIDIA refused.  These negotiations were intense and included phone calls between the respective lawyers, experts, and NVIDIA executives.  After negotiations that on more than one occasion appeared at an impasse, NVIDIA agreed to provide a choice between the CQ56 and the Asus as a Replacement Model for the Tablet.  Westerman Decl. ¶ 9.

### D.      This Settlement Is Very Beneficial To The Class Members

Dell and Apple owners are submitting their computers to their respective manufacturers for repairs, and owners of Class Computers have been submitting their claims for reimbursement.  Administration of replacement claims also is well under way.

The Brown Movants claim that Class Members lack an ability to have their computers repaired if they so choose because HP parts are "no longer sufficiently available for use as replacement parts."  The Brown Movants overlook two facts.  First, while HP may not have enough parts to repair all Class Computers under the settlement terms, this does not mean there are *no* parts outside the settlement context.  To the extent HP or other computer repair centers have parts, Class Members may pay for repairs if they prefer to keep their existing computers and then seek reimbursement through the Settlement.  Consumers who prefer their computers, including the Brown Movants, can still fix their computer free of charge.  The new computer relief available to Class Members here is even greater than the relief available in the *Lundell* settlement, where this Court found:

> The Settlement provides Class members 100% of their out-of-pocket expenses for certain qualifying repairs of the Dell Inspiron 5150 notebook computer and a new, limited one year extended warranty on the computers to cover qualifying repairs. The Court finds that these benefits to the Class are exceptional under the facts and circumstances of this case. Given the age and expected lifespan of the computers

at issue, it is particularly important that the Settlement provides relief now rather than after years of additional litigation.

*Lundell v. Dell, Inc.*, No. C 05-3970 JW/RS, 2006 U.S. Dist. LEXIS 90990, at *11 (N.D. Cal. Dec. 4, 2006).

Second, claims for reimbursement are not limited to repairs by HP. Under the Settlement Agreement, Class Members may seek repair at any number of third party repair shops, and still be reimbursed for the expense. Settlement Agreement ¶ 2.10.

The benefits of the Settlement in its current form are substantiated by the claims made and processed to date. As of March 4, 2011, with the claims window open until March 14, Class Members submitted claims for 18,942 replacements. Rosenthal Decl. ¶ 6. The 18,942 HP replacement claims submitted are over two thirds of the total claims submitted. A total of 28,355 claims were filed, meaning the HP replacement claims constitute approximately 70% of the total filed claims. These figures negate the Brown Movants' unsubstantiated argument that HP Class Members are not being placed on an equal footing with the Dell or Apple Class Members. This is particularly true considering HP owners constitute about 32% of the potential Settlement Class but account for approximately 70% of the claims. Horton Decl. ¶ 8.

The Brown Movants' speculation, without substantiating facts, about why Class Members are not submitting more replacement claims is not borne out by the overall rate of the claims themselves. Although the Apple and Dell claimants, and the cash reimbursement claimants, comprise a larger part of the noticed consumers, the replacement claims are coming in at a higher rate. In other words, the replacement computer options are clearly driving higher, not lower claims participation.

In sharp contrast to the over 18,000 requests by Class Members for replacements, Class Counsel received only 87 complaints regarding the Replacement Models. Of note, even including all complaints claimed by counsel for the Brown Movants, the total number of complaints appears to be less than 300. Laratro Decl. ¶ 11. This number includes the approximately 200 signatures on an internet "petition" that one of Mr. Frank's clients urged others to sign. But many of the "signatures" are not complaints at all, many are anonymous,

several are from outside the country and therefore unlikely to be from Class Members, and several are from owners of Dell or Apple machines. Indeed, one entry is from a Dell owner in Italy stating he would prefer the remedy afforded HP Class Members. *See Id.*, Ex. A, entry 132. Even were all 300 actual complaints, which they are not, this still represents only approximately 1% of the total claimants, and an even lower percentage of all noticed Class Members.

Of the 87 complaints received by Class Counsel regarding the Replacement Models, 18 relate to the originally inaccurately announced CQ50 as a replacement, and another 10 relate to the Asus which was originally provided as the sole replacement for the Tablet without any other option. Indeed, the majority of the complaints received — 52 of the 87 — were received before Class Counsel was apprised of, and corrected, the error on the Settlement Website to state that the replacement model for the Laptops would be the CQ56. The complaints further decreased when Class Counsel successfully negotiated for the option for Tablet owners to select either the Asus or the CQ56 as a replacement. Since that development was announced on February 16, Class Counsel received only 14 complaints regarding the replacement computers. Again, these figures pale in comparison to the over 18,000 HP owners who opted for a replacement computer. Finally, in contrast to these complaints, even as recently as March 3, Class Counsel was still receiving emails from HP owners not covered by the Settlement, who want to be included. Laratro Decl. ¶ 10.

### E.      The Intent Of The Parties Must Be Considered

As this Court stated in the *Facebook* case:

> California has a strong policy in favor of enforcing settlement agreements. *Osumi v. Sutton*, 151 Cal. App. 4th 1355, 1357 (2007). Under California law, a settlement agreement "must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." *Roden v. Bergen Brunswig Corp.*, 107 Cal. App. 4th 620, 625 (2003); *see* Cal. Civ. Code, § 1636.

*The Facebook, Inc. v. ConnectU, Inc.,* No. C 07-01389 JW (N.D. Cal. June 25, 2008) (order granting motion to enforce settlement agreement). Looking at this Settlement Agreement as a whole, the negotiations described above and the efforts taken by the parties to properly evaluate the Replacement Models, it is clear the Replacement Models satisfy the intent of Paragraph 2.6. The Replacement Models fulfill similar functions, and do so in a comparable or even better

1  fashion than their predecessors.  This is confirmed by Dr. Bagherzadeh's reports.  Further,

2  Replacement Models provide Class Members with a computer that, satisfies the class action

3  settlement standard of fair, reasonable and adequate.  This does not mean recreating each

4  individual feature of a Class Computer.  As Dr. Bagherzadeh noted, there must also be a

5  recognition that "the amount of computing in terms of Millions of Instructions Per Second

6  (MIPS) per dollar is constantly increasing, meaning every year computers are getting cheaper for

7  a given performance rating . . . this cost reduction per feature set should be considered when

8  comparing replacement units with originals, and it is not necessary to provide a replacement that

9  meets the originals' exact cost as long as the main features are generally comparable."  Tablet

10  Report at 4.

11        F.        **The Brown Movants' Proposed Relief Is Subjective And Arbitrary**

12        The Brown Movants' requested relief is wholly inappropriate.  As an initial matter, "[i]t

13  is not a district judge's job to dictate the terms of a class settlement; he should approve or

14  disapprove a proposed agreement as it is placed before him and should not take it upon himself

15  to modify its terms."  *Brooks v. Georgia State Bd. of Elections*, 59 F.3d 1114, 1120 (11th Cir.

16  1995) (quoting *In re Warner Commc'ns Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986)).  The Brown

17  Movants ignore this precept, asking this Court to rewrite the Settlement Agreement, by

18  mandatory injunction with [over] 27 new terms.  *See* Brown Movants' Proposed Order.

19        Further, the Brown Movants' requested relief is unsupported by their proffered

20  "evidence."  The Vlastone Report - by a lay person versed in home and car entertainment

21  installation — either does not mention the features sought by the Brown Movants, or fails to

22  consider them holistically.  For example, the Brown Movants demand both touch screens and

23  media remote controls, but the Vlastone Report mentions neither and, of note, the Asus is

24  equipped with a touch screen.  Tablet Report at 3.  The Vlastone Report highlights the

25  importance of WiFi-n capability but the CQ56, unlike the original Laptops, has 802.11n, "which

26  is a more advanced WiFi standard."  Laptop Report at 3.  Further, Vlastone raises the importance

27  of claimants being able to keep their hard drives but if HP Class Members ask, they are permitted

28  to remove their hard drives before shipping.  And, the Brown Movants fail to explain why the

1   remaining items of requested relief are "crucial," in light of Dr.  Bagherzadeh's extensive (and

2   learned) explanations to the contrary.  In short, the Brown Movants cherry-picked certain

3   features from a panoply of thousands of computers, and now claim to be dissatisfied with the

4   absence of these features in the Replacement Models, with no consideration of the off-setting

5   advantages from technological advancements, new computer features, and additional product

6   warranties.

7   **III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE**

8          The applicable standard for evaluating the Settlement, including the new Replacement

9   Models, is whether the Settlement is fair, reasonable and adequate.  *Officers for Justice v. Civil*

10  *Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

11  1026 (9th Cir. 1998); *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  In

12  determining the adequacy and reasonableness of a proposed settlement, where the settlement is

13  reached through arm's-length bargaining, where investigation is sufficient to allow counsel and

14  the Court to act intelligently, where counsel is experienced in similar litigation, and where the

15  percentage of objectors is small, the settlement is presumed to be fair.  *See In re Consol.*

16  *Pinnacle W. Sec. Litig.*, 51 F.3d 194, 197 n.6 (9th Cir. 1995); *Fulford v. Logitech, Inc.*, No. 08-

17  cv-02041 MC, 2010 U.S. Dist. LEXIS 29042, at *6 (N.D. Cal. Mar. 5, 2010).  This presumption

18  continues to be properly applied to the implementation of this Settlement.

19

20        **A.    Plaintiffs Undertook Significant Efforts to Vet the Suitability of the
              Replacement Models**

21         After Plaintiffs' expert reviewed the suitability of the Replacement Models, Class

22  Counsel engaged in further negotiations with NVIDIA in an effort to allow Tablet Class

23  Members to have a choice between the CQ56 and the Asus.  The discussions between Plaintiffs

24  and NVIDIA were rigorous.  Westerman Decl. ¶ 8.  The parties conducted the entire Settlement

25  negotiation process - including the discussions regarding the Replacement Models - at arm's

26  length and in an adversarial manner.  Contrary to Movants' speculation, there was no collusion.

27  Westerman Decl. ¶ 10; *see also* Decl. of the mediator, Hon. Layn Phillips (Dkt. 256-2).

28

### B. Experienced Counsel Recommend Approval of the Replacements

Significant weight is placed on the endorsement of a settlement by plaintiff's counsel. *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL Dkt. No. 901, 1992 U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992) (finding belief of counsel that the proposed settlement represented the most beneficial result for class compelling factor in approving settlement); *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (when the counsel recommending approval of the settlement are competent and experienced, significant weight may be given to their opinion). Here, experienced counsel negotiated the Settlement and the Replacement Models to timely benefit the Settlement Class.

Plaintiffs' goal throughout was to obtain a fix of the defective NVIDIA GPUs at issue and obtain the right for Settlement Class Members to seek reimbursement for out-of-pocket expenditures to fix the defect. Plaintiffs were successful in realizing these goals. Counsel has significant experience in complex class action litigation. *See* Westerman Declaration submitted for the final approval hearing. Dkt. 258. Where the Settlement and the choice of Replacement Models is the product of serious, informed, non-collusive negotiations after over two years of contentious litigation, the Court should attribute significant weight to the belief of experienced counsel, and their independent expert, that the implementation of this Settlement is in the best interest of the Class.

### C. The Class Members' Reaction to the Settlement Relief is Instructive

Over 26,000 Class Members already filed claims seeking relief under the Settlement. Of those, over 18,000 are awaiting a replacement computer. Compared to this response to the Settlement, only 87 unverified Class Members complained to Class Counsel about the Replacement Models. Laratro Decl. ¶ 8. That is to say, even including the total number of complaints claimed by the Brown Movants, approximately 1% of the Class Members complained about the Replacement Models. This is an infinitesimal percentage of Class Members, and a strong factor weighing in favor of this Settlement. *See, e.g., Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 U.S. Dist. LEXIS 86266, at *37-38 (N.D. Cal. Nov. 16, 2007) (finding "[t]he relatively low percentage of objectors weighs in favor of approval").

**D.     The Few Individual Complaints Confirm This Settlement Is Superior To Continued Litigation**

The Brown Movants' assertions regarding individual features of their computers allegedly not found in the Replacement Models demonstrate the risks in litigating these claims as a class. *See generally Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir. 1998) (whether a settlement is fair is determined by "a balancing of several factors which may include . . . the risk of maintaining class action status throughout the trial").  The question is not whether the Settlement provides Class Members everything they could hope to recover, but whether the Settlement is a fair, reasonable and adequate arm's length *compromise* of a dispute.  *See Browning*, 2007 U.S. Dist. LEXIS 86266, at *17 ("[S]ome objectors complain that they should get a full cash refund.  This is tantamount to complaining that the settlement should be 'better,' which is not a valid objection."); *Linney,* 151 F.3d at 1242 ("Appellants offer nothing more than speculation about what damages might have been won had they prevailed at trial. . . .  [I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement relief is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.") (internal quotations and citations omitted); *Hanlon*, 150 F.3d at 1027 ("[I]t is possible, as many of the objectors' affidavits imply, that the settlement could have been better.  But this possibility does not mean the settlement presented was not fair, reasonable or adequate. Settlement is the offspring of compromise.").  To adhere to the Brown Movants' whims and require the computer-by-computer analysis — for tens of thousands of Class Members - set forth in their Proposed Order is contrary to the very nature of a settlement.

This Settlement is fair, reasonable and adequate in all respects and should not be shut down by five individuals seeking specification by specification perfection in a replacement model, especially when the replacements are superior or equal in all material respects.  Many of the features the Brown Movants demand can be achieved through their purchase of inexpensive peripherals for features of individual significance to them.  For example, USB based Bluetooth is

1   available for under $10, as are camera units with better resolution than the original laptops.  *See*

2   Report # 3.  Many of the Brown Movants' other complaints are plainly irrelevant.  Firewire is a

3   technology falling out of favor with users because, for only 15% more speed, it increases the

4   costs of peripherals - many new laptops no longer use Firewire and, of note, it is now used

5   primarily in Apple computers, not PC's.  *Id.*  Likewise, the brand name of the laptop is in this

6   case irrelevant - HP and Compaq are the same company, and the same entity backing warranties.

7   The Brown Movants' complaint that they are receiving a Compaq instead of an HP is

8   immaterial.  *Id.*  The remainder of the Brown Movants' complaints can be attributed to the

9   march of time.  In short, the Settlement is fair, reasonable, and adequate.

10  **IV.    THE BROWN CLASS MOVANTS' COUNSEL IS NOT MOTIVATED TO
        PROTECT CLASS MEMBERS' INTEREST, BUT RATHER HIS SELF-
11      PROFESSED GOAL OF TORT REFORM**

12          Contrary to his representations that his actions are intended to benefit members of class

13  actions, Ted Frank, counsel for the Brown Movants, is motivated by a tort reform agenda.  How

14  else does one explain filing a mandatory preliminary injunction motion, without even mentioning

15  the legal standard, while aggressively blogging about this motion and seeking media attention.

16  There is greater concern about lay opinion than addressing the required legal standard with the

17  Court.    Frank   holds   himself   out   as   a   "leading   tort-reform   advocate."   *See*

18  http://centerforclassactionfairness.blogspot.com/ (quoting Peter Lattman, "Trial Lawyers Defend

19  Themselves While Taking on Terrorism", Wall Street Journal Law Blog, October 30, 2006,

20  available   at   http://blogs.wsj.com/law/   2006/10/30/trial-lawyers-defends-themselves-while-

21  taking-on-terrorism/).  Indeed, Frank reiterated his status as a "tort reform advocate" as recently

22  as March 1 of this year.  *See* http://www.pointoflaw.com/archives/2011/03/the-nvidia-clas.php.

23  While he is probably a fine tort reform advocate, seeking publicity for trying to shut down this

24  settlement is not in the interest of the Class.

25          Frank's status as a professional objector to class action settlements is well documented.

26  *See In re HP Inkjet Printer Litig.*, No. C-05-3580 JF (PVT) (N.D. Cal. filed Jan. 17, 2011),

27  Declaration of Niall P. McCarthy In Support of Plaintiffs' Motion For Final Approval of Class

28  Action Settlement, (Dkt. 272) at Ex. 3 (listing over 10 cases in which Ted Frank either objected,

himself, or represented an objector).  Simply stated, the missing injunctive legal analysis, the overly complex proposed order and the aggressive publicity seeking reveal that the goal is to play with this valuable settlement at the expense of Class Members who are in the process of obtaining their relief.

In stark contrast to the respected and independent Ph.D. in Electrical Engineering hired to evaluate the proposed Replacement Models, the Movants' counsel chose to rely upon Michael A. Vlastone.

Unlike Dr. Bagherzadeh, who earned a Ph.D. in Electrical Engineering from the University of Texas, Austin in 1987, and who has more than 20 years of experience in his field, Mr. Vlastone is unqualified to evaluate whether the proposed replacement computers are "of like or similar kind."  Vlastone lacks any advanced degree or educated experience evaluating computer systems.  Further, documents filed in the class action, *In re HP Laser Printer Litig.*, No. 07-0667 AG (RNBx) (C.D. Cal. filed June 6, 2007) (the "HP Printer Case"), reveal Vlastone was an objector.  In the Vlastone Report, Vlastone holds himself out as a "professional computer consultant" and "experienced technology advisor for class action litigation."  Vlastone Report at 1; *see also* Vlastone Report at 2 (describing Vlastone as a "highly qualified computer consultant with specific expertise in advising clients on budgeting for and selecting appropriate laptops").

When deposed as an objector in the HP Printer Case, Vlastone's testimony revealed that Vlastone is an installer of iPod based home entertainment systems.  Vlastone testified that he is self-employed by an entity named iShine.  *See* Deposition Transcript of Michael A. Vlastone dated January 25, 2011 ("Vlastone Tr."); Declaration of Gina Tufaro ¶ 5, Ex. A at 97.  According to Vlastone, "iShine is a multi-media environment based on Macintosh computers that enables a family to have access to a very media-rich environment . . .  Its sort of like a mega iPod you can say."  Vlastone Tr. at 97.  It does not appear that Vlastone advises individuals on which laptops to purchase, other than Apple Macintosh.  *See* www.ishine.com/code/about.htm (last visited March 2, 2011) (stating that Vlastone "design[s], build[s], deploy[s] and support[s] digital entertainment systems (DES) for residences and cars.")  Vlastone's "qualifications" stand in stark contrast to those of Dr. Bagherzadeh.  Bagherzadeh Decl., Ex. A.

In 2007, the first of the HP Printer Cases was filed.  Shortly after that action was filed, Vlastone approached plaintiffs' counsel in the HP Printer Case.  Vlastone Tr. at 25, 30, 34, 43-44.  During an in-person meeting with counsel, Vlastone informed counsel that he had a strategy that counsel had not advanced that would be beneficial to its prosecution of the HP Printer Case.  Vlastone Tr. at 76-78.  During that meeting, Vlastone also suggested that counsel purchase a building and that iShine operate as a tenant free of charge in that building.  Vlastone Tr. at 25, 30-32, 34, 43-44, 100.  Plaintiffs' counsel in the HP Printer Case informed the court that it interpreted Vlastone's purchase proposal as a request by Vlastone that counsel purchase the building in lieu of compensating Vlastone for the services that he would render as a consultant in the HP Printer Case.  Counsel rejected Vlastone's offer, because, as counsel represented to the court, counsel was troubled both by Vlastone's purported strategy, as well as the building purchase proposal.  *See* HP Printer Case, Plaintiff and Class Representative Kelsea Baggett's Separate Response to the Young and Vlastone Objections to the Class Action Settlements, Dkt. 232 at 4-5; *see also* Vlastone Tr. at 25, 30, 34, 43-44; *see also* Plaintiff and Class Representative Kelsea Baggett's Report on Investigation of Objector Michael A. Vlastone, Dkt. 238, at 2 (enumerating the many misrepresentations purportedly made by Vlastone during the course of the HP Printer Case, which were revealed by his deposition testimony).

It is clear that Vlastone is operating, here, not as an "expert," but someone with an agenda to repeatedly object to class settlements.  Vlastone's background and conduct render his motivations and opinion unreliable and raise further questions about his selection by Movants' counsel.

## V. THE BROWN MOVANTS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

The Brown Movants do not satisfy the requirements necessary to obtain injunctive relief.[5] A "'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (quoting 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948, at 129-30 (2d ed. 1995); *see also San Jose Entm't Grp. v. City of San Jose*, No. C 11-00207 JW, at 1 (N.D. Cal. Feb. 16, 2011) (order denying preliminary injunction). Far from making the requisite "clear showing," the motion makes absolutely no reference to elements for injunctive relief, even when it discusses the relief sought. *See* Motion at 18-19.

Before an injunction can issue, the Brown Movants must clearly establish four elements. *San Jose Entm't Grp.*, No. C 11-00207 JW at 1; *Alliance for the Wild Rockies v. Cottrel*l, No. 09-35756, 2011 U.S. App. LEXIS 1473, at *10 (9th Cir. Jan. 25, 2011). Nowhere do the Brown Movants mention — let alone apply — the four elements of injunctive relief to the facts of this case. The Brown Movants may not "sand bag" by raising for the first time and then addressing the specific injunction elements on reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.") (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)). Regardless, they cannot satisfy the requirements for injunctive relief.

### A. Likelihood of Irreparable Harm

The Brown Movants must "demonstrate a likelihood that absent the injunction," they "will be irreparably harmed" by continuation of the claims administration process. *See Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009). But the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Lydo*

---

[5] Of note, the Brown Movants are also not entitled to, nor make any showing for, the discovery they seek in their Notice of Motion.

*Enter., Inc. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); accord *Davoodi v. Imani*, No. C 11-0260 SBA, 2011 U.S. Dist. LEXIS 17758, at *19 (N.D. Cal. Feb. 9, 2011). Even were the Court to determine the Brown Movants are entitled to replacement models different from those currently available under the Settlement, the Brown Movants fail to show how "adequate compensatory or other corrective relief" will not be available to them. *See Lydo*, 745 F.2d at 1213. This alone prevents the Court from issuing the requested injunction. *See Alliance for the Wild Rockies*, 2011 U.S. App. LEXIS 1473, at *21 ("plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction").

There is no irreparable harm because, as demonstrated above, the replacement computers being offered satisfy the terms of the Settlement, and they are consistent with the applicable standard, *i.e.* that the Settlement be fair, reasonable, and adequate.

### B.   Likelihood of Success on the Merits

Nor do the Brown Movants demonstrate a likelihood of success on the merits of their motion: (i) Plaintiffs' qualified expert concluded that the Replacement Models comply with the requirements of the Settlement Agreement; (ii) the parties conferred in good faith and negotiated at contested arm's length to arrive at the Replacement Models; and (iii) as part of the Settlement as a whole, the Replacement Models are a "fair reasonable and adequate" component of the entire remedy. As detailed above, the Brown Movants fail to establish anything to the contrary in their motion. No "serious questions" on the merits are set forth in the moving papers. *See Alliance for the Wild Rockies*, 2011 U.S. App. LEXIS 1473, at *28. The Brown Movants are unable to show the Settlement, including the Replacement Models, is not fair, reasonable and adequate and, therefore, have no likelihood of success on the merits.

### C.   Balance of Hardships

"A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in his favor." *Maxim Integrated*, 654 F. Supp. 2d at 1036. In balancing hardships, the Court "will look to the possible harm that could befall the various parties." *Id.* Here, the balance of hardships militates strongly against enjoining the Settlement. An injunction would prevent

1    NVIDIA from shipping new Replacement Models to over 16,000 Class Members who filed

2    claims and after years of tolerating defective GPU's are awaiting receipt of a new computer.  It

3    would also undo the approximately $2 million spent by NVIDIA for the Class' benefit to get the

4    administration to this point.  It surely cannot be equitable for a few disgruntled Class Members to

5    stop Class relief which is in progress.  As this Court found in a similar settlement, "[g]iven the

6    age and expected lifespan of the computers at issue, it is particularly important that the

7    Settlement provides relief now rather than after years of additional litigation."  *Lundell*, 2006

8    U.S. Dist. LEXIS 90990, at *11.  The claimants are already retrieving their defective computers

9    and simply waiting for their replacement to arrive.  Delivery of the new computers should

10   proceed on schedule and not be delayed.

11       The reaction of Class Members as part of the standard for resolving the fairness,

12   reasonableness, and adequacy of a settlement is instructive here.  Over five million notices were

13   sent, over 28,000 claims were filed, and the Brown Movants indicate awareness of "dozens" of

14   persons that actively sought representation and "over a hundred" that were willing to sign

15   declarations.  Brown Motion at 7.  Class Counsel received 87 complaints about the replacement

16   computers, some of which were submitted by the Brown Movants and likely the same group of

17   "dozens" that the Brown Movants cite.  Of that number, 52 complained to Class Counsel about

18   the Laptops replacement before the correction from CQ50 to CQ56, and only 14 have

19   complained since the election between the CQ56 and the Asus for Tablet owners was announced.

20   Class Counsel's overall estimate of up to 300 total complaints — who are not necessarily Class

21   Members, or even objectors, thus likely overstates the negative reaction.

22       **D.    Public Interest**

23       Finally, the Court "must consider whether an injunction is in the public interest."  *Maxim*

24   *Integrated*, 654 F. Supp. 2d at 1036.  Again, in their moving papers, the Brown Movants make

25   no showing that the requested injunction is in any way in the public interest.  The failure to even

26   discuss this element, while seeking publicity, conclusively demonstrates this motion was filed for

27   someone's personal promotion, but not the public interest.  Because the Brown Movants made no

28

1   showing, let alone the requisite "clear showing," the Court should deny their request for

2   injunctive relief.

## VI.      CONCLUSION

Plaintiffs respectfully request that this Court deny the Brown Movants' motion.

DATED: March 4, 2011                          MILBERG LLP
                                              JEFF S. WESTERMAN
                                              SABRINA S. KIM
                                              NICOLE M. DUCKETT


                                      _____
                                              */s/ Jeff S. Westerman*
                                              JEFF S. WESTERMAN

                                              One California Plaza
                                              300 S. Grand Avenue, Suite 3900
                                              Los Angeles, CA  90071
                                              Telephone: (213) 617-1200
                                              Facsimile:  (213) 617-1975
                                              E-mail:  jwesterman@milberg.com
                                                 skim@milberg.com
                                                 nduckett@milberg.com

                                              MILBERG LLP
                                              PETER SAFIRSTEIN
                                              JENNIFER S. CZEISLER
                                              ROLAND RIGGS
                                              One Pennsylvania Plaza, 49th Floor
                                              New York, NY  10119
                                              Telephone: (212) 594-5300
                                              Facsimile:  (212) 868-1229
                                              E-mail:  psafirstein@milberg.com
                                                 jczeisler@milberg.com
                                                 rriggs@milberg.com

                                              Counsel for Plaintiff Todd Feinstein and
                                              Lead Class Counsel

                                              SHALOV STONE BONNER & ROCCO LLP
                                              RALPH M. STONE
                                              THOMAS G. CIARLONE, JR.
                                              485 Seventh Avenue
                                              Suite 1000
                                              New York, New York 10018
                                              Telephone: (212) 239-4340
                                              Facsimile:  (212) 239-4310
                                              E-mail:  rstone@lawssb.com
                                                 tciarlone@lawssb.com

                                              Counsel for Plaintiff Lance Waidzunas and
                                              Plaintiffs' Co-Counsel

HORWITZ HORWITZ & PARADIS
PAUL O. PARADIS
MICHAEL A. SCHWARTZ
GINA M. TUFARO
405 Lexington Avenue, 61st Floor
New York, NY  10174
Telephone: (212) 986-4500
Facsimile:  (212) 986-4501
E-mail:  pparadis@hhplawny.com
        mschwartz@hhplawny.com
        gtufaro@hhplawny.com

Counsel for Plaintiff Nathan DeBockler and
Plaintiffs' Co-Counsel

DOYLE LOWTHER LLP
WILLIAM J. DOYLE, II
JOHN A. LOWTHER, IV
9466 Black Mountain Road, Suite 210
San Diego, CA 92126
Telephone: (619) 573-1700
Facsimile:  (619) 573-1701
E-mail:  bill@doylelowther.com
        john@doylelowther.com

Counsel for Plaintiff John Russo and
Plaintiffs' Co-Counsel