MILBERG LLP
JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
SABRINA S. KIM (SBN 186242)
skim@milberg.com
NICOLE M. DUCKETT (SBN 198168
nduckett@milberg.com
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975

MILBERG LLP
PETER SAFIRSTEIN
psafirstein@milberg.com
JENNIFER S. CZEISLER
jczeisler@milberg.com
ROLAND RIGGS
rriggs@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY  10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

*Counsel for Plaintiff Todd Feinstein and
Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE NVIDIA GPU LITIGATION | ) Case No. C 08-4312 JW |
| | ) **CLASS ACTION** |
| | ) |
| This Document Relates To: | ) DECLARATION OF GINA M. TUFARO |
| | ) IN SUPPORT OF PLAINTIFFS' |
| | ) OPPOSITION TO BROWN MOVANTS' |
| ALL ACTIONS. | ) MOTION FOR PRELIMINARY |
| | ) INJUNCTION |
| | ) |
| | ) DATE:          March 28, 2011 |
| | ) TIME:          9:00 a.m. |
| | ) CTRM:         8, 4th Floor |
| | ) JUDGE:        Hon. James Ware |

| | | |
|---|---|---|
| DECL. OF GINA M. TUFARO IN SUPP. OF PLS.' OPP'N TO BROWN MOVANTS' MOT. FOR PRELIM. INJ. | | Case No. C 08-4312 JW |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE NVIDIA GPU LITIGATION

This Document Relates To:

ALL ACTIONS.

CLASS ACTION

Case No. C 08-4312 JW

**DECLARATION OF GINA M. TUFARO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO BROWN MOVANTS' MOTION FOR PRELIMINARY INJUNCTION**

I, Gina Tufaro, under penalty of perjury, hereby declare that the following is true and correct to the best of my knowledge and belief:

1.   I am a partner at the law firm of Horwitz, Horwitz & Paradis, Attorneys at Law, one of Plaintiffs' counsel in this litigation.

2.   I am over the age of 18 and am fully familiar with the facts and circumstances set forth herein and could competently testify thereto if called upon to do so.

3.   I am a citizen and resident of the State of New York.

4.   I submit this Declaration in support of Plaintiffs' Opposition To Brown Movants' Motion For Preliminary Injunction ("Plaintiffs' Opposition").

5.   In connection with Plaintiffs' Opposition, Plaintiffs have made reference to the deposition transcript of Michael A. Vlastone, dated January 25, 2011 (the "Vlastone Deposition Transcript"). The Vlastone Deposition Transcript was part of the court file for the case captioned, *In re HP Laser Printer Litigation*, CV 07-0667 AG (RNBx), and included as Exhibit A to Plaintiff and Class Representative Kelsea Baggett's Report of Investigation of Objector Michael A. Vlastone, dated February 7, 2011, Docket No. 238. The court file reflects that the Vlastone Deposition Transcript was authenticated by Joanne Balboni, CSR No. 10206.

///

///

1

**DECLARATION OF GINA M. TUFARO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO BROWN MOVANTSMOTION FOR PRELIMINARY INJUNCTION**

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct and that this declaration was executed on this 4th day of March,

3    2011 at New York, New York.

4                                                          Gina M. Tufaro

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                    2
         **DECLARATION OF GINA M. TUFARO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
                   BROWN MOVANTSMOTION FOR PRELIMINARY INJUNCTION**

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISRICT OF CALIFORNIA

3                    -   -   -

4     In re:  HP LASER PRINTER
      LITIGATION.                    No. SA CV 07-0667

5     _____)

6

7

8

9

10

11

12

13                DEPOSITION OF

14               MICHAEL VLASTONE

15           SAN FRANCISCO, CALIFORNIA

16          TUESDAY, JANUARY 25, 2011

17

18

19

20

21

22    Atkinson-Baker, Inc.
      Court Reporters
      (800) 288-3376

23    www.depo.com

24    REPORTED BY:  JOANNE BALBONI, CSR NO. 10206

25    FILE NO.:  A500C28

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                  -   -   -

4

5    In re:  HP LASER PRINTER
     LITIGATION.                    No. SA CV 07-0667

6

     _____)

7

8

9

10

11

12

13

14        Deposition of MICHAEL VLASTONE, taken on behalf

15    of Plaintiffs, at 50 Francisco Street, Suite 460, San

16    Francisco, California, commencing at 12:06 p.m.,

17    Tuesday, January 25, 2011, before Joanne Balboni, CSR

18    No. 10206.

19

20

21

22

23

24

25

```
 1      A P P E A R A N C E S :

 2


 3          FOR THE PLAINTIFFS:

 4          KABATECK, BROWN, KELLNER
            BY:  BRIAN S. KABATECK, ESQ.
 5          644 South Figueroa Street
            Los Angeles, California 90017
 6          (213) 217-5000

 7          FOR DEFENDANT HEWLETT-PACKARD COMPANY:

 8          MORGAN, LEWIS & BOCKIUS
            BY:  KRISTOFOR T. HENNING, ESQ.
 9          1701 Market Street
            Philadelphia, Pennsylvania 19103
10          (215) 963-5882

11          FOR THE WITNESS MICHAEL VLASTONE:

12          LAW OFFICES OF ANDREW ALEXANDER DOSA
            BY:  ANDREW ALEXANDER DOSA, ESQ.
13          1516 Oak Street, Suite 310
            Alameda, California 94501
14          (510) 865-1600

15          LAW OFFICES OF TIMOTHY P. RUMBERGER
            BY:  TIMOTHY P. RUMBERGER, ESQ.
16          2161 Shattuck Avenue, Suite 200
            Berkeley, California 94704
17          (510) 841-5500

18

19

20

21

22

23

24

25
```

3

```
 1                          I N D E X

 2     WITNESS:  MICHAEL VLASTONE

 3     Examination                                    Page

 4          By Mr. Kabateck                        6, 153

 5          By Mr. Henning                            101

 6     EXHIBITS
                            PLAINTIFFS'
 7     NUMBER             DESCRIPTION               PAGE

 8     1-      Document entitled "Notice of Deposition
               of Michael A. Vlastone"                  6
 9
       2-      Document entitled "Declarations by Lead
10             Plaintiff James C. Young, Request to
               Dismiss Current Designated Counsel,
11             Objection to Settlement, Appearance at
               Hearing"                                  7
12
       3-      Document entitled "Declaration of Kristen
13             Law Sagafi in Response to Objection by
               Michael Vlastone"                        36
14
       4-      Document entitled "Declarations by Class
15             Member Michael A. Vlastone, Objection to
               Settlement, Appearance at Hearing"       38
16
       5-      Document entitled "Declarations by Class
17             Member Michael A. Vlastone, Objection to
               Settlement, Appearance at Hearing"       48
18
       6-      Correspondence from Sheldon H. Jaffee to
19             the Honorable Andrew J. Guilford dated
               January 21, 2011                         57
20
       7-      Document entitled "Plaintiff's Response
21             to Order to Show Cause"                  64

22     8-      Correspondence from Michael Vlastone to
               Brian Kabateck, Darren Kaplan, Richard
23             Kellner, Alfredo Torrijos, dated
               Thursday, December 16, 2010              67
24

25
```

4

```
 1                          I N D E X

 2        (Continued):

 3        EXHIBITS
                              PLAINTIFFS'
 4        NUMBER                                        PAGE

 5        9-     Correspondence from Michael Vlastone to
                 Richard Kellner, Darren Kaplan, Alfredo
 6               Torrijos, dated Friday, December 24, 2010   75

 7        10-    Correspondence from Michael Vlastone to
                 Richard Kellner dated Monday, December
 8               27, 2010                                    82

 9        11-    Correspondence from Michael Vlastone to
                 Ted Frank dated Tuesday, January 4, 2011    95

10

11        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12                         PAGE   LINE
                           143     6
13

14        TRANSCRIPT REQUESTED TO BE MARKED:

15                         PAGE   LINE
                            57     17
16                         130     12

17

18

19

20

21

22

23

24

25
```

```
 1                    MICHAEL VLASTONE,

 2              having first been duly sworn, was

 3             examined and testified as follows:

 4                         EXAMINATION

 5    BY MR. KABATECK:

 6         Q.  Would you state and spell your full name for

 7    the record, please?

 8         A.  It's Michael Vlastone.  The spelling is V, as

 9    in Victor, -l-a-s-t-o-n-e.

10         MR. KABATECK:  Okay.  Let's go ahead and mark

11    this as Exhibit 1, please.

12             (Plaintiffs' Exhibit 1 marked.)

13    BY MR. KABATECK:

14         Q.  I'll hand you what's been marked as Exhibit 1

15    to this deposition, which is the notice of the

16    deposition, along with the subpoena that compelled you

17    to be here today.

18             Do you understand, sir, that you are under oath

19    and obligated to tell the truth?

20         A.  Yes, I do.

21         Q.  Okay.  Good.  What date did you first contact

22    Jim Young?

23         A.  I contacted James Young on January 31st.  Yes,

24    January 31st.

25         Q.  You are sure it's January 31st?
```

```
 1        A.  The reason I paused is, he did not respond to

 2   my first e-mail when I contacted him through e-mail, and

 3   then I was able to track down his phone number from the

 4   fax signature.  And when I called, he did answer the

 5   phone call, and we had a conversation.  The conversation

 6   was on the 31st --

 7        MR. DOSA:  You answered the question.

 8   BY MR. KABATECK:

 9        Q.  The 31st of January?

10        A.  December.  Sorry about that.

11        MR. KABATECK:  Let's mark as Exhibit 2 a

12   declaration by lead plaintiff James C. Young, please.

13        (Plaintiffs' Exhibit 2 marked.)

14   BY MR. KABATECK:

15        Q.  I'll show you the document that's been marked

16   as Exhibit 2, the declaration of Mr. Young.

17        It's true, sir, you prepared this for Mr.

18   Young, correct?

19        A.  Yes.

20        Q.  Okay.  So let's start at the beginning of this

21   document.  It states "Statement of Integrity."

22        What's a statement of integrity?

23        A.  The intention was for Mr. Young or -- his

24   intention was to recount that he had not been

25   manipulated in any way to provide information in that
```

1    statement, that he is doing it of his own free will, and

2    everything in there is going to be accurate.

3        Q.  And you created the concept "Statement of

4    Integrity," correct?

5        A.  That is correct.

6        Q.  And if you just look at paragraph 3 of this

7    declaration, you wrote for Mr. Young in that paragraph

8    --

9        A.  I'm sorry, sir.  The pages are out of sequence.

10       Q.  Paragraph 3.

11           MR. DOSA:  There is no page 2.

12           MR. KABATECK:  Why don't you hand me the

13   document back so I can take a look and see if the other

14   pages are in there.  The other pages appear to be there.

15           THE WITNESS:  I'm sorry?

16           MR. KABATECK:  The other pages do appear to be

17   there, and I withdraw the previous question that I had.

18       Q.  Let me ask you to go to the end of Exhibit 2.

19   There is a letter written by or signed by someone with

20   the name James Young.  Do you see that letter in front

21   of you?

22       A.  Yes, I do.

23       Q.  And it's true, sir, you wrote that letter for

24   Mr. Young as well?

25       A.  It is true that, yeah, I typed it up.

```
 1          Q.  Okay.

 2          A.  M-hm.

 3          Q.  Did you see Mr. Young sign this?

 4          A.  Yes.  We've been in regular contact.

 5          Q.  You actually saw him sign it?

 6          A.  No.  I said I've been in regular contact with

 7     him.

 8          Q.  That wasn't my question.

 9              My question was:  Did you see him sign it?  Yes

10     or no?

11          A.  No.  I did not see him sign it.

12          Q.  Have you visited Harrisburg, Pennsylvania, to

13     meet Mr. Young?

14          A.  No, I have not.

15          Q.  How many times have you spoken to Mr. Young

16     since the 31st of December?

17          A.  At least 20 times.

18          Q.  20.  And you initially found him by doing some

19     sort of internet search; is that correct?

20          A.  That is correct.

21          Q.  Okay.  Is Mr. Young planning to come to the

22     hearing on Monday the 31st?

23          A.  I cannot answer that question.  I do not know.

24     I --

25          Q.  We -- I'm sorry.  Go ahead.  Finish your
```

```
 1      answer.
 2               MR. DOSA:  I think you've answered the
 3      question.
 4               THE WITNESS:  Yeah.
 5      BY MR. KABATECK:
 6         Q.  Have you asked him to come to the hearing?
 7         A.  Not -- I have asked him to make himself
 8      available, to appear electronically at the hearing using
 9      Skype conferencing because he cannot afford to fly to
10      California.
11         Q.  Okay.  Do you know if he is going to make
12      himself available by video conferencing to appear at the
13      hearing?
14         A.  I have every reason to believe that he will.
15         Q.  Do you know if that technology is available in
16      the courtroom?
17         A.  No, I don't.  That's on my list of things to
18      check this week.
19         Q.  Okay.  Now, you wrote a letter to counsel on
20      Mr. Young's behalf not to contact him, correct?
21         A.  Mr. Young did not want to be bothered.  That
22      was one of his concerns.  He said, "I do not want him to
23      bother me and contact me."  I said, "Okay.  I'll include
24      that in the letter."
25         Q.  Well, it's very important to you to be open and
```

```
 1      forthright and things like that, correct?
 2          A.  Yes, absolutely.  That's why --
 3          Q.  So did you tell Mr. Young -- let me finish my
 4      question first, sir, before you start to answer.  I
 5      promise if at any time I don't let you finish your
 6      answer, you tell me.  I'll stop talking so you can
 7      finish your answer.  Okay?
 8          A.  Certainly.
 9          Q.  It's important, you believe, for people to be
10      open and forthcoming?
11          A.  Yes, absolutely.
12          Q.  So did you recommend to Mr. Young words to the
13      effect, "You should talk to the lawyers.  You should get
14      their version of what happened"?
15          A.  I did not say that.
16          Q.  Okay.  Let's go back to the declaration now.
17              Now, when you were talking to Mr. Young --
18          A.  M-hm.
19          Q.  -- before you prepared the declaration that he
20      signed, did you talk to Mr. Young about the Sutherland
21      case that's pending in the State of California?
22          A.  That was, in fact, the purpose of my phone call
23      to him originally, which was to find out if he knows
24      about it.  And then if he doesn't know about it, to
25      inform him about it.
```

```
 1              Q.  So the answer is yes?

 2              A.  Yes.

 3                  MR. DOSA:  One moment.

 4                  (Discussion off the record.)

 5     BY MR. KABATECK:

 6              Q.  Did you need to amend or correct your answer

 7     also?

 8              A.  No, not at all.

 9              Q.  When you were talking to Mr. Young about the

10     Sutherland case, did you explain to Mr. Young that the

11     Sutherland case is a case pending in the Superior Court

12     of the State of California?

13              A.  I did.

14              Q.  Did you tell Mr. Young that because he wasn't a

15     resident of the State of California, the Sutherland case

16     could not affect him?

17              A.  That is correct.

18              Q.  You did tell that?

19              A.  Yes, sir.

20              Q.  What was his reaction to that?

21              A.  I explained to Mr. Young that if he were to

22     make the revelations to the court that he made to me

23     with regards to him not having been aware of what the

24     settlement would lead to, that if he made those

25     declarations, and the settlement was scuttled, it would
```

1     mean that he would not be rewarded.  He would lose the

2     1,000-dollar reward, you know, as the lead plaintiff,

3     and he should consider that in making his decision.  His

4     response was --

5             MR. DOSA:  He just asked you what you told him.

6             THE WITNESS:  Right.  So I guess that's --

7     BY MR. KABATECK:

8        Q.  Did you explain to Mr. Young by virtue of the

9     fact that him not being a resident of the State of

10    California, a California class action called the

11    Sutherland case, the one you are talking about, couldn't

12    bring him any relief?  Did you tell him that?

13       A.  Absolutely.

14       Q.  And he was fine with that?

15       A.  He was fine with that because he felt the

16    relief was worthless.

17       Q.  And instead he told you that he'd rather have

18    the Sutherland case pursued on his behalf?

19       A.  Not on his behalf, but on behalf of all the

20    consumers.  I did tell him that it was my belief that if

21    we succeeded with the Sutherland case, Hewlett-Packard

22    would have no option but to universally correct their

23    firm and stop the terrible practice that they were

24    engaging in affecting all the consumers in the United

25    States, although, you know, it's an issue of question,

1    you know, whether people outside of California would

2    receive any compensation, but I was sure that --

3            MR. DOSA:  I think you answered the question,

4    which was, what was Mr. Young's response?

5            THE WITNESS:  Okay.

6    BY MR. KABATECK:

7        Q.  Mr. Vlastone, you certainly knew --

8        A.  Mr. Vlastone.  There is no "d" in there.

9        Q.  Okay.  You knew at the time that the Sutherland

10   case only can affect California consumers, which is

11   approximately 12 to 14 percent of the country, correct?

12   You knew that?

13       A.  I knew that, yes.

14       Q.  Okay.

15       A.  Yes.

16       Q.  Now, when you talked to Mr. Young, he writes

17   here on page 3, paragraph 9, that he received a phone

18   call from Michael Vlastone, a founder and director of

19   the Integrity Capitalism Network.

20            Did you tell him in the phone call, Mr.

21   Vlastone, the Integrity Capitalism Network isn't a

22   corporation?

23       A.  Yes, I did.

24       Q.  Did you say it's not a business organization of

25   any kind?

```
 1          A.  That is correct.

 2          Q.  You said it's just something you've created?

 3          A.  Exactly.

 4          Q.  So it's not a legal entity at all, and you

 5     disclosed that to him?

 6          A.  I made sure to disclose that to him.

 7          Q.  And you explained that to him?

 8          A.  Yes, absolutely.  I also explained that I

 9     intend for it to become a legal entity, but we lack the

10     funding to do so.

11          Q.  Did you tell Mr. Young that you were going to

12     try to get him a lawyer to represent him?

13          A.  Yes, I did.  And I referred him to two

14     different lawyers.

15          Q.  Right.  You referred him to one of the lawyers

16     here in the room today, Mr. Rumberger --

17              MR. RUMBERGER:  Rumberger.

18     BY MR. KABATECK:

19          Q.  -- right?  And Mr. Rumberger declined to

20     represent him?  You understand he declined to represent

21     him?

22          A.  Yes.  That's correct.

23          Q.  You also referred him to a lawyer on the East

24     Coast by the name of Theodore Frank; is that right?

25          A.  Correct.
```

1      Q.  You also referred him to a California lawyer by

2   the name of Reece Halpern?

3      A.  That is correct.

4      Q.  Do you know if Mr. Young and Mr. Halpern ever

5   spoke?

6      A.  Yes, I do.

7      Q.  How do you know that?

8      A.  Because both of them had followed up with a

9   phone call with me after they had spent about two hours

10  on the phone.

11     Q.  What did Mr. Halpern tell you when he called

12  you?

13     A.  Mr. Halpern told me that he had gone over the

14  declaration that Mr. Young had asked me to assist him

15  with preparing.  He had gone over every little detail,

16  that they did come across a number of items that were

17  inaccurate and needed to be corrected, which I proceeded

18  to correct.

19     Q.  Before it was filed?

20     A.  Before, exactly.  Before it was sent for final

21  review by Mr. Young.

22     Q.  And you also talked to Mr. Young about Theodore

23  Frank?

24     A.  That is correct.

25     Q.  And you learned that Theodore Frank was

1    associated with something called the Center for Class

2    Action Fairness?

3         A.  That is correct.

4         Q.  Now, did you tell Mr. Young that the Center for

5    Class Action Fairness also isn't a legal business entity

6    of any kind?

7         A.  I actually never discussed any of that.  I

8    simply referred him.  I stated that Ted Frank works pro

9    bono on behalf of consumers that are affected in class

10   action lawsuits and that he has given me some very good

11   advice.  I found him through the internet as well.  I

12   thought he was really a great guy, and Mr. Young should

13   try to talk to him and see if he might get some help

14   from him.

15        Q.  Mr. Vlastone, you are an experienced internet

16   researcher, right?

17        A.  Yes.

18        Q.  And you spend a lot of time on the --

19        A.  I do.

20        Q.  -- internet?

21        A.  Yeah.

22        Q.  So surely you went in and you investigated this

23   Center for Class Action Fairness before you had a

24   conversation with Mr. Young, didn't you?

25        A.  I most certainly did, but it did not come up in

1    the conversation with Mr. Young.  It was irrelevant, I

2    felt.

3          Q.  Well, did you think it was relevant to tell Mr.

4    Young that the Center for Class Action Fairness is

5    funded by a conservative think tank?

6          A.  I do not recall exactly.

7          Q.  Did you tell him that Mr. Frank receives

8    funding for his cause from pharmaceutical corporations?

9          A.  I was not aware of that myself, nor did I

10   communicate that to Mr. Young.

11         Q.  Did you tell Mr. Young that one of Mr. Frank's

12   mission statements is effectively a platform of tort

13   reform?

14         A.  No.  I did not tell him that.

15         Q.  Why didn't you tell him that?

16         A.  Why would I tell him that?

17         Q.  Do you have a general concept of what tort

18   reform is, sir?

19         A.  I think people have different opinions as to

20   what tort reform is.

21         Q.  No, I don't think so.  My question is:  Do you

22   have a general understanding of what it is?

23              MR. DOSA:  Okay.  We are going to take a break.

24   Let's go outside.

25              MR. KABATECK:  Okay.

```
 1                    (Recess.)

 2              MR. KABATECK:  Was there a question pending?

 3              (Record read.)

 4              MR. DOSA:  So he's asked you a question, and

 5    you haven't answer it yet.

 6              THE WITNESS:  Right.

 7              MR. DOSA:  So the question is:  Do you have a

 8    general impression of what tort reform is?  Do you, or

 9    do you not?

10              THE WITNESS:  I should say that I'm not fully

11    knowledgeable about that issue.  I have some idea, but

12    I'm not thoroughly knowledgeable about it.

13    BY MR. KABATECK:

14         Q.  Well, before you talked to Mr. Young in

15    preparation of this declaration of his, did you have an

16    understanding that Mr. Frank had an agenda, at least in

17    part, to try to limit class actions?

18         A.  My understanding of Mr. Frank's agenda is that

19    he wants to bring integrity to the conduct of class

20    action.  His opinions may be very different than mine as

21    to how to accomplish that.

22         Q.  Well, have you ever formed the opinion that Mr.

23    Frank is opposed to class actions?

24         A.  Not at all.

25         Q.  That the entity he works for is opposed to
```

1 class actions?

2   A. I came to a conclusion that Mr. Frank opposes

3 the manner in which a class action is conducted, and I

4 have the same opinion as him, having encountered --

5 having learned about it over the last three years.

6   Q. In your conversations with Mr. Frank, did Mr.

7 Frank ever tell you that he was on a personal crusade

8 against the Kabateck firm?  Yes or no?

9   A. No.

10   Q. Did Mr. Frank tell you that Mr. Kellner had

11 written an op-ed piece in a legal newspaper in

12 California, and since that time, Mr. Frank had been on a

13 crusade against the Kabateck firm?

14   A. No.

15   Q. Did he ever tell you about an op-ed Mr. Kellner

16 had written about it?

17   A. No.

18   Q. Did it trouble you at any time to learn that

19 Mr. Frank was receiving his financing from corporate

20 entities?

21   A. No.

22   Q. Okay.  Now, if you go to page 12 of the

23 declaration paragraph, paragraph L -- tell me when you

24 are there.

25   A. M-hm.

1    Q.  Do you have that in front of you, sir?

2    A.  Yes.

3    Q.  Okay.  You talked to Mr. Young about what you

4  refer to here as a "world renowned Stanford University

5  professor Dr. Phil Zimbardo," correct?

6    A.  Yes, I did.

7    Q.  Did you tell Mr. Young that Dr. Zimbardo was

8  not a scientist at Stanford?

9    A.  You just made a false statement.

10   Q.  Okay.  I'll withdraw the question and ask you a

11  different question now.

12   A.  Sure.

13   Q.  Did you tell Mr. Young that Dr. Zimbardo was a

14  professor of psychology at Stanford?

15   A.  I most certainly did.

16   Q.  Did you tell him that he may have been in the

17  social science department, but he wasn't in the

18  mechanical science department?

19   A.  Oh, yeah.

20   Q.  You told him that?

21   A.  Oh, yeah.

22   Q.  And you told him that Dr. Zimbardo had no

23  formal training in the science related to printers or

24  laser printers?

25   A.  To make it simpler, I'll tell you that I

```
 1      explained to Mr. Young --
 2           Q.  Well, I don't want to make it simpler.  I just
 3      want you to answer my question.
 4           A.  Okay.  Mr. Zimbardo is trained in the
 5      scientific method and in the conduct of experiments
 6      regardless of what field they apply to.  It's a general
 7      skill that you acquire by becoming a scientist.  He
 8      certainly does not have specialization in mechanical
 9      engineering.
10           Q.  Well, he doesn't have specialization in any of
11      the sciences that relate to the printers that are the
12      subject of this litigation, does he?
13           A.  What's relevant to --
14                MR. DOSA:  Hang on.  The question is -- I'm
15      sorry.
16                MR. KABATECK:  You want it read back?
17                MR. DOSA:  Yes.
18                (Record read.)
19                THE WITNESS:  Oh, yes, he does.
20      BY MR. KABATECK:
21           Q.  What's that?
22           A.  It's how organizations become corrupted such
23      that engineers or lawyers or managers begin to engage
24      themselves in developing technologies and marketing
25      materials that are deceptive.
```

1          Q.  But that's not the science of the printer.

2     Let's make it very simple for you, Mr. Vlastone.  I want

3     to make it very easy.  The way the printer operates --

4          This Dr. Zimbardo, he doesn't have any special

5     training in the way the printer operates, right?

6          A.  No, he does not.

7          Q.  So did you think it was at all deceptive when

8     you write a document that's going to appear with the

9     court that refers to -- I'll just quote it -- "Finally,

10    I've just learned that Sutherland versus HP is supported

11    by a scientific yield delivery study endorsed by a well

12    renown Stanford University professor, Dr. Phil Zimbardo,

13    that provides empirical proof of the alleged HP yield

14    frauds"?  Do you think that's a deceptive statement?

15         A.  Not in the least.

16         Q.  Okay.  Now, in your conversations with Mr.

17    Young, a word that you continuously use, Mr. Vlastone,

18    is "integrity"?

19         A.  Yes.

20         Q.  You also talk about openness and frankness?

21         A.  That's right.

22         Q.  Did you at any time tell Mr. Young, you know,

23    "Mr. Young, I think you should at least have a

24    conversation with these lawyers"?  Did you tell him

25    that?

```
 1              A.  I did not tell him that.

 2              Q.  Actually, what you did is, you discouraged him

 3         from having conversations with the lawyers, didn't you?

 4              A.  I did not.

 5              Q.  You told him not to speak to the lawyers?

 6              A.  I simply told him that if he does not wish to

 7         talk to you, he doesn't have to.

 8              Q.  Did you say in response to that, "but we can

 9         have a conversation with the lawyers.  All of us

10         together can have a conversation with the lawyers to

11         talk about this"?

12              A.  No.

13              Q.  Because that's not in your interest, is it?

14              MR. DOSA:  Well, I think the question is

15         argumentative.  If you understand the question, you can

16         answer it.  Do you understand the question?

17              THE WITNESS:  It seems like a little bit of a

18         trick question.

19              MR. KABATECK:  Would you read the question back

20         to the witness, please?

21              (Record read.)

22              THE WITNESS:  It did not occur to me that you

23         would be willing to do that.  If it had occurred to me

24         that you'd be willing to do that, I would have probably

25         suggested it.
```

```
 1     BY MR. KABATECK:

 2         Q.  Well, I'm not going to quarrel with you, Mr.

 3     Vlastone, but you repeatedly asked for and had

 4     conversations with the lawyers in this case, correct?

 5     The lawyers in this case.  Not the Sutherland case, but

 6     in this case.

 7         A.  Yes.

 8         Q.  Has anyone ever turned you down for a request

 9     to have a conversation?

10         A.  Yes.

11         Q.  Who?

12         A.  When the results of the study first started

13     trickling in, I called Mr. Kaplan and asked him to give

14     me a call.  He promised to give me a call and never did.

15     Myself and Mr. Berko reached, I believe -- I can never

16     pronounce his name -- Torrijos -- is that his name?

17         Q.  Torrijos.

18         A.  Torrijos.  I apologize.

19             -- and invited him to start a discussion about

20     the issues again that was kind of scuttled.

21         Q.  Okay.  You actually came to the Kabateck firm

22     in Los Angeles in September of 2008?

23         A.  That is correct.

24         Q.  At that time how many hours did the lawyers

25     there spend with you going over your theories?
```

1   A. I believe we spent about two and a half hours.

2   Q. During that conversation, was anyone there in

3 any way disrespectful to you?

4   A. There was no outward disrespect. However, I

5 believe that my work at the time was not taken seriously

6 by the people involved at your firm.

7   Q. Isn't it true, sir, at that time you asked the

8 lawyers present to help purchase a building in San

9 Francisco for the iShine Foundation?

10   A. That is completely false.

11   Q. You didn't have materials with you that day to

12 show a building that you wanted the lawyers to help you

13 purchase?

14   A. There was a conversation about the building,

15 but the context was completely different than what you

16 are claiming.

17   Q. Well, you showed the lawyers some marketing

18 materials for a particular building you wanted to

19 acquire, correct?

20   A. I suggested that your firm should acquire that

21 building.

22   MR. DOSA: Wait. The question was: Did you go

23 there with materials? I think that's the question?

24   MR. KABATECK: Yes.

25   THE WITNESS: Yes.

1          MR. DOSA:  So did you go there with materials?

2     That's the question.

3          THE WITNESS:  Yes, absolutely.

4     BY MR. KABATECK:

5          Q.  And then you were saying that the suggestion

6     was made that the Kabateck firm acquire the building --

7          A.  Yes.

8          Q.  -- purchase the building?

9          A.  Yes.

10         Q.  And iShine would become one of the tenants?

11         A.  Yes.

12         Q.  The idea was that iShine could operate that way

13    in a building, helping to develop additional ideas about

14    other corporations who were engaged, in addition to HP,

15    in fraud abuse?

16         A.  In --

17         MR. DOSA:  Before you answer that, I believe

18    that all the communications between Mr. Vlastone and

19    your firm at that time were attorney-client privilege.

20         MR. KABATECK:  How in the world could that ever

21    be?

22         THE WITNESS:  I specifically asked for that in

23    the e-mail.

24         MR. DOSA:  Hang on, hang on.  He was a member

25    of the class.  So you were representing him, correct?

1     That's the first thing.  The second thing is that he

2     communicated that he understood or desired that the

3     communications be understood to be attorney-client

4     privileged because you were counsel, and he was a client

5     discussing the lawsuit and issues related thereto.

6         MR. KABATECK:  So it's undoubtedly one of the

7     most bizarre circumstances I've ever faced in my career,

8     are you instructing him not to answer the question?

9         MR. DOSA:  Actually, I'll start off by saying

10    -- I want to put on the table and say that I believe

11    there's attorney-client privilege issues that are raised

12    by your questions about communications between him and

13    you because, again, they were communications about the

14    lawsuit.  I believe that they would be -- at some level,

15    they are attorney-client privilege.  There is an e-mail

16    that I saw where he requested that specifically, the

17    operative framework for the communication.  So if that's

18    true, then I would be instructing him not to answer.

19        MR. KABATECK:  And you don't think that he's

20    put these communications directly into issue by raising

21    scurrilous allegations about my firm, about me, about

22    lawyers that work for me, about my co-counsel, that he's

23    put those into issue and waived the privilege, if

24    there's one?  I'm not even agreeing there is a

25    privilege.

1            MR. DOSA:  I will offer this:  That the problem

2    is that I've only just come in here.  So I haven't seen

3    communications from him to you or communications by him

4    -- actually I should say communications by him to others

5    related to his conflict with you.  If you want to show

6    them to me -- if you want to take a break and show them

7    to me, then I may change my thought, but I am not aware

8    of that.

9            MR. KABATECK:  You haven't seen the documents

10   that he's filed with the court?

11           MR. DOSA:  I haven't seen that.  I haven't had

12   time.

13           MR. KABATECK:  Well, I'll be happy to show them

14   to you then.  You can take a look at what he said.  Let

15   me just ask some foundational matters.

16           MR. DOSA:  All right.

17   BY MR. KABATECK:

18      Q.  Mr. Vlastone, you've raised --

19      A.  There is no D in there.  The last name is

20   Vlastone.

21      Q.  Do you hear a D?

22           MR. DOSA:  Don't worry about it.  It's all

23   right.

24           THE WITNESS:  You write it in your e-mails.

25   All your e-mails to me have a D in them.  That's why I'm

1 correcting you for the record.

2   MR. KABATECK:  Well, whatever.

3  Q.  You have brought up to the court the fact that

4 you came in and met with us in September of 2008?

5  A.  That is correct.

6  Q.  Okay.  You've also on several occasions, either

7 your own documents that you filed with the court or

8 documents that you've written for Mr. Young, referred to

9 the lawyers in this case from the Kabateck firm, Mr.

10 Kaplan, other lawyers, as engaging in unethical conduct,

11 correct?

12  A.  That's correct.

13  Q.  And you refer to the communications that you've

14 had with my firm, with members of my firm, with lawyers

15 in my firm, right?

16  A.  Yes.

17  Q.  At any time have you instructed the court or

18 told the court that you thought that communications

19 between us were subject to the attorney-client

20 privilege?

21  A.  I have not made that communication to the

22 court.

23  Q.  When you talked about the September 2008

24 meeting in my office, you didn't refer to the court or

25 to anyone as that being attorney-client privileged

1    communications?

2        A.  No, I have not.

3        Q.  In fact, what you wanted to do is relate to the

4    court that there was a meeting and that you did impart

5    upon us your knowledge and a demonstration of the

6    printer issues in this case, right?  I mean, you told

7    the court that?

8        A.  But that has nothing to do with --

9            MR. DOSA:  Remember, the question is:  Did you

10   do that, or did you not do that?  All right.  You'll

11   answer the question.  Then he can ask the next question.

12   We'll go from there.

13           THE WITNESS:  Would you repeat the question?

14           (Record read.)

15           THE WITNESS:  That is correct as it pertains to

16   the printer issues.

17   BY MR. KABATECK:

18       Q.  Isn't it true that in this meeting in September

19   of 2008, at the same time as the rest of the meeting,

20   that you've explained to the court, you discussed the

21   building in San Francisco?

22       A.  That was a completely separate agenda from the

23   lawsuit, a completely separate agenda.  I came there

24   with multiple --

25           MR. DOSA:  Hang on.  Remember, the question is

31

1       that you discussed that.

2               THE WITNESS:  Yes.

3               MR. DOSA:  All right.  With that, I'm taking a

4       break.  Bear with me.

5               MR. KABATECK:  Okay.

6               THE WITNESS:  Do you want me to follow?

7               MR. DOSA:  Yes, please.

8               (Recess.)

9               (Discussion off the record.)

10              MR. KABATECK:  Off the record, we've had a

11      discussion about this, and I think the general consensus

12      is that the matters that I've asked questions so far

13      have not invaded the attorney-client privilege.

14              MR. DOSA:  I think that's fair.

15      BY MR. KABATECK:

16         Q.  Okay.  The last couple of questions I have

17      about this, Mr. Vlastone, we are simply talking about a

18      meeting that took place in September of 2008 at the

19      Kabateck office, correct?

20         A.  Yes.

21         Q.  At that meeting, one of the topics discussed

22      was whether or not the Kabateck firm would purchase a

23      building in San Francisco?

24         A.  Yes.

25         Q.  Another topic that was talked about was whether

1    or not the iShine Foundation would become a tenant?

2        A.  Yes.

3        Q.  Other than that, you also indicated, while we

4    were off the record, that after you left my office, you

5    went to go see Tom Gerardi from the --

6        A.  Correct.

7        Q.  -- Gerardi firm?

8        A.  Yes.

9        Q.  And you made a similar proposal to him?

10       A.  Correct.

11       Q.  Okay.  And then you visited somebody in San

12   Francisco?

13       A.  Yes.

14       Q.  Who did you visit?

15       A.  I visited Lieff Cabreser, and I spoke with

16   Fabrice Vincent.  We have had two long meetings.

17       Q.  About the same topics?

18       A.  Yes.  And also about the HP case.

19       Q.  Did you intend there to be an attorney-client

20   relationship with that person?

21       A.  There were aspects of that that there would be

22   an attorney-client privilege, which is our seeking

23   advice on how to appropriately form relationships with

24   law firms.  Anything else related to the HP case, I

25   think should be up for grabs, if you want to talk about

```
 1     that.
 2          Q.  Who was the person that you talked to at -- can
 3     you spell it for the record?
 4          A.  Fabrice Vincent.
 5          Q.  Can you spell it for the record?
 6          A.  F-a-b-r-i-c-e.  The last name is Vincent.  If
 7     I'm not mistaken it's V-i-n-c-e-n-t.
 8          Q.  When did you speak to Fabrice about the HP
 9     litigation?
10          A.  It would have been the second or third week of
11     September of 2008, after I came back from Los Angeles.
12     You guys made it clear that you were not interested.  So
13     -- I answered your question.
14          Q.  Okay.  What did you tell Fabrice about the
15     litigation?
16          A.  I told him about the work that I had done on
17     researching it.  I told him about the meeting you and I
18     had had.  Specifically, I only spoke about the issues as
19     they relate to your legal theories, specifically
20     focusing on the leftover toner as opposed to focusing on
21     the foundation of the yield promise that was made to the
22     consumers.
23          I expressed my belief that your law firm will
24     fail in the litigation that you are pursuing, that very
25     likely the lawsuit will be tossed out of court, and that
```

1    consumers will be left unprotected.  I requested Lieff

2    Cabreser to consider taking the case and taking over the

3    representation of Martha Sutherland from Berko.

4         Q.  And they turned you down?

5         A.  They turned me down specifically because they

6    felt that you guys are very competent, and consumers are

7    already well protected by your representation.  They

8    said, "Michael, these guys, they nailed Epson.  I think

9    they are pretty competent to go after HP."

10        Q.  Were you surprised later when you learned that

11   that very law firm did get involved in this litigation?

12        A.  I was pretty shocked, yes.

13        Q.  At some point in time, did you speak to a

14   lawyer named Carlton (sic)?

15        A.  Yes, I did.

16        Q.  When did you speak to Jim Carlton?

17        A.  I don't remember the exact date, but I believe

18   it was either before I was started running the yield

19   study, or right after I started getting the results from

20   the study.  So this would have been either the end of

21   December 2009 or early January 2010.

22        Q.  Did I mispronounce his name, too?  I said

23   Carlton.  You said Calton?

24        A.  Calton.  There is no R in there.

25             MR. KABATECK:  Let's mark as the next exhibit a

```
 1     declaration.

 2              (Plaintiffs' Exhibit 3 marked.)

 3     BY MR. KABATECK:

 4         Q.  Exhibit 3 is a declaration of Kristen Law

 5     Sagafi.  It's executed January 7, 2011.

 6              Do you have that document in front of you, sir?

 7         A.  No, I don't.

 8         Q.  That's because I have it.

 9         A.  You have it.

10         Q.  Do you have that in front you?

11         A.  Yes, I do.

12         Q.  Have you seen this before?

13         A.  Yes, I have.

14         Q.  You've read it before?

15         A.  Yes, I have.

16         Q.  Did you disagree with it?

17         A.  Give me a second to review it.

18              (Pause in proceedings.)

19              THE WITNESS:  I would like to volunteer a

20     clarification, if I may.  I may have vis-a-vis the

21     declaration of Kristen Law -- having read it, it

22     occurred to me that I may have confused a communication

23     about Kristen Law that I received from Mr. Calton.  I

24     attributed it to things that she said because basically

25     Mr. Calton quoted her.  So in my mind, it may have
```

```
 1      formed a recollection that she said that to me directly.

 2      She claims that we hadn't had a phone conversation.

 3              I know we definitely exchanged e-mails.  It

 4      might be very true that I did not talk to her, but

 5      simply Mr. Calton quoted to me the content of his

 6      immediate phone conversation with Ms. Law.

 7      BY MR. KABATECK:

 8          Q.  And this involves a question of whether or not

 9      --

10          A.  They lost the cartridges.

11          Q.  You've got to let me finish the question.

12          A.  Sorry.

13          Q.  Otherwise, it doesn't --

14          A.  I apologize.

15          Q.  You are still doing it.  When two of us talk,

16      it doesn't appear clear in the record.

17              Have you ever read a transcript before of a

18      deposition?

19          A.  Yes.

20          Q.  It will look disjointed.  So let me make sure

21      that I have this clear, which is the question of whether

22      or not the Lieff Cabraser firm and Ms. Law Sagafi had

23      lost some physical evidence, correct?

24          A.  Correct.

25          Q.  After you read the e-mail exchange between Mr.
```

1    Calton and Ms. Law, did you then formulate a different

2    opinion of what potentially happened?

3         A.  No.  My opinion remains that Ms. Law had

4    misplaced the cartridges.  That's my opinion.  I do not

5    know that for a fact.

6         Q.  But read the e-mails that were attached to

7    this?

8         A.  Yes.

9         Q.  In the e-mails here, Ms. Law says, "You never

10   sent them to me."  Do you think she's just lying?

11        A.  No.  What I saw in the e-mails that she says,

12   "I'm not sure if I had received them or not.  I thought

13   I had received them."  Mr. Calton related to me that he

14   is absolutely sure that he sent them.  There is no

15   question in his mind that he sent those cartridges.  So

16   --

17             MR. DOSA:  You answered the question.

18             MR. KABATECK:  There is no question pending.

19             MR. DOSA:  Yeah.

20             MR. KABATECK:  Let's mark as Exhibit 4 the

21   e-mail from Mr. Vlastone to, it looks like, the class

22   action administrator, Mr. Kellner, Mr. Khenning, and

23   others with his objections.

24             (Plaintiffs' Exhibit 4 marked.)

25   BY MR. KABATECK:

```
 1          Q.  So just confirm for me that's the e-mails and

 2     e-mail you sent to the class action administrator with

 3     your objection, correct?

 4          A.  Yes.  That is correct.

 5          Q.  The next page starts the objection?

 6          A.  Yes.

 7          Q.  Okay.  At the very bottom of the next page, you

 8     see the footer there that says, "Declaration and

 9     Objection of James C. Young."  Now, this isn't the

10     declaration of Mr. Young, is it?

11          A.  That is correct.

12          Q.  It's your declaration?

13          A.  Yes.

14          Q.  And you made that mistake because after you did

15     and prepared Mr. Young's declaration, you prepared your

16     own?

17          A.  They were being prepared concurrently actually.

18     I neglected and used a wrong template file, and I

19     notified the court of my mistake as soon as I became

20     aware of it and sent corrections to everybody.

21          Q.  Well, in fact, large sections of your

22     declaration are not just merely close to Mr. Young's,

23     they are identical, correct?

24          A.  That is correct.

25          Q.  So you drafted both, then cut and pasted, and
```

1    made your modifications?

2        A.  That is correct.

3        Q.  When you drafted your declaration, Mr.

4    Vlastone, it was your intention to be fair and honest

5    and accurate, correct?

6        A.  Yes --

7        Q.  You didn't want to mislead the court in any

8    way, shape, or form?

9        A.  -- absolutely.

10       Q.  Did you intentionally fail to disclose to the

11    court that the class action pending in California was a

12    California only class action?

13       A.  Well, I don't think I failed to disclose that

14    to the court.

15       Q.  Did you anywhere in here indicate to the court

16    that it only would affect citizens of the State of

17    California?

18       A.  I did not indicate that.  I thought the court

19    would know that automatically.

20       Q.  Again, you refer to Mr. Zimbardo, but it wasn't

21    your intent to mislead the court by indicating that Dr.

22    Zimbardo was a psychologist?

23       A.  I never made that indication.

24       Q.  You never told the court that he was a 40-year

25    professor of psychology at Stanford, right?

1    A.  He is a professor of social psychology at

2    Stanford, not a psychologist.

3    Q.  I'm sure there is a difference --

4    A.  Big difference.

5    Q.  -- but you didn't mention either of those

6    issues to the court?

7    A.  Nor were they relevant.

8    Q.  In your mind?

9    A.  Yes.

10   Q.  And then you tell the court -- I'm on the

11   fourth page of the declaration, and we'll call it line

12   21 and a half.  Do you have that?

13       You say, "Sutherland case is on track to obtain

14   comprehensive injunctive relief that will fully protect

15   consumers," and it goes on from there, correct?

16   A.  Yes.

17   Q.  Did you intend to deceive the court into

18   believing that the Sutherland case was actually awaiting

19   a demurrer?  It hadn't even gotten out of the pleading

20   stage?

21   A.  I certainly have no intentions of deceiving

22   anybody.

23   Q.  Well, you say, "the case is on track," and yet

24   the case hadn't even finished the very fundamental

25   pleading stages of the case yet.

```
 1            A.  Very interesting you should ask that because

 2       one of the reasons that it had sat and waited is because

 3       Mr. Kaplan had -- at the end of our meeting, he had

 4       insisted that the Sutherland case should wait.  He said,

 5       "Michael, we want to own this litigation."  That's the

 6       words that he used.  "We don't want less competent

 7       attorneys interfering and creating a mess out of it and,

 8       God forbid, taking bullshit coupon settlements."

 9            I said, "Don't worry.  We will honor that.  We

10       will not interfere.  You know, the Epson case looks like

11       a tremendous victory.  We'll sit tight," and then we

12       moved forward only after you guys lost everything.

13            Q.  That's nice, but the question I was asking you

14       was:  When you told the court that the "Sutherland case

15       is on track to obtain comprehensive injunctive relief,"

16       you didn't intend to deceive the court?

17            A.  Of course not.

18            Q.  But you didn't tell the court that it hadn't

19       even survived the initial round of attacks on the

20       pleadings, correct?  Yes or no?

21            A.  Yes.

22            Q.  Did you think that it was a foregone conclusion

23       that the case would get out of the pleading stage?

24            A.  Yes --

25            Q.  Had anything happened in the case --
```

```
1        A.  -- based on the rulings of all the judges.
2   Sorry.
3            MR. DOSA:  All right.
4            THE WITNESS:  I'm sorry.
5   BY MR. KABATECK:
6        Q.  Had anything happened on the case, other than
7   filing a first amended complaint with Mr. Berko, Mr.
8   Rumberger coming into it and filing a second amended
9   complaint?  Had anything other than that happened in the
10  case?
11       A.  It couldn't because it was blocked by your
12  settlement.
13       Q.  How was the case on track then to obtain
14  comprehensive injunctive relief?
15       A.  It will be a long explanation.  Are you
16  prepared to hear it?
17           Because HP testified to the court that
18  Hewlett-Packard had indeed advertised yield promises to
19  consumers, and Hewlett-Packard's counsel believes that
20  Hewlett-Packard is fully answerable for those promises.
21  That's on record.
22           The settlement litigation, unlike your
23  litigation, was based entirely on yield from the very
24  beginning contrary to the statements made in your
25  opposition statements.  Even the original complaint at
```

1    its foundation said that Hewlett-Packard fails to

2    deliver promised yields, and all the allegations are

3    based on that.

4            We have conducted a scientific study that --

5    let me correct myself.  We had first collected ad hoc

6    data from many consumers that shows that Hewlett-Packard

7    fails to deliver the promised yields.  We had then

8    conducted a study that proves that empirically.  Anybody

9    else can use the model for the study that we created to

10   repeat that study.  Hewlett-Packard can do that.  News

11   organizations can do that.  You can do that.  You will

12   see that indeed HP consistently fails to deliver

13   promised yields based on common and normal printing

14   conditions.

15           And given what HP had already testified to and

16   assured the court on one hand, and the evidence that we

17   have been able to uncover that anybody can replicate, I

18   do believe that it is a foregone conclusion that the

19   Sutherland case will succeed.

20       Q.  Let's turn to the next page in your

21   declaration, please.

22           Just to be sure, I just want to make sure it's

23   crystal clear in the record.  It was absolutely your

24   intent to be honest and forthright --

25       A.  Yes.

```
 1          Q.  -- with the court?

 2          A.  Yes.

 3          Q.  With the court?

 4          A.  Yes.

 5          Q.  Then in paragraph 11, page 5 of Exhibit 4, you

 6     refer to the fact that you understand that Mr. Young is

 7     providing a declaration for this court that will fully

 8     reveal the disturbing truth about his experiences.  You

 9     write that --

10          A.  M-hm.

11          Q.  -- correct?

12          A.  Yes.

13          Q.  And you understood that because you were

14     writing it at the same time?

15          A.  I was putting in writing what Mr. Young had

16     communicated to me orally, and he had asked for my

17     assistance to prepare that document.

18          Q.  But I want to make sure that it's perfectly

19     clear, sir, that when you say you understand he is going

20     to provide a declaration, you know he is going to

21     provide a declaration because you are writing it for him

22     --

23          A.  That's exactly what I just said.

24          Q.  Let me finish my question.

25              -- and you intend to file it, right?
```

1    A.  Yes.

2    Q.  Okay.  So why is it that nowhere in your

3    declaration -- and you filed it twice -- do you tell the

4    court, "I'm writing this declaration for Mr. Young.  I'm

5    preparing it.  I'm going to get it filed"?  You don't

6    say that at all.  Why?

7    A.  I believe -- allow me to correct you.  Where is

8    Mr. Young's declaration?

9    Q.  No.  I'm not asking about Mr. Young's

10   declaration, Mr. Vlastone.  I'm asking you.

11       In your declaration, you don't tell the court

12   in here at all that you are drafting this declaration,

13   that you are writing it, that you've written a letter to

14   the lawyers.  You don't tell the court at all, do you?

15   A.  I do believe that was -- at least with regard

16   to filing it, it was disclosed in Mr. Young's -- it says

17   right there in the proof of service that I'm going to do

18   that on his behalf.

19   Q.  Mr. Vlastone, I believe I'm not very

20   articulate, and I apologize for that.  I'm just trying

21   to ask you where in your declaration --

22   A.  You have multiple questions.  So the answer to

23   the first question is as to whether or not I was --

24       MR. DOSA:  Hang on.

25       THE WITNESS:  The answer is it's disclosed.

46

1      MR. DOSA:  Hang on.  If it's multiple

2  questions, then he'll start over, and he'll ask you one

3  at a time.  The question is:  Where in your declaration

4  did you tell the court that you were drafting Mr.

5  Young's declaration?  Whatever it is.  I don't want to

6  put words in your mouth.

7      MR. KABATECK:  That's fine.

8      THE WITNESS:  I disclosed that in the letter of

9  correction that was e-mailed and sent the second day.

10  It says it right there.  I disclosed the fact that I

11  used the same template in Microsoft Word.  That's why

12  the mistake had crept in.  I think it's entirely obvious

13  what was going on, and there's no --

14  BY MR. KABATECK:

15      Q.  Mr. Vlastone, without answering a question with

16  300 words, can you just answer yes or no?

17      A.  I disclosed it.

18      Q.  Can you let me finish my question, sir?  Can

19  you do that, please?

20      A.  Yes.

21      Q.  Can you tell me where in the declaration you

22  filed with the court right here that's marked as

23  Exhibit 4 that goes on for 28 paragraphs and 14 pages --

24      A.  It's not in there.

25      Q.  Okay.  Let me finish and make sure it's clear.

1          You don't once in this document say to the

2     court, "I prepared the declaration for Mr. Young"?

3          A.  I did not know that I was supposed to do that.

4     If I knew that, I would have done that immediately.

5          Q.  Did you think that's something the court might

6     want to know?

7          A.  I thought that that would come up during the --

8     that would immediately come up during, you know, our

9     appearance.

10         Q.  How would that come up in an appearance, sir?

11         A.  Look, I'm not a lawyer.  All right?  And if I

12    did not do something perfectly right, you know, to your

13    standard, I certainly -- there is no intent to deceive

14    anybody whatsoever.

15         MR. KABATECK:  Let's mark as Exhibit 5 the

16    correction e-mail of January 5th, 2011, with the

17    attached declaration.

18         (Plaintiffs' Exhibit 5 marked.)

19    BY MR. KABATECK:

20         Q.  This is the document that you filed with the

21    court?

22         A.  No.  It was a longer letter that I wrote to the

23    court.  The electronic one is a short one.  The printed

24    page was much longer and actually intended to describe

25    more specifically what had happened.

1      Q.  So the document that is in front of you here is

2   or is not an e-mail that you prepared?

3      A.  It is an e-mail that I prepared.

4      Q.  And it's the entirety of that e-mail?

5      A.  It's the entirety of that e-mail, but what --

6      Q.  Yes or no?

7      A.  Yes, it is.

8      Q.  Okay.  Did you send privately a letter to the

9   judge that wasn't copied to the other parties disclosing

10  the fact that you were preparing Mr. Young's declaration

11  for him?  Yes or no?

12     A.  Not privately to the judge.  It was addressed

13  to the clerk of the court.

14     Q.  Where is it?  Do you have it with you today?

15     A.  I do not have it with me today.  I figured that

16  you guys would have gotten it because I anticipated that

17  would get posted in the electronic record, and it would

18  be accessible.

19     Q.  So there is a letter out there that you sent to

20  the clerk of the court that clearly and unequivocally

21  indicates that you prepared Mr. Young's declaration for

22  him?

23     A.  I believe so.  Without having it in front of me

24  -- I would really like to have it in front of me.

25     Q.  Well, this is a few days ago.  I mean, today is

```
 1        the 25th of January, and --

 2             A.  It was on the 5th.

 3             Q.  The 5th.  So it was 20 days ago.  So certainly

 4        you remember if a letter like that exists.

 5             A.  My recollection is that I specifically

 6        disclosed that I had used the same template file.  And

 7        as a result of that, I failed to correct the header.

 8             Q.  Well, this actual letter that you wrote to the

 9        administrator got copied to Mr. Kellner.  I'll just read

10        the paragraph.  "I would like to recall the PDF file

11        previously submitted within the stipulated deadline due

12        to an error caused by the failure to update the footer

13        label of a shared template file, which might cause

14        confusion in handling documents by the parties, and I

15        request to substitute it with a corrected PDF file."

16             A.  Correct.

17             Q.  You would agree that this does not adequately

18        disclose to anybody that you wrote the Young

19        declaration?

20             A.  Yes.

21             Q.  And you'd agree with me, sir, that that's a

22        significant fact that you think the judge should know,

23        that you wrote the Young declaration?

24             A.  Absolutely.

25             Q.  When you contacted Mr. Young for the first time
```

1      at the end of 2010, you told Mr. Young right out of the

2      gate that you thought the lawyers in this case had acted

3      unethically and unlawfully?

4           A.  No.

5           Q.  Did you know that Mr. Young was an older man?

6           A.  Are you talking about Mr. Young was an older

7      man?

8           Q.  Yes.

9           A.  What do you mean by "older"?

10          Q.  Elderly.

11          A.  Specifically?

12          Q.  I don't know.  What does that word mean to you?

13          A.  Over 75.

14          Q.  Were you concerned at all that you were riling

15     Mr. Young up?

16          A.  Maybe you are confusing it with Mr. Baggett.

17          Q.  No, I'm not.  I'm asking you about Mr. Young.

18     Were you concerned at any time --

19          A.  No.  He sounded youthful and healthy and

20     perfectly strong.  He sounds great.

21          Q.  Let's go with Mr. Baggett.  You called him on

22     the phone as well?

23          A.  Correct.

24          Q.  You found his number and called him on the

25     phone?

```
 1          A.  Yes.

 2          Q.  Now, up until that point, you had been

 3     exchanging e-mails with Mr. Kellner, Mr. Torrijos, and

 4     Mr. Kaplan?

 5          A.  Yes.

 6          Q.  And you didn't tell anybody associated with the

 7     class counsel in this case that you were planning to do

 8     that?

 9          A.  That is correct.

10          Q.  You did that surreptitiously?

11          A.  Yes.

12          Q.  Okay.  And you contacted -- do you know what

13     that word means?

14          A.  I just realized I don't know what that word

15     means.

16          Q.  Secretly.

17          A.  It was not my intention to do it secretly at

18     all.  I thought you would find out about it, you know,

19     immediately.

20          Q.  Well, eventually, right?  Eventually the

21     lawyers would find out about it.

22          A.  I did not --

23          Q.  Why didn't you feel, sir, that it was

24     appropriate to contact the lawyers and say, "I'd like to

25     have a conversation with Mr. Baggett.  I'd like to have
```

1    a conversation with Mr. Young"?

2        A.  Two reasons.  Number one:  I did not trust you

3    at that point anymore.  Number two:  I did not feel that

4    that was in any way required or appropriate.  I felt

5    that as a member of the class, I have every right to

6    talk to other members of the class, particularly the

7    lead plaintiffs.

8        Q.  Well, you said you didn't trust us at that

9    point.  Isn't one of the reasons you didn't trust us at

10   that point because you didn't believe that the lawyers

11   who represented this class were listening to you?

12       A.  Oh, I believe you guys were listening to me.

13       Q.  But not following your advice and instructions?

14       A.  It was not a matter of not following my advice

15   or instructions.  I think it's having a very different

16   agenda.

17       Q.  Well --

18       A.  Specifically, my agenda being to protect the

19   consumers, and your agenda is to wrap this up and clean

20   it up, the mess that's been left behind.

21       Q.  Mr. Vlastone, what had happened at that point

22   in time is that you had several conversations by e-mail

23   and by telephone with the lawyers representing the

24   class, correct?

25       A.  Yes.

1          Q.  And your concept and idea had been rejected,

2     correct?

3          A.  Yes --

4          Q.  Let me withdraw that.

5          A.  -- absolutely.

6          Q.  All right.  And that made you mad?

7          A.  No.

8          Q.  Well, it frustrated you, didn't it?

9          A.  No.

10         Q.  Your response though after the concepts had

11    been rejected was to secretly call Mr. Young and

12    secretly call Mr. Baggett?

13         A.  Not secretly.  I called them openly.  There is

14    nothing secret about my phone call.

15         Q.  You didn't tell the lawyers, right?

16         A.  I did not feel it was appropriate to tell you

17    at that point.

18         Q.  Right, because you wanted to have a private

19    conversation with them to shop your agenda and your case

20    and your theory to them without being influenced by the

21    lawyers.  True?

22         A.  Yes.

23         Q.  Okay.  So when you got Mr. Baggett on the

24    phone, he didn't have much time for you, did he?

25         A.  Actually, as a matter of fact, he did.  We had

```
 1      a very long and interesting conversation --

 2           Q.  There is no question pending.

 3           A.  Okay.

 4           Q.  Would it surprise you to know that he has not

 5      had a heart attack?

 6           A.  It would.

 7           Q.  So when you wrote this down to the court, and

 8      you reported to the court that he had a number of heart

 9      attacks, and his days were numbered, and he was going to

10      die soon, that's truthful, honest, and accurate

11      information based on what he told you?

12           A.  That is exactly what he told me.

13           Q.  Okay.  So you must have been floored when you

14      got his declaration?

15           A.  I'm sorry.  Whose declaration.

16           Q.  Mr. Baggett's declaration.

17           A.  I was surprised, yes.  It contradicted my

18      conversation with him?

19           Q.  Did you just become convinced at that point in

20      time, Mr. Vlastone, that the lawyers, who you thought

21      were unethical, engaging in illegal conduct, had also

22      gotten Mr. Baggett to sign something?

23           A.  As a matter of fact, I did.

24           Q.  Because you are convinced that the lawyers in

25      this case are just up to no good?
```

1     A.  Not quite.  I saw that the facts contained in

2    that declaration contradicted the facts of what had

3    happened.  There were also a number of opinions in

4    there, and I believe that people are entitled to their

5    opinions.  You know, we all have different agendas, and

6    that results in different opinions.  However, when

7    people started substituting facts, that is unethical in

8    my view.

9     Q.  Why don't you turn to page 10 of this

10   declaration?

11     A.  Which one?

12     Q.  Of your declaration.

13     A.  Okay.

14     MR. DOSA:  Again, this is the new and improved

15   --

16     MR. KABATECK:  I'm actually referring to

17   Exhibit 4.

18     Q.  My understanding is that there is no difference

19   between the two, right?  You didn't change anything?

20     A.  No.  I did not change anything other than

21   fixing the footer.

22     Q.  Now, starting with paragraph 22 of your

23   declaration, you refer to efforts to contact the

24   attorney general of the State of California?

25     A.  Correct.

1          Q.  And you refer there to talking to them and

2     speaking to someone named Frances Grunder?

3          A.  Correct.

4          Q.  And that they wanted to work with you, correct?

5          A.  Correct.

6          MR. KABATECK:  Okay.  So let's mark as Exhibit

7     6 a letter to Judge Guilford dated January 21st, 2011.

8          (Plaintiffs' Exhibit 6 marked.)

9     BY MR. KABATECK:

10         Q.  Did you receive this letter, sir?

11         A.  Yes, I did.

12         Q.  So just like seeing Mr. Baggett's declaration,

13    did this floor you?

14         A.  Not at all.

15         Q.  Did you agree with the statements made in this

16    letter?

17         A.  I had received a subsequent phone call very

18    shortly after getting that letter from Albert Shelden

19    who explained to me the context of that letter.  That

20    is, regardless of what is actually going on, the policy

21    of the attorney general is to not comment on ongoing

22    investigations.  He told me that they hadn't explained

23    that to me.  I probably should not have written what I

24    had written, but it was not a big deal, not to worry

25    about it.  This is a formality.  He said, "Michael, do

1    not be offended by that letter."

2           MR. KABATECK:  Would you mark this part of the

3    transcript, please?

4           THE COURT REPORTER:  Yes.

5    BY MR. KABATECK:

6       Q.  You said someone named Albert Shelden.  Did you

7    mean Sheldon Jaffe?

8       A.  No.  Albert Shelden.

9       Q.  Would you spell that for the record, please?

10      A.  Albert, A-l-b-e-r-t.  Shelden, it's a different

11   spelling than the other gentleman.  I wish I could

12   remember.  I believe there's an "a" in there.  I believe

13   it's S-h-e-l-d-a-n.  So Shelden would be the last name

14   as opposed to the first name.  Mr. Sheldon Jaffee, the

15   first name is Sheldon.  The last name is Jaffee.  Albert

16   Shelden, the first name is Albert.  Shelden is the last

17   name.

18      Q.  How do you spell the last name?

19      A.  Do you mind if I look it up in my phone?

20      Q.  Sure.

21          (Pause in proceedings.)

22          THE WITNESS:  It's spelled S-h-e-l-d-e-n.

23   BY MR. KABATECK:

24      Q.  Did he tell you his role was -- let me back up.

25   I withdraw the question.  Let me ask you a different

1    question.

2          A.  Sure.

3          Q.  Who did he say he was?

4          A.  Mr. Shelden is the senior official at the

5    California State Attorney General in charge of consumer

6    fraud investigations.

7          Q.  Had you talked to him before this phone call

8    that he made to you?

9          A.  Yes.

10          Q.  How many times?

11          A.  Four times.

12          Q.  Where is he located?

13          A.  He is located in San Diego.

14          Q.  Okay.  What did he tell you?  Did he tell you

15    anything about the status of their investigation?

16          A.  He has told me that their policy is not to

17    comment on ongoing investigations, number one.  Number

18    two, if I was questioned during a deposition, I may go

19    ahead and tell you guys that there is an internal

20    investigation being launched, and there's a whole team

21    of people being assigned to it.

22          Q.  Did he tell you anything else you could or

23    couldn't say during today's deposition?

24          A.  No.  He said I can say anything that -- you

25    know, they would not limit me in any way as to what I

1      can say.

2          Q.  Did you ask him why his office wasn't objecting

3      to the settlement?

4          A.  I didn't have to ask him.  He volunteered that

5      information.

6          Q.  What did he tell you?

7          A.  That for them to do that, they have to complete

8      their initial investigation and get authorization from

9      Kamala Harris to do so.

10         Q.  To do what?

11         A.  To file an objection.

12         Q.  Well, it's too late to file an objection.

13         A.  Oh.

14         Q.  So did you tell him, you know, "What are you

15      going to do?  What's your plan?"

16         A.  I certainly did.

17         Q.  What did he say?

18         A.  He explained to me that the attorney general's

19      office has the ability to get objections in front of the

20      court despite the deadlines.

21         Q.  Did he tell you they had some special

22      dispensation?

23         A.  No.  Just procedural law in California.

24         Q.  Well, the case isn't in California.  It's in

25      federal court.

1          So did he tell you in federal court, there was

2     some special rule that gave the California attorney

3     general --

4          A.  No.  We did not --

5          Q.  Let me finish my question.

6          A.  All right.

7          Q.  When he said that, you just took him at his

8     word?

9          A.  Yes.

10         Q.  Okay.  Do you expect that he is going to appear

11    in court on Monday in the hearing?

12         A.  No.

13         Q.  So is it your understanding that if the court

14    approves the settlement on Monday, the attorney general

15    can still come in and object after the fact?

16         A.  No.

17         Q.  Okay.  Mr. Vlastone, let me ask you this

18    question.  It's a slightly different topic.

19         What is your hope here that the case go on

20    appeal in the 9th Circuit?  Well, let me back up and ask

21    you a different question, what we call a foundational

22    question.

23         You understand that Judge Guilford had already

24    granted summary judgement to dismiss the case?

25         A.  Yes.

1     Q.  And you are objecting to the settlement, and

2    you want Judge Guilford to deny class certification,

3    class settlement, approval, correct?

4     A.  Yes.

5     Q.  So at that point in time, would your

6    anticipation be that the case would then return to the

7    9th Circuit for an appeal?

8     A.  You are asking me attorney questions.

9     Q.  No.  I'm asking you as an objector, what the

10   future holds for the Baggett, Young case, the federal

11   court HP case.

12     What is your position as an objector that it

13   holds?

14     A.  If your firm was to choose to go forward and

15   try to appeal it, you might.  Quite frankly, I think it

16   would be futile to do so based on the work that you have

17   done so far in that case.  I believe that the settlement

18   case would go forward and would result in the ending of

19   this ongoing fraud.

20     Q.  In California?

21     A.  No.  Globally.

22     Q.  Did you contemplate what would happen if the

23   9th Circuit made a ruling adverse to the Baggett, Young

24   case?

25     A.  Affecting what?  I'm sorry.

1        Q.  I'm just asking you.  There is not necessarily

2    a right or a wrong answer.

3        Did you consider what would happen if the 9th

4    Circuit validated Judge Guilford's ruling on dismissal

5    of the Baggett and the Young case?  I mean, maybe your

6    answer is you didn't consider it.  It's okay.  That's a

7    fine answer.  There is no right or wrong answer here.

8        A.  The only thing I considered is I believe that

9    the Baggett and the Young cases as they proceeded were

10    based on a completely flawed legal theory that had

11    absolutely no chance of succeeding because it did not

12    refer to actual promises made by Hewlett-Packard to

13    consumers.  What would happen to its future at this

14    point is really of no concern.

15        What is of concern to me is the settlement case

16    being able to proceed and to protect consumers and for

17    HHP to stop the fraud that they are engaging in.

18        Q.  So we can all stipulate that I'm incompetent.

19    I understand that.  Beyond my incompetence, I'm not

20    asking you, you know, to evaluate my extremely high

21    degree of incompetence.

22        A.  I answered the question the best way I can.

23        Q.  What I'm asking you, Mr. Vlastone, is:  Did

24    you?  The answer may be, no, you didn't.

25        Did you contemplate what would happen if the

```
 1        9th Circuit agreed with Judge Guilford?

 2        A.   There would be nothing left of the Baggett and

 3   Young cases, yes.

 4        Q.   Did you consider how that would or would not

 5   affect the Sutherland case?

 6        A.   It would not adversely affect the Sutherland

 7   case.

 8        Q.   Why?

 9        A.   Because the Sutherland case is based on a

10   completely different legal -- as a matter of a factual

11   foundation, than the Baggett and Young cases.

12        Q.   Completely different?

13        A.   For legal purposes, yes.

14             MR. KABATECK:   Okay.   Let's mark as Exhibit 7

15   "Plaintiff's response to order to show cause" filed on

16   September 11, 2009, in the Superior Court in California.

17             (Plaintiffs' Exhibit 7 marked.)

18   BY MR. KABATECK:

19        Q.   Mr. Vlastone, the document that I marked and

20   put in front of you as Exhibit 7, I believe, was a

21   response at one time that was filed by Mr. Berko.

22             Have you seen this before?

23        A.   Yes.

24        Q.   Did you agree with the statements in there

25   about some similar issues and certain facts being
```

1    similar in the Sutherland case as to the Baggett case?

2        A.  Yes.

3        Q.  Okay.  Now, you've said you had a number of

4    telephone conversations with Mr. Young in the last 20

5    days.  In fact, I think you said you've had about 20?

6        A.  Yes.

7        Q.  So you talk to him about every day?

8        A.  No.

9        Q.  So some days you talk to him more than once?

10       A.  Yes.

11       Q.  What is the general gist of those conversations

12   about?

13       A.  I've given Mr. Young regular updates about my

14   work, including my contact with the California Attorney

15   General's Office.  We also developed a bit of a

16   friendship.  We spent some time talking about politics,

17   and what's going on in the country.  We happen to be on

18   slightly different opinions about things, and it's very

19   interesting to find common ground.  So I find it very

20   interesting talking with him.  That's about it.

21       Q.  Has he agreed to become a representative in

22   another case involving HP products?

23       A.  He has agreed to testify for the Sutherland

24   case, if his testimony would be helpful.

25       Q.  What has he agreed to do?

```
 1        A.  He has agreed to appear electronically at the
 2   hearing in Los Angeles, if that can be arranged.  He
 3   also agreed to come to Los Angeles if I'm able to secure
 4   funding to pay for his trip, which I have not yet.  He
 5   had agreed to provide honest testimony to anybody with
 6   regard to my interactions with him about anything at all
 7   that I had communicated to him, and he had communicated
 8   to me.  I had, you know, encouraged him to be completely
 9   open and honest about it if he's ever questioned by
10   anybody.
11        Q.  Anything else?
12        A.  He agreed to send the cartridges that he had
13   saved for you guys, and you had never collected from
14   him, if we need them.  I'm trying to be just as complete
15   as I can possibly be with that question.  If you care to
16   elaborate, I will --
17        Q.  Well, you said that you encouraged him to
18   cooperate and to provide truthful testimony, correct?
19        A.  Correct.
20        Q.  Did you encourage him to talk to the lawyers in
21   this case?
22        A.  No, I did not.
23        Q.  In fact, you said, "Don't talk to them," right?
24        A.  When he said that he does not want to hear from
25   you guys, I said, "Then don't talk to them.  Nobody can
```

```
 1    force you to talk to them."

 2         Q.  But you didn't encourage him?  You didn't say

 3    --

 4         A.  No.  I did not encourage him.

 5         Q.  In fact, that's perfectly fine as far as you

 6    are concerned, right?

 7         A.  Yes.

 8         Q.  Okay.  Would you be willing to broker a

 9    conversation between the lawyers and Mr. Young?

10         A.  Yes.

11              MR. KABATECK:  Okay.  Let's mark as Exhibit 8

12    an e-mail from Mr. Vlastone to some lawyers in this case

13    dated December 16th, 2010.

14              (Plaintiffs' Exhibit 8 marked.)

15    BY MR. KABATECK:

16         Q.  Is this an e-mail you sent?

17         A.  Yes.

18         Q.  In the very first line of it, you say that you

19    "made a few attempts to establish a dialogue with your

20    firm," but I assume you mean the two firms --

21         A.  Correct.

22         Q.  -- that are represented here?

23         A.  Correct.

24         Q.  What sort of efforts were made?  Is that a

25    difficult question for you?
```

1        A.   Would you point me to the paragraph?

2        Q.   Well, it's the first paragraph.

3        A.   Okay.

4             (Pause in proceedings.)

5             THE WITNESS:  I had called Mr. Kaplan.  The

6     purpose of that call was to let him know about the

7     rather extraordinary data that was coming back from the

8     study.  I reached him on the cell phone.  He indicated

9     he was busy, but he promised -- he said, "I will call

10    you," and then he never did.

11            I subsequently made a call to your Los Angeles

12    location, to KBK Law, and had requested to talk to you.

13    I was told that you were not available, and then Mr.

14    Torrijos -- help me out again.

15            MR. DOSA:  Torrijos.

16            MR. KABATECK:  Torrijos.

17            THE WITNESS:  So I was sent to his voicemail.

18    And if I recall correctly, I left a message indicating

19    that I wanted to talk, and that was not responded to.

20            Then I had a meeting with Mr. Berko -- that

21    would be sometime in either the spring or the early

22    summer of 2010 -- at which point we had succeeded in

23    getting Alfredo on the phone.  Mr. Berko had advised him

24    that the settlement case intends to go forward, and that

25    the Baggett and Young had been lost.

1           And if I recall correctly, Alfredo indicated

2      that there were negotiations going on between you and

3      Hewlett-Packard.  Mr. Berko had asked to clarify if that

4      was pertaining to inkjet or laser, and Alfredo indicated

5      that it would be both the inkjet and the laser cases.

6      Mr. Berko proceeded to insist that the Sutherland claims

7      were substantial different from the Baggett and Young

8      claims.

9           I also remember in that conversation Alfredo

10     saying something about you guys having spent five

11     million dollars worth of legal time working on those

12     cases.  That's the extent of my recollection.

13     BY MR. KABATECK:

14         Q.  Then the next conversation was when you reached

15     me in December?

16         A.  Correct.

17         Q.  Okay.  So when you say in here that you "made a

18     few attempts to establish a dialogue, but it was

19     fruitless up until today," it wasn't that your calls

20     weren't returned or didn't have a dialogue with someone.

21     It's just that they didn't go the way you wanted them

22     to?

23         A.  No.  The first two calls were not returned, and

24     --

25         Q.  But you just testified that in the summer of

1   2010, you reached Mr. Torrijos.  He accurately told you

2   that the case had been settled --

3       A.  I did not --

4       Q.  Let me finish.

5       A.  Sorry.

6       Q.  That he accurately told you that the case had

7   been settled.  He told you what the status of it was,

8   and then -- okay.  What's wrong with what I just said,

9   Mr. Vlastone?

10      A.  He did not say that the case was settled.  He

11  said that you were engaged in negotiations with

12  Hewlett-Packard that embraced both the Inkjet and the

13  failed laser jet litigations.  I did not participate in

14  that conversation.  I listened to it.

15          This was completely driven by Mr. Berko, and I

16  was not invited by Mr. Berko to actively participate in

17  that conversation.  Therefore, I had no control over

18  that conversation.  Therefore, I could not be frustrated

19  by Alfredo's response or nonresponse.

20      Q.  Was it disclosed to Mr. Torrijos that you were

21  on the phone?

22      A.  It was on a speaker phone.  I do not recall.

23      Q.  Okay.  You don't remember if Mr. Berko said,

24  "and I have Mr. Vlastone sitting here in the room"?

25      A.  I don't remember if he said that.  He might

1    have.  He might not have.

2         Q.  I just want to make sure it's clear.

3         When you say "the few attempts to establish a

4    dialogue with your firm, but it was fruitless up until

5    today," it wasn't that the firm wasn't responding to

6    you, at least as of the summer of 2010.  It's just that

7    they weren't agreeing with you?

8         A.  If I recall correctly, that phone call from

9    Berko ended with, when he said good-bye, "Well, Michael,

10   clearly these guys are not going to want to talk to

11   you."

12        Q.  Okay.  So then later --

13        A.  I never had an opportunity to --

14        Q.  Later in your e-mail, on the same page, on page

15   1 of Exhibit 8, you refer to Dr. Zimbardo again and

16   don't indicate that he is a social psychologist,

17   correct?

18        A.  That is correct.

19        Q.  Then on the second page, in about the middle of

20   the page, Point 5, you write, "I understand from Brian

21   that HP failed to notify either you or Judge Guilford

22   that the Sutherland case was fully in play, or that they

23   were provided with an advanced copy of the study proving

24   yield fraud.  This appears to be a potential breach of

25   ethics and would perhaps allow you to request that Judge

1    Guilford stay the settlement process pending the review

2    of this matter."

3           Now, the ethics you are referring to there, the

4    breach of ethics, it's a breach of ethics on behalf of

5    HP --

6       A.  Correct.

7       Q.  -- and its counsel?

8       A.  Right, yes.

9       Q.  So now it's, "I wasn't responsible for some

10   unethical violation.  Now it's the other lawyers who

11   were responsible for it"?

12      A.  It's not the "now."  I believe that HP should

13   have notified you when they received the study.

14      Q.  Do you become convinced, Mr. Vlastone, that all

15   lawyers at some point or another have ethical problems?

16      A.  Not all.

17      Q.  Okay.  Then on the third page, you refer to a

18   conversation with John Schultz?

19      A.  Which page would that be?

20      Q.  On the third page of the exhibit.

21      A.  Uh-huh.

22      Q.  In May of 2009?

23      A.  Correct.

24      Q.  And you say Mr. Schultz almost had a heart

25   attack?

```
1            A.  M-hm.

2            Q.  Were you there?

3            A.  I was sitting right next to him, like I'm

4       sitting next to Andrew.

5            Q.  And the gist of what you are saying is that Mr.

6       Schultz was very surprised at your findings?

7            A.  He was very upset and very surprised.

8            Q.  Was he upset at you?

9            A.  No.

10           Q.  Who was he upset at?

11           A.  He was upset at you actually, interestingly

12      enough.

13           Q.  Why?  I don't know Mr. Schultz.  So why was he

14      upset at me?

15           A.  He said, you know, "All these sleazy lawyers

16      are filing these lawsuits against us.  Michael, what you

17      don't understand is we are the most honest company in

18      the world.  We make truly the best printers.  You have

19      no idea how much money we spend to test them and make

20      sure that they deliver everything that we promise."

21               He was being very courteous to me.  He was

22      upset.  It was not in any way directed towards me.  I

23      said, you know, "Mr. Schultz, you are looking -- I swear

24      to you we did not manipulate your products.  The things

25      that you saw in the video actually came from your
```

1     consumers.  I mean, we can go and collect more
2     cartridges."  He said, "Well, I don't know.  Something
3     must have gone wrong because our printers just don't do
4     that.  What I saw on the screen, that cannot be."
5         Q.  Well, when you write in here that he almost had
6     a heart attack, was it his heart attack or his simulated
7     heart attack, whatever you are referring to, just to
8     sleazy lawyers like me?
9         A.  His heart attack was when he saw the aspects of
10    the video that showed the enormous amount of full yield
11    toner being blocked from delivery to consumers.  You
12    know, when we started --
13        The reason I said -- and this should be "heart
14    attack," almost had a heart attack, he was very calm and
15    self-assured when he was in the meeting.  He was sitting
16    very comfortably.  When the video got to that point, his
17    left leg started jerking uncontrollably.  He completely
18    lost his composure.  I've never seen an adult male
19    behave that way in the context of a business meeting.  I
20    mean, he just was losing it.
21        He started grabbing for his BlackBerry.  You
22    know, it wasn't paging him, but he started taking notes.
23    He was just excruciatingly uncomfortable.  I guess the
24    "almost had a heart attack" refers specifically to his
25    left leg, like jumping under the table.  We were

```
 1      watching the video on a laptop sitting side by side.

 2      That's how that came to be.

 3              MR. KABATECK:  Exhibit Number 9.  Soon that

 4      will be a completely lost reference, right?

 5              MR. DOSA:  It looks like, but the counting of

 6      the numbers will show.

 7              MR. KABATECK:  Exhibit Number 9 is a December

 8      24, 2010 e-mail to Richard Kellner among others.

 9              (Plaintiffs' Exhibit 9 marked.)

10      BY MR. KABATECK:

11         Q.  Mr. Vlastone, on December 24th, 2010, you sent

12      this e-mail to Mr. Kellner, Mr. Kaplan, and Mr.

13      Torrijos, among others, correct?

14         A.  Yes.

15         Q.  At that point your point in sending this e-mail

16      was to continue to try to persuade the class action

17      lawyers that there was a better alternative than going

18      forward with the settlement?

19         A.  Correct.

20         Q.  On the third page of the document -- I'm

21      showing you the second page of the memo -- you write in

22      the second paragraph, "If I were a judge, I would have

23      no other choice but to rule exactly the same way"?

24         A.  That is correct.

25         Q.  So do you still believe that Judge Guilford
```

1    made the right ruling based on the facts and evidence

2    presented to him?

3         A.  I believe that the judge made the right ruling

4    based on the legal theory that you had attached to the

5    rather incomplete facts you had submitted in that case.

6         Q.  Okay.  And you also believe that the

7    manufacturer Brother was innocent of any fraud?

8         A.  Specifically with regards to the monochrome

9    laser printers.

10        Q.  And you write in the fourth paragraph, "It's

11   essential that your team come to terms with this reality

12   because continuing to be in denial will lead to more

13   self-defeating, costly mistakes down the line."

14             Now, is that something that Dr. Zimbardo from

15   the social psychology told you?

16        A.  No.

17        Q.  Now, it's true that one of your strategies, and

18   one of the strategies that you pitched to the class

19   action lawyers in this case has been to use the

20   Integrity Capitalism Network to reach out to the board

21   of directors of HP?

22        A.  Not to use it, but to allow for that to take

23   place, yes.

24        Q.  Well, let's turn to the next page of Exhibit 9.

25   At the very top you write --

1          A.  Which page?  I'm sorry.

2          Q.  The next page.

3          A.  The next page.  I'm sorry.

4              MR. DOSA:  Which is?

5              MR. KABATECK:  They are not numbered.

6              THE WITNESS:  Page 3 of the memo.

7              MR. DOSA:  So it's "As attorneys for the

8      injured consumers"?  Is that it?

9              MR. KABATECK:  Yes.

10             MR. DOSA:  All right.

11     BY MR. KABATECK:

12         Q.  You write, "As attorneys for the injured

13     consumers, you do not have any way of reaching out to

14     the HP board or HP management because professional rules

15     of conduct restricts you," right?

16         A.  Yes.

17         Q.  Then in the next paragraph you write that you

18     are not bound by those limitations?

19         A.  Exactly.

20         Q.  So it is part of the Integrity Capitalism

21     Network to reach out to the board of HP?

22         A.  Absolutely.  That's one of the -- in fact,

23     that's one of the innovations that we want to bring to

24     the field of stopping fraud.  It's one of the many

25     elements, but -- anyway, I'll let you continue asking

1    questions.

2         Q.  Has anyone ever told you that that was a naive

3    theory?

4         A.  No.

5         Q.  Have you reached out to the board at HP?

6         A.  Not yet.

7         Q.  Have you tried?

8         A.  Not yet.

9         Q.  Why not?

10        A.  It was my intention to reach out to the board

11   of HP, having given the attorneys for HP full

12   opportunity to review the study and to comment on it, if

13   they found something incorrect or inappropriate in that

14   study.

15            However, instead of that taking place, Mr.

16   Rumberger was notified by HP's counsel that nothing

17   further needs to be done because the matter is already

18   settled in your case.  That was, you know, a big

19   surprise.  That basically reset the whole schedule of

20   what the Integrity Capitalism Network intends to do.

21        Q.  Does the Integrity Capitalism Network still

22   intend to reach out to somebody?

23        A.  Yes, it does.

24        Q.  Who is the Integrity Capitalism Network?

25        A.  Integrity Capitalism Network is myself.  It is

1    Professor Zimbardo.  It is Martin Hammill.  These would

2    be the three active individuals.  Then I seek advice

3    and, you know, counsel from anybody who is willing to

4    help us with this cause.

5        Q.  You are not a 501(c)(3)?

6        A.  No.

7        Q.  You are not a legal entity of any kind?

8        A.  Not yet.

9        Q.  Why haven't you become a legal entity?

10       A.  Because I have not been able to raise funding

11   that would cover the management of this organization as

12   a legal entity, which would involve accounting,

13   compliance, et cetera.  As soon as we can raise money,

14   there will be reason to become an entity.  It will also

15   enable me to pay for the expenses of managing the

16   entity.

17       Q.  You know, forgive me, but it doesn't seem like

18   it exists.  It's just a name.  It's not even a dba, is

19   it?  A fictitious business name?

20       A.  That is correct, but it hasn't received checks

21   from anybody that would need to be used that way.

22       Q.  Well, you consistently refer to the Integrity

23   Capitalism Network --

24       A.  Yes.

25       Q.  -- as if it's an entity, but you would agree

```
 1      with me it's not an entity of any kind?
 2              MR. DOSA:  You know, I'll just jump on that
 3      fact.  I suppose that calls for a legal conclusion.  You
 4      can probably argue that it's a dba of some sort, but
 5      ultimately it's a solo.  So it does have some
 6      significance, but --
 7              MR. KABATECK:  It might be a partnership.
 8              MR. DOSA:  Yeah, potentially or an association
 9      of some sort, but it hasn't formally gotten a license
10      or, you know, an LLC, LLP variation on the thing.
11      BY MR. KABATECK:
12          Q.  Okay.  Now --
13          A.  And it's certainly my hope to make it into a
14      formal nonprofit.
15          Q.  Mr. Vlastone, you don't report anywhere in all
16      the documents we have here that it's not any kind of
17      entity, at least a legally recognized entity, right?
18          A.  How would it be of any consequence?
19              MR. DOSA:  Actually, I'll jump in, whether it's
20      helpful or not.  He can register as a fictitious
21      business entity right now doing what he does.  I mean,
22      if there are studies that are performed by him under
23      that title, then it's doing something.  He just hasn't
24      gone through the formal steps.  He hasn't taken the
25      steps to become formalized as something.  You can do
```

```
 1      that --

 2              THE WITNESS:  Yeah.

 3      BY MR. KABATECK:

 4          Q.  Let's skip ahead a little bit to the second to

 5      the last page, the penultimate page of this document.

 6          A.  The last page.  I got it.

 7          Q.  At the very bottom, the last full paragraph,

 8      you write about "the long-term goal of Integrity

 9      Capitalism Network."  Then in the next paragraph, you

10      talk about like you need an outside organization.  So

11      presumably you are referring to the class lawyers in

12      this case.  "Why you need an outside organization

13      working on many simultaneous cases to enable weekly

14      episodic content in video and print that coordinates its

15      activities with the litigation process, allowing

16      attorneys to do what they do best in courtrooms while

17      they allow the ICN brand and its media celebrities to

18      entertain and engage the public using the formula we

19      call irresistible fun, impossible challenges, noble

20      causes."  Then you actually put the TM mark there,

21      trademark.

22          A.  M-hm.

23          Q.  So have you trademarked that slogan?

24          A.  No.

25          Q.  So isn't it true, Mr. Vlastone, it was your
```

1      intention and has been your intention to make people

2      believe that ICN is more than what it really is?

3          A.  No.  I fully disclosed exactly what it is.

4      It's a few people who strongly believe in this idea, and

5      we are struggling very hard to make it real.  I fully

6      disclosed that we are underpowered, underfunded, and

7      very much struggling to make it happen.

8              MR. DOSA:  Can I take --

9              MR. KABATECK:  You may.

10             (Discussion off the record.)

11             MR. DOSA:  Let's take a break.

12             MR. KABATECK:  Okay.

13             (Recess.)

14             MR. KABATECK:  I'll mark as Exhibit 10 an

15     e-mail from Mr. Vlastone to Mr. Richard Kellner dated

16     December 27th.

17             (Plaintiffs' Exhibit 10 marked.)

18     BY MR. KABATECK:

19         Q.  You address the e-mail to Darren, presumably

20     Darren Kaplan, correct?  It's a small part up at the

21     top.

22         A.  M-hm.

23         Q.  So it's Darren Kaplan you are referring to

24     there, correct?

25         A.  Yes.

```
 1              Q.  But the e-mail is addressed to Richard Kellner?

 2              A.  Yes.

 3              Q.  Okay.

 4              A.  It must have been a typo.

 5              Q.  That's all right.  No problem.

 6                  And below Rich had written that you were

 7      represented by counsel, and he was uncomfortable because

 8      of ethical issues discussing the case.  You wrote back

 9      to say that Mr. Rumberger wasn't your lawyer, right?

10      That was the gist of what you were saying?

11              A.  I'm sorry.  I'm a little bit confused by this.

12              Q.  Sure.  Do you need to read the document?

13              A.  Yes.  Let me read this.

14                  MR. KABATECH:  Go ahead.  That's fine.

15                  (Pause in proceedings.)

16                  THE WITNESS:  Go ahead, if you don't mind

17      repeating the question.

18      BY MR. KABATECK:

19              Q.  Well, just to set it up -- it's more

20      foundational than anything else.

21              A.  M-hm.

22              Q.  Mr. Kellner wrote you and said, "I'm

23      uncomfortable talking with you because you have a

24      lawyer," and the gist of what you are writing back to

25      him is Mr. Rumberger wasn't really your lawyer, correct?
```

1          A.  No.  That's not what I'm saying.  I'm --

2              MR. DOSA:  Let him finish.

3              MR. KABATECK:  That's fine.

4          Q.  What were you saying?

5          A.  I was saying that I believe that Tim is

6      representing me to the extent that I'm part of the

7      injured class.  At the same time, I'm, you know,

8      communicating to you also as an independent person.  To

9      that extent, I also believe that you were to some extent

10     my lawyers because you were representing me as a member

11     of the injured class.  I think the e-mail speaks for

12     itself.  I was just saying let's talk.  There is nothing

13     to hide.

14         Q.  And you meant what you said and said what you

15     meant, right?

16         A.  Yes.

17         Q.  And when you said that all decisions for the

18     injured class should be made by Tim, you meant that,

19     right?

20         A.  Yes.

21         Q.  So did Mr. Rumberger make the decision to call

22     Mr. Young?

23         A.  No.  I made that decision by myself.

24         Q.  So sometime between December 27th and

25     December 31st, you decided that you were going to start

1     making decisions for the injured class?

2        A.  No.  I think what the e-mail is referring to

3     is, there is going to be legal work that's done on

4     behalf of the class.  You know, court stuff, et cetera,

5     is handled by Tim.  As somebody who is investigating

6     this matter, I certainly can undertake whatever

7     investigative measures that I choose to undertake.

8         So Mr. Rumberger certainly does not in any way

9     control what I may choose or not choose to investigate.

10    What I was doing is, I was conducting the investigation.

11    I felt like we hadn't gotten to the bottom of things,

12    that there was something -- you know, something smelled

13    bad to me.

14       Q.  You don't say that at all in this e-mail

15    though, right?

16       A.  No.

17       Q.  In fact, quite to the contrary, what you say

18    is, all decisions will be made by Tim, correct?  That's

19    what you said?

20       A.  Yeah.

21       Q.  In the next line you write, "Tim and I made an

22    early determination that we will at least attempt to do

23    all of our work within an open source, full disclosure,

24    total integrity framework, even when it appears

25    strategically disadvantageous in the short term."  You

1    wrote that, right?

2         A.  Yes, I did.

3         Q.  So sometime between Monday, December 27th, and

4    Friday, December 31st, you decided to completely abandon

5    that proposal and contact Mr. Young?

6         A.  But as soon as I did, I notified Mr. Rumberger

7    that I had done.  I don't see how I abandoned anything.

8    You are loading the question, which is completely --

9    it's nonsense.

10        Q.  Well, I'm sorry I'm loading questions.  I

11   apologize.  It's just part of my general incompetency.

12   I'm trying the best I can to figure out why in your mind

13   on December 22nd, you are trying to have a dialogue, and

14   you are telling Richard Kellner that you want to do all

15   your work within an open source, and four days later,

16   you decided to just simply contact Mr. Young on your

17   own.  What changed?

18        A.  One of the things that changed for me is --

19   it's a reasonable question.  One of the things that

20   changed for me is, I perceived the content of our

21   conversations as going around in circles.  One of the

22   things that particularly struck me as disingenius (sic)

23   --

24        Q.  Disingenuous.

25        A.  Thank you very much for correcting me.  English

1    is my second language.

2          -- is Mr. Kellner repeatedly making

3    implications that there is something unethical about my

4    desire to contact the HP board, and my belief that if

5    the HP board of directors were to find out about what's

6    actually going on, they would then instruct the

7    management to terminate the business misconduct which is

8    going on inside the company.

9        Q.  So that upset you?

10       A.  My experience in life shows that when people

11   take something that's perfectly ethical and reasonable

12   and start calling it unethical, usually they have

13   something unethical to hide.

14         I certainly had no expectation that I would

15   call Mr. Young and find out from him all the things that

16   I did, which is that he wasn't even sure that he is the

17   plaintiff, that he was, you know, never explained

18   anything that's going on, et cetera, et cetera.

19       Q.  Can you answer the question I'm asking you,

20   sir?  I mean, know you want to lecture and you want to

21   talk, but can you just answer the question I'm asking

22   you?

23       A.  Repeat the question, please.

24       Q.  Well, I'll ask a different question.

25       A.  M-hm.

1          Q.  On 12:17 on Monday, December 27th, you wrote

2     back to Mr. Kellner and you said, "I'll be calling you

3     shortly and have Tim join us during his break," right?

4          A.  Yes.

5          Q.  Okay.  If you look at the next page, it looks

6     like that on December 26th at 8:15, Richard Kellner

7     wrote, Dave is going to try to reach Mr. Kaplan, that he

8     had a family commitment that evening, that he was unable

9     to get back to you tonight, but he could talk to you the

10    next day, right?

11         A.  M-hm.

12         Q.  Then you wrote him and suggested that maybe

13    there would be a call at 10:30 the next day, right?

14         A.  Yes.

15         Q.  Okay.  So the next day would have been --

16    actually, that is the next day.  December 27 is the next

17    day.

18         A.  Right, Monday, and the Monday call never

19    happened, as I recall.

20         Q.  But you were going to call him, right?  You

21    were going to call Mr. Kellner?  That's what your e-mail

22    says, "I'll be calling you shortly," right?

23         A.  Yes.

24         Q.  Okay.  So you don't have any other e-mails that

25    you sent to Mr. Kellner after this one before you called

1       Mr. Young?

2           A.  So we did have a call, right?  I'm sorry.  I'm

3       a little bit confused about the timeline.  I do believe

4       we had a call following this.

5           Q.  Well, everything up until this point had been

6       cordial and congenial between you and Mr. Kellner, and

7       Mr. Kaplan, correct?

8           A.  Correct.

9           Q.  Okay.  You can't remember if you had a call the

10      next day.  You were supposed to call.  You can't

11      remember if you actually called?

12          A.  I believe there was a call with Mr. Rumberger

13      present.

14          Q.  On the 28th?

15          A.  No.

16          Q.  There is no record of a call.  There is no

17      evidence of a call that took place on the 28th.  You

18      didn't call?

19              MR. DOSA:  Is that a question?

20              MR. KABATECK:  Yes.

21              MR. DOSA:  Okay.

22              THE WITNESS:  Right now I cannot recall without

23      referring back to my own notes in this --

24      BY MR. KABATECK:

25          Q.  Well, this was 28 days ago, right?

```
 1          A.  And during those 28 days, I have --

 2          MR. DOSA:  Actually, the answer is yes, it was

 3    only 28 days ago.

 4          THE WITNESS:  Right.

 5    BY MR. KABATECK:

 6          Q.  You don't have anything else of this magnitude

 7    going on in your professional life right now?

 8          A.  No, I do not.

 9          Q.  And you cannot confirm affirmatively that you

10    called Mr. Kellner the next day?

11          A.  Without looking at my notes and my e-mails, no,

12    I cannot.

13          Q.  Okay.  As a matter of fact, you didn't have

14    another conversation you can recall with Mr. Kellner

15    before you called Mr. Young?

16          A.  I think I already answered that, right?

17          Q.  True?

18          A.  Like I said, I would have to refer to my notes

19    to answer that question properly.

20          MR. DOSA:  Without putting words in your mouth,

21    you are not sure?

22          THE WITNESS:  Yeah, I'm not sure.

23    BY MR. KABATECK:

24          Q.  What you did know though on December 31st, when

25    you contacted Mr. Young, and you also contacted Mr.
```

1     Baggett at the same time?

2          A.  Yes.

3          Q.  You contacted both of them at the same time.

4              You started looking the day before for their

5     phone number.  So at least on December 30th, you were

6     looking to find them and find their phone numbers --

7          A.  Correct.

8          Q.  -- right?

9              And you're using the internet to find them?

10         A.  Correct.

11         Q.  At that point you knew that -- and this may

12    sound ridiculous, but it's true, just for the record --

13    the 31st of December was a holiday in anticipation of

14    the New Year's day celebration, right?

15         A.  Yes.

16         Q.  So the court was closed, and the court wouldn't

17    open again until January 3rd, correct?

18         A.  Yes.

19         Q.  And by January 4th, objections had to be filed,

20    correct?

21         A.  Yes.

22         Q.  So time was running out?

23         A.  That's right.

24         Q.  And you intended to file an objection, correct?

25         A.  Yes.

1       Q.  And you were hoping that Mr. Young and Mr.

2    Baggett would help you in your effort to set aside this

3    case, this settlement?

4       A.  My intention was to notify them about the

5    settlement case and our study.  Specifically, I had that

6    very clear in my mind, and I had prepared everything

7    necessary to be able to forward that information

8    electronically to them.  I also wanted to find out from

9    them what was going on, and what was their experience.

10   That was my intent.

11      Q.  And you've already indicated that your intent

12   was to hopefully get them to object to the settlement?

13      A.  Yes.

14      Q.  Because you don't want this settlement --

15      A.  Yes, absolutely.

16      Q.  -- to take place?

17      A.  Absolutely.

18      Q.  Absolutely?

19      A.  Yes.

20      Q.  So what you wanted to do was everything in your

21   power to accomplish those goals?  I mean --

22      A.  Everything legal in my power.  Everything

23   lawful and appropriate, yes.

24      Q.  You are a very determined man, aren't you?

25      A.  I am a very determined man.

1       Q.  In order to achieve this goal, you were able to

2    secure a declaration that you wrote from Mr. Young?

3       A.  Yes.  And for clarification, it's based on

4    information that Mr. Young had volunteered to me, and I

5    offered to write it down because that is my skill, to

6    write it down.

7       Q.  And no one but Michael Vlastone has confirmed

8    this declaration with Mr. Young?

9       A.  That is not correct.  Mr. Reece Halpern was

10   hired to independently review every word of that

11   declaration precisely because I am not a lawyer.  I

12   cannot practice law in California, and it was --

13      Q.  Or anywhere.

14      A.  Or anywhere, for that matter, exactly.  It

15   would be inappropriate for me -- it was perfectly

16   appropriate for me to help Mr. Young write something

17   that was based on his intent and his desires.

18          I felt it was absolutely necessary for an

19   attorney to be involved to review everything, to advise

20   him of his rights and responsibilities, and to make sure

21   that, you know, whatever is filed is going to be

22   appropriate.

23      Q.  Were you ever on the phone with Mr. Halpern and

24   Mr. Young at the same time?

25      A.  No.

1     Q.  So no one that's appeared in this litigation,

2  except you, has talked to Mr. Young?

3     A.  That is correct.

4     Q.  The only person who has verified the

5  authenticity of the Young declaration and the Young

6  letter is you?

7     A.  Well, given that you are the ones who obtained

8  his signature with his phone number, and that's the

9  phone number I called, I think it's appropriate to think

10  that if he is the right Mr. Young and not some random

11  Mr. Young from another planet that I spoke with.

12     Q.  That wasn't my question.  Will you read the

13  question back so he can hear it, and listen carefully.

14     A.  Okay.

15     (Record read.)

16     THE WITNESS:  Yes.  Well, to the extent of my

17  knowledge.  I don't know.  Maybe others have verified

18  it, but I have certainly verified it to my satisfaction.

19  BY MR. KABATECK:

20     Q.  Well, do you know of anybody else?  A name of

21  another person?

22     A.  No, I do not.

23     Q.  And you also know, because you wrote it, of a

24  letter that Mr. Young allegedly sent to his lawyers

25  saying, "Don't talk to me," right?

```
 1          A.  Yes.

 2          Q.  Okay.  So is it reasonable for you to conclude

 3     that his lawyers haven't talked to him?

 4          A.  Yes.

 5          Q.  Okay.  So how does anyone know of the

 6     authenticity of the Young declaration and the Young

 7     letter?  Anyone?

 8          A.  I see the problem that you are posing.

 9          Q.  So you agree with me?

10          A.  I now agree with you that you would have

11     potentially a reasonable allegation that there is

12     something improper about that declaration and clearly

13     measures need to be taken at this point to verify it.

14          Q.  Okay.

15          A.  That did not occur to me, and I apologize for

16     the deficiency in my thinking.

17          MR. KABATECK:  Let's mark as Exhibit 11 an

18     e-mail to Ted Frank from Mr. Vlastone dated January 4th.

19          (Plaintiffs' Exhibit 11 marked.)

20     BY MR. KABATECK:

21          Q.  Did you send this e-mail?

22          A.  Yes, I did.

23          Q.  At the time of sending this e-mail, had you

24     spoken to Mr. Frank on the phone?

25          A.  No.  I was one of the people addressed on an
```

1    e-mail from him that he felt compelled -- you know, for

2    the purpose of protecting, I guess, his own integrity to

3    send out to everybody, and I responded to him and to

4    everybody else with my own.

5        Q.  Okay.

6        A.  He did not call me.  He did not call me.

7        Q.  Have you ever talked to him?

8        A.  I have spoken to him one time since then just a

9    couple of days ago.

10       Q.  What did you talk about?

11       A.  I told him about a film that I had just seen

12   through Netflix called Freakonomics, which I believe

13   contains a wonderfully concise and clear explanation of

14   how incentives cause otherwise, or -- how perverted

15   incentives oftentimes cause otherwise good professionals

16   to do unethical things.  That was the big theme that we

17   had discussed.  I just gave him an update on kind of

18   what was happening with me.

19            I also inquired if he intended to file anything

20   in the laser cases, and he confirmed that he would, and

21   then he sent me copies.

22       Q.  Of his late filing?

23       A.  I wouldn't qualify it as late or anything.

24   Whatever he filed.  I wouldn't know if it's considered

25   late or not.

```
 1              Q.  I'll move away from this and ask you some

 2      general questions.

 3              Is Martha Sutherland a client of yours?

 4              A.  Yes, she is.

 5              Q.  You at some point in your life were a prelaw

 6      undergraduate at UC Berkeley?

 7              A.  I took prelaw courses.  I was not a declared

 8      major.

 9              Q.  What's the iShine entertainment system?

10              A.  An iShine entertainment system is a multi-media

11      environment based on Macintosh computers that enables a

12      family to have access to a very media-rich environment

13      and quality content everywhere in their house and their

14      car and multiple residences.

15              It organizes people's media collection or

16      family media collections in digital format.  It's sort

17      of like a mega iPod you can say.

18              Q.  Is that how you earn a living currently?

19              A.  That's correct.

20              Q.  And people compensate you for your work in

21      that?

22              A.  That's correct, yes.  It's a consultancy

23      basically.  I design, install, and support these

24      systems.

25              Q.  Is the iShine entertainment system a business
```

1    entity of some kind?

2         A.   No, it is not.   There were multiple attempts

3    made at incorporating it, and we had failed to raise VC

4    funding to make it into a viable scalable business.   I

5    have basically remained a successful independent

6    consultant.

7         Q.   Who is Ida McArthur?

8         A.   She was at one time a friend and a woman who

9    wanted to enter into a relationship with me and that I

10   declined and became a stalker.   I had a great difficulty

11   getting rid of her in my life, and I finally did.

12        Q.   She had a restraining order against you?

13        A.   That is correct.

14        Q.   As long as she is not a class counsel in some

15   case.

16        A.   No.

17        Q.   Gary Champagne, who is that?

18        A.   Gary Champagne is -- well, there is Gary and

19   John Champagne.   They are two brothers who inherited the

20   building where I had rented an apartment for ten years

21   and who undertook an illegal scheme to evict me out of

22   there in order to sell the place at a higher price than

23   it would otherwise be at.

24        Q.   Actually, they did evict you?

25             MR. DOSA:   Yes or no.

1          THE WITNESS:  Yes.

2          MR. DOSA:  Okay.

3  BY MR. KABATECK:

4      Q.  Now, in 2006, you'd been evicted from some

5  building or some place by a Tina Kwok, correct?

6      A.  Correct.

7      Q.  Okay.

8      A.  No.  I was not evicted.  I voluntarily left and

9  exactly at the time when I had contracted to leave.

10      Q.  And somebody filed a --

11      A.  She filed an eviction, but she wound up losing,

12  basically giving up, and then having to pay me damages

13  for breaking our contract.  So I think it would be

14  unfair to characterize that as a matter of me being

15  evicted.  It was actually a matter of somebody breaking

16  their contractual obligations and trying to use the

17  process of eviction to break her contract.  She had

18  utterly failed at that and wound up losing money as a

19  result of that and apologizing for it.

20      Q.  Well, when you visited the Kabateck firm in

21  September of 2008, it's true that starting the next

22  month, you stopped paying your rent on the Gateway

23  Business Bank Building that you were located at, that

24  iShine was located at?

25          MR. DOSA:  What's the relevance of that?

1           MR. KABATECK: Well, I think it goes to the

2    credibility of the fact that we think he was trying to

3    get us to put him up in a building in exchange for his

4    work on the case. I mean, I can make the argument that

5    he stopped paying rent in October of 2008. He visited

6    us in September of 2008. He eventually gets evicted by

7    the owner of the building for the iShine Foundation,

8    exactly the entity that he was trying to get us to put

9    him up in a building.

10          THE WITNESS: I think I'll be happy to explain

11    to Mr. Kabateck what happened.

12          MR. DOSA: Just answer it.

13          THE WITNESS: Brian, may I just simply give you

14    a narrative answer? You are entitled to know exactly

15    what happened. I'll tell you the whole story very

16    quickly.

17    BY MR. KABATECK:

18       Q. I'm not sure I want a narrative answer. I

19    simply asked you if you stopped paying your rent in the

20    building you were in in October of 2008.

21       A. Yes, I did.

22          MR. KABATECK: Okay. I don't think I have any

23    further questions at this time. I think counsel is

24    going to ask some questions, and I may have some

25    follow-up after that. Do you want to take a break at

1    this point, or do you want to go straight into it.

2            MR. HENNING:  It's up to you.

3            MR. DOSA:  Let's take a little break.

4         (Recess.)

5                  EXAMINATION

6    BY MR. HENNING:

7       Q.  Mr. Vlastone, my name is Kris Henning.  I'm

8    from the law firm of Morgan, Lewis & Bockius, and we are

9    representing HP in these cases.  I have a few questions

10    to follow up on what Mr. Kabateck asked you.

11           Would you mind pulling out Exhibit 5, please?

12       A.  Yes.

13       Q.  In particular, in that first paragraph, you

14    state that you were the owner of certain HP Color

15    LaserJet printers.  Do you see that?

16       A.  Yes.

17       Q.  Are those the only two HP color LaserJet

18    printers you own?

19       A.  These are the ones that I purchased with my own

20    money.  I presently have in my custody two additional

21    printers.  They are 2600n.  One is owned by Martha

22    Sutherland, and the other one is owned by Peter Boyer.

23       Q.  Any others that you have in your possession?

24       A.  That's it.

25       Q.  Are there any that you own, but are not in your

1    possession?

2            MR. DOSA:  Let me interrupt.  Are you talking

3    about cartridges or the printers?

4            MR. HENNING:  No.  The actual printers.

5            MR. DOSA:  Okay.

6            THE WITNESS:  Would you please repeat the

7    question because there's precise words there?

8    BY MR. HENNING:

9        Q.  Yes.  You made a distinction between some that

10   you don't own, but are in your possession.  I want to

11   know if there are any that you do own that are not in

12   your possession.

13       A.  No.  Everything that I personally own is in my

14   possession.

15       Q.  The printer for Martha Sutherland that's in

16   your possession, is that the printer that is the subject

17   of the Sutherland lawsuit?

18       A.  That's correct.

19       Q.  How long has that been in your possession?

20       A.  That has been in my possession since -- I want

21   to say November or December of 2009.

22       Q.  Has it continuously been in your possession

23   from that time?

24       A.  Correct.

25       Q.  Nobody else has it?

```
 1        A.  No.

 2        Q.  Have you done any testing to it?

 3        A.  Yes.

 4        Q.  How would you conduct the testing you've done

 5   to it?

 6        A.  It is fully and thoroughly described in the

 7   study report, which I had submitted to you in full.

 8        Q.  Did you take it apart?

 9        A.  No.

10        Q.  Did you do any testing to it that's not

11   described in this study?

12        A.  I would like to make a distinction between the

13   cartridges and the printer itself.  So I had done

14   additional testing that's not described -- well, no.

15   Actually, it's referenced in the study, but it's not

16   described in detail.  That's the initial ad hoc testing

17   that was done in the summer of 2008 -- yes, summer of

18   2008 -- at which point, you know, cartridges were

19   drilled, and we discovered that they were full of toner.

20        Q.  So when Ms. Sutherland's printer came to you,

21   it had cartridges in it?

22        A.  Yeah.  It had a subsequent replacement set of

23   cartridges that she had purchased.

24        Q.  So is there four cartridges --

25        A.  Four cartridges, correct.
```

1      Q.  -- in there?  Have you ever seen any other

2  cartridges that have been in that printer?

3      A.  I have run a brand-new set of cartridges

4  through that printer, I guess.

5      Q.  They had not been in the printer when you got

6  the printer?

7      A.  That is correct.  I received the printer with

8  the cartridges that Martha had in it at the time.

9      Q.  And those are the cartridges you drilled; is

10  that right?

11      A.  No.  The drilled set of cartridges from 2008

12  were set aside by Martha upon my request when she called

13  to first complain to me that it appeared that the

14  printer -- something is wrong with the printer.  She did

15  not recall printing any substantial number of color

16  pages.  Yet, it was demanding the replacement of the

17  color cartridges.

18          At that point I didn't have time.  I said,

19  "Martha, just go ahead" -- you know, "HP is great.

20  Anything couldn't have gone wrong.  It's a great

21  company, great printer.  Go and buy a replacement.

22  These are probably starters, but do set them aside.  At

23  some point I will look at them."

24          She actually called me.  She thought that the

25  toner might be leaking out.  And when she took them out

1    on my instructions, there was no leakage.  I said,

2    "Probably everything is fine.  Don't worry about it."

3           It was only -- the subsequent time when it

4    asked for replacement again, that's when the alarms went

5    off.  That's when I really started the investigation.

6    Up until that time, I thought there's nothing wrong.

7        Q.  Okay.  We were talking about the cartridges

8    that were drilled.  Which are the ones that were

9    drilled?

10       A.  They are the ones that she set aside.  I want

11   to say it would have been in early 2007.

12       Q.  Let me try again.

13          Are the ones that you drilled ones that you

14   bought?

15       A.  No.  The drilled cartridges were the first set

16   of cartridges --

17          MR. DOSA:  You answered the question.

18   BY MR. HENNING:

19       Q.  Are the ones that you drilled ones that Ms.

20   Sutherland bought?

21       A.  They came with the printer.

22       Q.  Okay.  Were the ones that you drilled the ones

23   that were in the printer when you took possession of it?

24       A.  No.  It was a new set of cartridges, and they

25   had not been drilled.  They had been preserved as they

1    are.

2        Q.  My question was:  The ones that you drilled,

3    were those the ones that were in the printer at the time

4    you took possession of it?

5        A.  No, they were not.

6        Q.  So what happened to the ones that were in the

7    printer at the time you took possession?

8        A.  They are still in my possession.

9        Q.  They haven't been drilled?

10       A.  They have not been drilled.

11       Q.  So I thought we established there were only

12   four cartridges that you've seen that were ever in this

13   printer --

14       A.  No.

15       Q.  -- as of the time you took possession of it,

16   right?  Which ones were drilled?

17       A.  I think if I tell you in terms of timeline --

18       Q.  No.  That takes too long.

19       A.  -- we'll establish complete clarity.  Okay.

20       Q.  Did you buy the cartridges that were drilled?

21       A.  No.

22       Q.  Did Ms. Sutherland buy the cartridges that were

23   drilled?

24       A.  Yes.

25       Q.  When did she buy them?

```
1         A.  That was in late 2005.

2         Q.  Okay.  The ones that were drilled were not the

3    ones that were in the printer when you took possession

4    of it?

5         A.  Correct.

6         Q.  They were replacements that you brought?

7         A.  Yes.  Hold on.  I want to make sure we don't

8    get confused.  Would you come again, just the last part

9    of the question?

10        Q.  Yes.  Were they a replacement set of cartridges

11   that she bought?

12        A.  The cartridges, which I received together with

13   the printer from Ms. Sutherland in late 2009, were

14   replacement cartridges that she had purchased at some

15   point.

16        Q.  Okay.  And those you put aside and didn't

17   drill?

18        A.  That is correct.

19        Q.  Okay.  The ones that you drilled were other

20   cartridges that she had; is that right?

21        A.  Correct.

22        Q.  Were the ones that you drilled cartridges that

23   she had used in the printer?

24        A.  Correct.

25        Q.  Did you drill all four?
```

```
1        A.  I drilled all three.  We did not do the black

2   since black was never suspected of being shortchanged on

3   the yield.

4        Q.  What's the other gentleman's name whose printer

5   you have possession of?

6        A.  I have a printer that belongs to Peter Boyer.

7        Q.  Who is he?

8        A.  He is another client of mine.

9        Q.  Why do you have his printer?

10       A.  I have his printer because he encountered a

11  problem with that printer and had stopped using it.  He

12  owns three of them.  So he now is using another one of

13  the printers that he owns.

14           Having found out that there is a problem with

15  it, and he no longer uses it, I said, "Would you be

16  willing to let me take possession or take custody of

17  that printer for the purpose of our ongoing

18  investigations?"  Mr. Boyer agreed and brought that to

19  767 Bryant Street.

20       Q.  So this is a printer he didn't want to use

21  anymore.  Is that fair?

22       A.  Yes.

23       Q.  Do you know what the model is of that one?

24       A.  It's a 2600n.

25       Q.  Let's take the 2600n that you own.
```

1    A.  Yes.

2    Q.  Did you buy that?

3    A.  Yes.

4    Q.  When did you buy that?

5    A.  I purchased that in the summer of 2008 from

6    LaserLink.

7    Q.  Why did you buy that one?

8    A.  I bought that one for the purpose of conducting

9    the investigation and also for my own use.  I do need a

10   color laser printer for my work.  So I do use it for my

11   work.  There are two reasons for the purchase.

12   Q.  So before you bought it, you had decided to

13   start the study; is that right?

14   A.  No.  That was before we -- that was way before

15   the study.  The study is December 2009.  We are now way

16   back in 2008.

17        MR. DOSA:  You've answered the question.

18   BY MR. HENNING:

19   Q.  Before you bought it, you had decided to start

20   an investigation, I think you said; is that right?

21   A.  Correct, yes.

22   Q.  And that's at least in part why you bought it?

23   A.  Yes.  The other reason was to be able to print

24   my own documents at that point, yes.

25   Q.  One reason primary over the other?

1          A.  I would say the investigation was primary, yes.

2          Q.  How about the next printer, the 1518?  When did

3      you buy that?

4          A.  That was purchased specifically and exclusively

5      for the study in December of 2009.

6          Q.  So you didn't buy that for your own personal

7      use?

8          A.  No.

9          Q.  How much did you pay for the 2600n?

10         A.  I believe I paid $200 for it.

11         Q.  How about the 1518?

12         A.  That was purchased from -- I want to say

13     Staples.  I have an exact record of it, but I was

14     looking at three different stores.  So I apologize if I

15     mix it up.  I do have an exact receipt.  I believe it

16     was Staples that I purchased it from.  I was at three

17     different stores the same day.

18         Q.  Is it the case that you bought these with your

19     own funds?

20         A.  Yes, I did.

21         Q.  Have you been reimbursed for the purchase of

22     those printers by anyone?

23         A.  No.

24         Q.  Have you tried to sell them?

25         A.  No.

```
 1              Q.  Let's stay on Exhibit 5, Mr. Vlastone.

 2                  Can you flip all the way to the end, the proof

 3       of service?

 4              A.  Sure.

 5              Q.  It's page 15.

 6              A.  Yes.

 7              Q.  Is that your signature on the page?

 8              A.  Yes, it is.

 9              Q.  Did you sign it on January 4th?

10              A.  Yes, I did.

11              Q.  Did you actually mail the document to the clerk

12       of the court in Santa Ana?

13              A.  Yes, I did.  I have a receipt for that.

14              Q.  From where did you mail it?

15              A.  I mailed it from the so-called airport station

16       in San Francisco.  It's located at SFO.

17              Q.  Why did you send it to the clerk of the court?

18              A.  Because that's what I was instructed to do on

19       the settlement website.

20              Q.  You understood it had to be filed with the

21       court?

22              A.  I understood that it has to be sent to the

23       court because that's the language that it uses on the

24       website.

25              Q.  Is it your testimony you never saw the word
```

1      "filed" on the subject website?

2         A.  What I read there was, you must write to the

3      court that you intend to object and appear.  That's the

4      exact language that was used.  It must be postmarked on

5      January the 4th.  That's the language that I read, and

6      that's the instructions that I followed.

7         Q.  How many times have you been to the settlement

8      website?

9         A.  Twice.

10         Q.  There is a piece on the settlement website, if

11     I recall correctly, on relevant documents or documents

12     of interest.

13         A.  Yes.

14         Q.  Have you gone to those?

15         A.  Yes.

16         Q.  Have you read any of those?

17         A.  I downloaded all of them.

18         Q.  Have you read all of them?

19         A.  Yes.

20         Q.  Have you ever seen anything you understood to

21     be a notice of the settlement in this case?

22         A.  Yes.

23         Q.  How many times?

24         A.  Well, one is the documents that were forwarded

25     to me, I believe, by Mr. Rumberger, and another is the

1    stuff that I downloaded from the website myself.  I

2    found discrepancies between the two sets.

3        Q.  Did you read these documents carefully?

4        A.  Yes, I believe so.

5        Q.  I mean, this settlement is something that's

6    important to you, right?

7        A.  Yes, I believe so.  Like I said, I believe I

8    read them very carefully.

9        Q.  When did you learn of the settlement?

10       A.  I learned of the settlement from Mr. Rumberger,

11   who I understand was advised by yourself.

12       Q.  When did you learn of it?

13       A.  That would be the first week of September --

14   no.  I can't say exactly.  It was in September.

15   Probably the first week of September actually.  The

16   second week of September.  I'll say September.

17       Q.  What role, if any, did Mr. Halpern play in

18   assisting you to prepare your declaration, Exhibit 5?

19       A.  Mr. Halpern did not help me to prepare the

20   declaration in Exhibit 5.

21       Q.  What role did he play, if any, as it pertains

22   to this declaration?

23       A.  I did not seek any advice from him whatsoever

24   with regards to my own declaration.

25       Q.  You only sought his advice for some other

1      reason?

2          A.  I specifically reached out to Mr. Halpern to

3      assist Mr. Young and to work with him independently to

4      make sure that the declaration I had typed up for Mr.

5      Young based on his communications to me, it was accurate

6      and fully represented what Mr. Young himself wishes to

7      do.

8          Q.  How did you find out to put your declaration in

9      the form that it ultimately took?

10         A.  I borrowed the form from Mr. Rumberger.  In

11     fact, I should say I simply used the -- I believe I used

12     a template of his draft, which I read.

13         Q.  The draft objection in this case?

14         A.  Correct.

15         Q.  When did you see that draft objection?

16         A.  That would have been the 1st or 2nd of January.

17     Something like that.

18         Q.  When did you decide you would object?

19         A.  I think the moment that I found out that I

20     could.

21         Q.  Had you read the settlement agreement by then?

22         A.  I read the settlement agreement as soon as I

23     received it from Mr. Rumberger in the e-mail.

24         Q.  Is that approximately September of 2010?

25         A.  That is correct.

```
 1          Q.  So was it right after you read the settlement

 2     agreement that you decided you would object?

 3          A.  Yes.

 4          Q.  Had you been following the Baggett and Young

 5     litigation?

 6          A.  Yes.

 7          Q.  It's fair to say you were following it quite

 8     closely, isn't it?

 9          A.  Very closely.

10          Q.  Have you ever gone to the court's website to

11     look at pleadings on the docket online?

12          A.  Yes, I have.

13          Q.  Did you do that often?

14          A.  I've done it at a few specific occasions.  It

15     was not a regular occurrence.  There were specific times

16     when I went and did that.

17          Q.  Did you make a plan to do that every so often

18     in a set particular time period or just on an ad hoc

19     basis?

20          A.  It was on an ad hoc basis, and primarily it was

21     also in part driven by communications that I would have

22     first from Mr. Berko and then with Mr. Rumberger when he

23     had taken over the case, meaning the Sutherland case.

24          Q.  Did you start monitoring the Baggett and Young

25     litigation as soon as you found out about them?
```

```
 1          A.  Yes.

 2          Q.  When was that?

 3          A.  When Mr. Berko was informed by your firm that

 4     the case had already been filed, that it appeared to

 5     them similar to the Sutherland case.

 6          Q.  Can you remember when that was?

 7          A.  That would have been mid-August 2008.

 8          Q.  How many days would you say you visited the

 9     Baggett docket?

10          A.  At least ten.  Maybe a lot more.

11          Q.  And how about the Young docket?

12          A.  The same -- no.  Less.  Definitely not because

13     it was a shorter case.

14          Q.  Is it fair to say that you stay on top of those

15     dockets?

16          A.  At this point I had downloaded and carefully

17     read every single important document on those dockets.

18          Q.  Have you ever seen something you understood to

19     be Judge Guilford's order of preliminarily approving the

20     settlement?

21          A.  No.  I got that from Mr. Rumberger in

22     September.

23          Q.  In September?

24          A.  Yes.

25          Q.  Did you read it when you got it?
```

```
 1            A.  Yes.

 2            Q.  Is it fair to say you read it carefully?

 3            A.  Yes.

 4            Q.  Can you turn to paragraph 14 of your

 5       declaration, please?  Lines 8 and 9, beginning in

 6       paragraph 14, there is a reference to a "collusive

 7       settlement."  Do you see that?

 8            A.  I apologize.  We are on page 14 of Exhibit 5?

 9            Q.  Sorry.  Paragraph 14.

10            A.  Oh, I'm totally in the wrong place.  Which line

11       would you like me to look at?

12            Q.  It's the sentence that starts on line 8 and

13       ends on line 9?

14            A.  Got it.

15            Q.  Do you see the term "collusive settlement"

16       there at the end of the first sentence?

17            A.  Yes.

18            Q.  Those are your words, right?

19            A.  Yes.

20            Q.  What does that mean?

21            A.  It means a lot of different things.

22            Q.  Well, I'm asking what you meant when you wrote

23       it.

24            A.  Okay.  What I meant is that the settlement does

25       not in any way address the original and ongoing fraud by
```

1  Hewlett-Packard.  I believe that the settlement actually

2  serves the economic interests of the designated counsel

3  and Hewlett-Packard, but is actually a settlement that's

4  against consumers in every conceivable way.

5      Q.  When does "collusive" mean to you?

6      A.  Collusive can mean two different things.  It

7  could mean two people or two or more entities explicitly

8  agreeing to work towards a particular mutually

9  beneficial outcome.  It can also mean two or more

10 entities knowing that they can benefit by cooperating on

11 something and not even having to explicitly say that

12 they are going to collude or cooperate.  Then each

13 independently taking steps towards achieving a common

14 goal.

15     Q.  Which is it in this declaration?

16     A.  In this declaration, it would be more of the

17 second simply because I don't have any specific evidence

18 of the first.

19     Q.  So you don't have any evidence that HP, for

20 instance, engaged in any conduct that you would consider

21 improperly collusive; is that right?

22     A.  That is correct.

23     Q.  But not so with regard to designated counsel?

24         MR. KABATECK:  No.  We are horrible.

25         THE WITNESS:  Sorry.

```
 1              MR. KABATECK:  You think it's funny?

 2              THE WITNESS:  No.  I thought it was funny that

 3        you interjected because you've cautioned me not to do

 4        the same thing.

 5        BY MR. HENNING:

 6        Q.  I think you mentioned you have a receipt of

 7        mailing to the clerk; is that right?

 8        A.  Yes.

 9        Q.  Of your objection?

10        A.  Yes.

11        Q.  Is that a registered mail receipt?

12        A.  No.  I paid with my Visa Card at the counter,

13        at SFO post.

14        Q.  It doesn't look like the proof of service, and

15        you can look at it on page 15.  It has a return receipt

16        requested.  Do you remember doing that?

17        A.  No, I did not do that.

18        Q.  Do you know whether the clerk got it?

19        A.  I do not know.  I've made every effort to

20        contact the clerk of the court and left multiple

21        messages and e-mails.  To this day, I haven't received

22        an answer from them whether or not they got it.

23        Q.  Have you gone on the docket after the time you

24        mailed this to the clerk?

25        A.  No, I haven't.  I don't have a way of doing it.
```

1    Mr. Rumberger informed me that it did not make it there,

2    and --

3         Q.  You said you don't have a way to do that.

4              MR. DOSA:  Just answer the question.

5    BY MR. HENNING:

6         Q.  How did you get on the docket the other times

7    you got on the docket?

8         A.  Mr. Berko was kind enough to allow me the use

9    of his name and password for access.  Since he is no

10   longer involved, I have not used it any longer.  I get

11   everything through Tim at this point.

12        Q.  Have you thought about whether there is any

13   settlement in this case you wouldn't object to?

14        A.  Absolutely.

15        Q.  In your mind, there is some form of settlement

16   you wouldn't object to in this case?

17        A.  Not only did I think about it, but I have

18   numerous documents within which I outlined it very

19   clearly.

20        Q.  Okay.  Can you turn to paragraph 18 of your

21   declaration?  While you are doing that, how long did it

22   take you to prepare this?

23        A.  Gosh.  About at least 48 hours of actual work.

24        Q.  When did you start preparing it?

25        A.  I've been preparing thoughts for it since the

1   time that I've learned about the settlement and formed

2   an intention to object, and then the actual writing of

3   it -- the real focus, bringing it all together, was

4   between December 31st and the 4th of January.

5        Q.  So beginning in around September 2010, when you

6   learned of the settlement, you had at least begun the

7   process of preparing this objection; is that right?

8        A.  Yes.  I began thinking about it and collecting

9   my thoughts about it.

10       Q.  And this is a process that you spent, say, more

11  than three months on?

12       A.  Well, it would not be entirely accurate.  Over

13  the period of three months, there was an occasional

14  involvement in it.  I had plenty of other things to

15  attend to.  As it got close to the deadline and our

16  efforts to reach out to the Kabateck law firm had

17  failed, that became the primary focus of my efforts.

18       Q.  What, if any, role do you play in the

19  settlement case?

20       A.  Well, I'm part of the class, number one.

21  Number two, I am a consultant for the case.  I have

22  provided and continue to provide research that I share

23  with Mr. Rumberger, and also I communicate about all of

24  my work with Ms. Sutherland.

25       Q.  Did you play any role in the filing of the

1    Sutherland action?

2         A.  Yes, I did.

3         Q.  Tell me about that role.

4         A.  How far back would you like me to go?  A

5    narrative, or --

6         Q.  Was the Sutherland case your idea?

7         A.  No.

8         Q.  Whose idea was it?

9         A.  It was actually the idea of a client, Henry

10   Laughlin, who ran into the same problem and contacted me

11   and said, "Michael" -- the long and the short of it is,

12   "Michael, I'm mad at this.  I want to file a class

13   action lawsuit.  Please find me an attorney who will do

14   that."

15        Q.  Did you do that?

16        A.  I had contact with Henry Laughlin and Dan

17   Berko.  I want to emphasize that I had absolutely no

18   role whatsoever in encouraging Henry.  It was completely

19   his own initiative.  Yes, I had established contact

20   between Mr. Berko and Henry Laughlin.

21        Q.  So you hooked the two of them up; is that --

22        A.  I connected them up, yes.

23        Q.  -- right?  Did you continue to play a role in

24   what became the Sutherland case?

25        A.  Yes.  Martha continued to have problems with

1    her printer.  At that point I had managed to reach out

2    to HP corporate escalation team, which took place --

3    well, not took place, but through the Mac world show in

4    2008.  That show was attended by HP personnel.  They had

5    promised --

6              First of all, you know, they appeared very

7    courteous and professional.  They contacted myself as

8    promised.  They acknowledged that the problem exists.

9    They called it the so-called 10 percent bug.

10             They were very receptive and said, "Anything we

11   can do for your client, we have a solution to the

12   problem.  We have a new framework that corrects this

13   bug.  There is a very specific procedure you must follow

14   for the fix to take place.  We will provide a free set

15   of cartridges for Ms. Sutherland."

16             All that took place, but the printer continued

17   doing exactly what it did before.  I also had reports

18   from multiple other clients calling and complaining to

19   me.  At that point I felt it was my responsibility to

20   research this since I was the one whom evaluated these

21   printers and recommended them to my clients in the first

22   place.

23             I picked up cartridges that Martha had saved

24   over a year ago, took them to LaserLink, asked them to

25   drill them.  That's when we discovered the first set of

1    shocking evidence.  Then I videotaped that.  I presented

2    that to Martha.  I said, "This is what's going on."

3    Martha said, "We've got to do something about it.  This

4    is not right."

5         Q.  And your work then led to the Sutherland

6    action.  Fair?

7         A.  Yes, I introduced her to --

8              MR. DOSA:  The answer is yes.

9    BY MR. HENNING:

10        Q.  And the shocking evidence you found was a lot

11   of toner left; is that right?

12        A.  That is correct.

13        Q.  At the time you found toner left, did you know

14   how many pages had been printed?

15        A.  I found that out after one of the cartridges

16   was drilled.  Not all of them them were drilled at the

17   same time.  So I had placed them back in the printer

18   because it wouldn't tell you the report if you placed

19   them into any other printer because --

20        Q.  The question, Mr. Vlastone, is:  At the time

21   you learned that there was toner left, did you know how

22   many pages were printed?

23        A.  No, I did not.

24        Q.  Did you ever call HP to complain about your own

25   printers?

1       A.  Yes, I did.

2       Q.  How many times?

3       A.  Actually as soon as I bought it, and the

4   problem was unrelated to yield.  I --

5           MR. DOSA:  Number of times?

6           THE WITNESS:  One time.

7           MR. DOSA:  Thank you.

8   BY MR. HENNING:

9       Q.  Which printer?

10      A.  That was the 2600n that I purchased from

11  LaserLink.

12      Q.  And that complaint was unrelated to page yield?

13      A.  Correct.  And HP took care of it.

14      Q.  Was it unrelated to toner?

15      A.  Correct.

16      Q.  So no other complaints to HP about your own

17  printers; is that right?

18      A.  That is correct.

19      Q.  It's fair to say, Mr. Vlastone, you are

20  familiar with the Sutherland action, right?

21      A.  Oh, yes.

22      Q.  You are very familiar with it?

23      A.  Yes, very familiar with it.

24      Q.  From its inception?

25      A.  Yes.

```
 1          Q.   Is there anybody you think is more familiar

 2     than you with the Sutherland case?

 3          A.   Only to the extent of legal knowledge would be

 4     Tim Rumberger.

 5          Q.   Anybody else?

 6          A.   No.

 7          Q.   Anybody other than you more familiar with the

 8     facts that underlie the Sutherland case?

 9          A.   Probably not.

10          Q.   I think you mentioned to Mr. Kabateck earlier

11     today that the theory in your view of the Sutherland

12     case has been the same ever since it was filed; is that

13     right?

14          A.   There has been some modifications, but the

15     fundamental issue, which is there was a yield promise by

16     HP --

17               MR. DOSA:   The question is --

18     BY MR. HENNING:

19          Q.   Has the theory been the same since it was

20     filed?

21          A.   The fundamental theory, yes.

22          Q.   Is the same?

23          A.   Yes.

24          Q.   And it has been the same ever since it was

25     filed?
```

1          A.  Yes.

2          Q.  Have you seen HP's demurrer to the Sutherland

3     action?

4          A.  Yes, I did.

5          Q.  Can you recall when you saw that?

6          A.  When Mr. Rumberger forwarded it to me fairly

7     recently.

8          Q.  Can you estimate the date or the month,

9     whatever is easiest for you?

10         A.  End of December I want to say.

11         Q.  Did you read it?

12         A.  Yes, I did.

13         Q.  What did you think?

14         A.  Well, I thought that was really shoddy work.

15         Q.  How so?

16         A.  Because it pretends that it's not -- like it

17    pretends that the second amended Sutherland complaint is

18    not saying what it's actually saying, and the demurrer

19    is addressing really the Baggett and Young litigation.

20         Q.  Any other reason you thought it was shoddy?

21         A.  Because I think it was a total waste of time,

22    instead of addressing the real issues that were being

23    put forth in the Sutherland litigation.

24         Q.  You've reached opinions about the legal merit

25    of these cases in the settlement, haven't you?

1        A.  Which cases?

2        Q.  The Baggett and Young cases.

3        A.  Would you please repeat the question again?

4        Q.  Sure.  I'll ask a different question.

5        A.  M-hm.

6        Q.  Have you reached a conclusion, your views, of

7    the legal merit of these cases?

8        A.  I felt that the -- yes, I have.

9        Q.  What is that view?

10       A.  That view is that the cases were advanced based

11   on a completely flawed legal theory, flawed to the

12   extent that it would actually allow a class action law

13   firm to file lawsuits against manufacturers who were

14   fully compliant with their promises to consumers.  At

15   the same time, it's a legal theory that would utterly

16   fail in the courts, which it had.

17       Q.  You don't think it had that much merit?

18       A.  Yes.  I do not think they have very much legal

19   merit.  I also think the research was insufficient, and

20   the fact-finding work performed on behalf of the Young

21   case specifically.  I think the Baggett case -- well, to

22   the extent that I can comment, it was well researched

23   because there was expansive discovery conducted.  The

24   Young case was not thorough researched.  Essential data

25   was missed which perhaps, if it had been discovered,

1    would have persuaded counsel to undertake a different

2    strategy.

3        Q.  Have you undertaken any investigation to figure

4    out how many pages you printed with your print

5    cartridges in your 2600n?

6        A.  Yes.  And that's in the study.

7        Q.  So your printer was one used in the study?

8        A.  Absolutely.

9        Q.  Do you have any financial interest in the

10    Sutherland litigation?

11        A.  Can you be more explicit about what you mean by

12    that?

13        Q.  Do you stand to get any money from the

14    Sutherland litigation?

15        MR. DOSA:  Well, that's vague.  If the lawsuit

16    prevails, he would gain as a member of the class.  Is

17    that what you mean?

18        MR. HENNING:  Well, I'm asking him if he thinks

19    he has any financial interest in the Sutherland case.

20        MR. DOSA:  If you understand the question, and

21    you can answer it, by all means, do that.

22        THE WITNESS:  Yes.

23    BY MR. HENNING:

24        Q.  What is that interest?  Is it simply your

25    interest as a member of that putative class?

1          A.  That is definitely one interest.

2          Q.  Are there others?

3          A.  Yes.

4          Q.  What are the others?

5          A.  I've done an enormous amount of work and

6     undertook an enormous amount of expense in order to

7     uncover this fraud, and I certainly hope that I would be

8     compensated for these very, very substantial expenses.

9          Q.  Do you have any agreement to be compensated?

10         A.  No, I do not.

11         Q.  Who do you hope to be compensated from?

12         A.  One possibility would be -- first of all, the

13    answer is:  I don't have an exact plan for that.  That's

14    never been my number one priority.  As a matter of

15    secondary importance to my key objectives in doing my

16    work, I believe there some possibility that cy pres

17    funds would be allocated to compensate those who have

18    spent an enormous amount of uncompensated work to end

19    this fraud.

20         MR. KABATECK:  Would you mark this section of

21    the transcript for me, please?  It's c-y, another word,

22    p-r-e-s.

23    BY MR. HENNING:

24         Q.  We'll get back to that in a minute.

25              Do you have any other financial interest in

1 Sutherland beyond your interest as a putative class

2 member and your interest in hoping to get reimbursed for

3 the work you've done?

4   A. No.

5   Q. Any way other than a cy pres recovery that you

6 expect to get reimbursed for your work?

7   A. No.

8   Q. Can you tell me your understanding of what was

9 cy pres?

10   A. My understanding of the cy pres doctrine is, it

11 stands for as closely as possible. It has been used

12 historically to provide funding to nonprofits and at

13 times individuals who do work in the realm of corporate

14 governance and fraud prevention, environmental damage

15 prevention, et cetera.

16   Q. Do you understand that it applies when there is

17 a settlement of litigation?

18   A. That is correct.

19   Q. Do you have any understanding as to whether it

20 applies in any other instance?

21   A. Not that I'm aware of.

22   Q. So you haven't been reimbursed for any of your

23 work that is part of the settlement case to date; is

24 that right?

25   A. That is correct.

1    Q.  Have you received any payments from Ms.

2    Sutherland in connection with this lawsuit?

3    A.  Not a penny.

4    Q.  How about from Mr. Laughlin?

5    A.  Not a penny.

6    Q.  How about anyone else?

7    A.  Not a penny -- I'm sorry.  That's not true.  I

8    have received $10,000 from Maurice Kanbar per Charitable

9    Trust towards covering a small portion of the costs in

10   developing the 18-minute documentary that was shared

11   with Mr. Schultz on May the 13th, 2009.

12   Q.  Do you have any understanding as to why Mr.

13   Laughlin isn't a plaintiff?

14   A.  Yes, I do.

15   Q.  Why is that?

16   A.  Because Mr. Laughlin had gotten into a long

17   argument with HP tech support people on the phone, and

18   they finally disclosed to him that there is an override

19   mode after a few hours.  He was actually able to use

20   that override mode.  The conclusion of Mr. Berko was

21   that Mr. Laughlin did not actually suffer a damage as a

22   result of this fraud.

23   Q.  So the override gave him what he was supposed

24   to get, in his view?

25   A.  No, it didn't.  I'll comment on that in a

```
 1      second.  Mr. Berko felt that he was not a good

 2      representative because of his experience.

 3           Q.  Mr. Vlastone, can you go to paragraph 18, your

 4      declaration, please?  It's Exhibit 5.

 5           A.  Sure, yes.

 6           Q.  You are free to look at this.  You wrote it.  I

 7      assume you are familiar with it.  If you look at

 8      paragraph 18, lines 14 and a half --

 9           A.  Okay.  Got it.

10           Q.  -- down to, say, 19 and a half.

11           A.  Let me just read that.

12           Q.  Sure.  Read what you like, but I'm going to ask

13      you about the sentence that starts, "I also have reasons

14      to believe."

15               (Pause in proceedings.)

16               THE WITNESS:  Yes.

17      BY MR. HENNING:

18           Q.  Do you see on line 17 there the two words

19      together "substantial variability"?

20           A.  Yes.

21           Q.  What does that mean?

22           A.  What that means is there are some individuals

23      who suffer more damages as a result of the toner yield

24      fraud than others, but it's not a consistent experience

25      for every single consumer.  It depends on the type of
```

133

1    printing they are doing at the time when they are using

2    the printer.

3        Q.  In your view, are there people who, because of

4    their type of printing, don't suffer any damage at all?

5        A.  Hypothetically that possibility definitely

6    exists.

7        Q.  How would those people use their printers?

8        A.  A good example of that would be graphics

9    designers who would use this printer as a proof printer

10   or a production printer, and they would be engaged in

11   consistently printing heavy color coverage documents

12   where color coverage is at 5 percent for each of the

13   cartridges or more.

14       Q.  Can you flip to paragraph 20 now of your

15   declaration?

16       A.  M-hm.

17       Q.  Again, you can read what you like, but I'm

18   going to ask you about the first sentence in that

19   paragraph.

20       A.  Sure.

21       Q.  It's the line between line 21 and 22.

22       A.  Yes.

23       Q.  The term "advertised," do you see that?

24       A.  Yes.

25       Q.  What does advertise mean to you?

1          A.  Advertise means statements that are propagated

2     by the seller of something through media published in

3     owners' manuals, brochures, point of sale materials, the

4     box in which equipment is sold.

5          Q.  Actual statements made --

6          A.  Actual statements --

7          Q.  -- by the seller?

8          A.  -- yes.

9          Q.  I'll say that again so we get it without us

10    talking over each other.

11          Actual statements made by the seller, right?

12         A.  Yes.  That's correct.

13         Q.  Paragraph 23?

14         A.  M-hm.

15         Q.  It's the second sentence I'm going to ask you

16    about.  It starts on line 19.  It starts, "Such

17    outcome."  Do you see that?

18         A.  Yes.

19         Q.  Do you see at the end where it says, "and in

20    full cooperation with the California AG"?

21         A.  Yes.

22         Q.  Does that mean in your view the Sutherland

23    litigation has the full cooperation of the California

24    AG?

25          A.  No.  The other way around.  It indicates my

1    intent to fully cooperate with the California Attorney

2    General.

3         Q.  It says in part, "Allow the Sutherland

4    litigation to proceed on track and in full cooperation

5    with the California AG."  You are not saying that --

6         A.  You know, now that you have read that, I

7    realize that it could be interpreted both ways.  Perhaps

8    I would have been better off structuring that sentence

9    in a manner that it could not be interpreted both ways.

10        What I meant was that it is my intent certainly

11   to fully cooperate with the California Attorney General

12   with regards to the investigation that they are

13   undertaking.

14        Q.  Mr. Vlastone, I take it you have seen all of

15   the Sutherland complaints; is that right?

16        A.  Yes.

17        Q.  In fact, you provided information in order to

18   prepare those complaints; is that right?

19        A.  Yes, I did.

20        Q.  Did you actually prepare any of them?

21        A.  I prepared sections of them, yes.

22        Q.  Do you recall by content or subject matter the

23   sections you prepared?

24        A.  Yes.

25        Q.  What are they?

1     A.  My biggest contribution was in two areas.

2    Number one is very precisely describing what yield is to

3    make sure that the court fully understands what the ISO

4    standard means, how it works, and what it implies, any

5    references, obviously, to the studies that I had

6    conducted.

7         There was another section, the idea for which

8    was developed independently by attorney John Pollitt who

9    consulted for this case to Mr. Berko, and that has to do

10    with the CLRA claims independent of yield claims and

11    based entirely on HP's published admissions of defects.

12     Q.  Mr. Vlastone, do you have any understanding why

13    the Sutherland lawsuit was filed?

14     A.  Yes, I do.

15     Q.  What's the basis of your understanding?

16     A.  Because Martha Sutherland has exhausted her

17    efforts to get HP to correct the problem and was lied

18    to, that the problem is fixed.  She saw the physical

19    evidence of the extraordinary waste of her money and

20    toner that was purchased for the purposes of delivering

21    the advertised yields.  Martha and myself believe that

22    this class action lawsuit will bring about HP ending

23    this fraud.

24     Q.  Can you look at Exhibit 9, please?

25     A.  M-hm.

1        Q.  Is it fair to say this document sets out some

2    strategy for the Sutherland litigation?

3        A.  It discusses my opinions about the Sutherland

4    litigation.

5        Q.  Does it go further and provide at least your

6    view of the strategy of that case?

7        A.  I'm not fully aware of the entire strategies.

8    That's the job of Mr. Rumberger.  I know what my

9    strategies are or the strategies of the Integrity

10    Capitalism Network are, and I can comment on that.

11        Q.  Well, your strategy is set forth in this

12    document; isn't that right?

13        A.  Yes.

14        MR. DOSA:  Can we take --

15        MR. HENNING:  Sure.

16        (Recess.)

17    BY MR. HENNING:

18        Q.  Mr. Vlastone, do you know what ISO means?

19        A.  Yes.  International Standards Organization.

20        Q.  Do you have any understanding of how ISO's

21    testing standards play into the color LaserJet printers?

22        A.  I believe I have a very thorough understanding

23    of that.

24        Q.  Is it accurate that the study you performed

25    concluded that HP's printers do pass the ISO 5 percent

1    coverage yield test?

2         A.   That is absolutely correct.

3         Q.   Mr. Vlastone, earlier today, you were talking

4    to Mr. Kabateck about some -- I think your words were

5    unethical conduct that HP lawyers have engaged in.

6         Do you believe that HP's lawyers have, in fact,

7    engaged in unethical conduct?

8         A.   Mr. Kabateck represented that --

9              MR. DOSA:   The question is --

10             THE WITNESS:   Yes.   Sorry.

11   BY MR. HENNING:

12        Q.   What is that conduct?

13        A.   Mr. Kabateck represented to me in the first

14   phone call that he had no idea that we are moving

15   forward, and that there is a study.   My understanding is

16   it was HP's duty to disclose to Mr. Kabateck and his

17   firm and all the lawyers involved that there is a case

18   that's moving forward that's based on a substantially

19   different legal theory, which is based on allegations of

20   yield fraud as opposed to allegations of inability to

21   use all the toner that's contained in the cartridge.

22        I also believe that HP is being unethical by

23   knowing that and deliberately adding the language of

24   yield into the settlement, which were never alleged by

25   the designated counsel, nor were they ever litigated.

```
1        Q.  So that I understand it correctly, you think I
2   and my law firm engaged in unethical conduct by not
3   telling, in your view, Mr. Kabateck about litigation
4   that you claim is completely legally and factually
5   different from his?
6        A.  Him and the court.  That's right.
7        Q.  So is there any other completely different, in
8   your view, factually legal litigation we should be
9   telling him --
10       A.  If there are other cases pending that we do not
11  know about, I believe all the cases should be disclosed
12  to the court --
13       Q.  So any --
14       A.  -- related to that specific issue, to consumers
15  not being happy with the use of toner in the 2600n
16  printers, which is what I am an expert on.
17       Q.  Why, in your view, should we have told Mr.
18  Kabateck about something that is completely different
19  from his case?
20       A.  Because the settlement should only release --
21       Q.  That's not my question.  You've made --
22       A.  You said why.  I'm answering why.
23       Q.  You've made a serious charge about HP lawyers
24  engaging in unethical conduct?
25       A.  That's right.
```

1    Q. And that charge is that we didn't tell Mr.

2 Kabateck about the Sutherland case and your study,

3 right?

4    A. M-hm.

5    Q. Okay. And you've testified, in your view, the

6 Sutherland case is entirely different both factually and

7 legally from the Baggett and Young case, right?

8    A. Yes.

9    Q. So your testimony is that HP's lawyers, I and

10 others, engaged in unethical conduct by not telling Mr.

11 Kabateck about a case and a study that pertains to

12 completely different factual and legal grounds? Is that

13 your testimony today?

14    A. Yes.

15    Q. Should we tell him about patent cases?

16    A. No. But you should tell him about yield claims

17 that we're making that they did not make. Yet, you

18 chose to insert yield language very explicitly into the

19 settlement.

20    Q. If the Sutherland litigation and the Baggett

21 and Young litigation were related, in your view, would

22 the release be appropriate?

23    MR. DOSA: I'm sorry. Would you --

24    THE WITNESS: I didn't understand that at all.

25 BY MR. HENNING:

141

1      Q.  The question is:  If the Sutherland litigation

2  and the Baggett and Young litigation were based on

3  related matters, in your view, would the release be

4  appropriate?

5      A.  Only if the same foundational allegations were

6  made in both.

7      Q.  My question asked:  If they were based on

8  related matters, would a release be appropriate?

9      A.  Like I said, the release would only be

10  appropriate if --

11      MR. DOSA:  Actually, you know something?

12  That's a hypothetical question, and he is not here as an

13  expert about this.

14      THE WITNESS:  I'm having difficulty formulating

15  the grammar -

16  BY MR. HENNING:

17      Q.  Have you ever used the term "related"?

18      A.  It's a very broad term.

19      Q.  Have you ever used the term?

20      A.  Yes.

21      Q.  When you use it, what does it mean?

22      A.  It can mean lots of different things.

23      Q.  What are the possibilities?

24      A.  Like both cases deal with laser printers, even

25  though maybe one case might be that they tend to explode

```
 1    hypothetically.  Another case might deal with the fact

 2    that they don't deliver yields.  They are related, but I

 3    can't see any reason why both should be released if one

 4    is about exploding printers, and the other one is about

 5    printers that don't deliver yields.

 6         Q.  If it were the case that the Sutherland lawsuit

 7    and the Baggett or the Young lawsuit raised

 8    substantively similar issues, in your view, would the

 9    release be appropriate?

10         MR. DOSA:  That's a hypothetical question.  I'm

11    going to instruct you not to answer that.

12         MR. HENNING:  On what grounds?

13         MR. DOSA:  He is a lay witness, and he's given

14    you his opinion about -- as a member of a party --

15    excuse me.  He is a member of a class in two separate

16    class actions.  You are asking him to answer a

17    hypothetical question.  So I'm not going to let him

18    answer that question.

19         MR. HENNING:  He is here today as an objector

20    to the terms of settlement complaining about a release.

21         MR. DOSA:  Right.

22         MR. HENNING:  I'm asking him about the release.

23         MR. DOSA:  He told you why he thinks it's

24    wrong, because the release covers issues that he

25    believes aren't related to the complaint -- let's back
```

```
1    up.
2            He's testified that the settlement agreement
3    that was drafted by HP attorneys includes the issue of
4    yields.
5            MR. HENNING:  Your view.  That's wrong, but go
6    ahead.  Keep going.
7            MR. DOSA:  I'm just repeating what the witness
8    said.
9            MR. HENNING:  Well, I know what he said.  My
10   question is -- he is objecting to the release.
11           MR. DOSA:  M-hm.
12           MR. HENNING:  He's got to answer questions
13   about why the release is improper, and what would make
14   it proper.
15           MR. DOSA:  So you can ask him hypothetical
16   questions, and he can speculate?  Is that what you are
17   saying?
18           MR. HENNING:  You can object and say I'm asking
19   --
20           MR. DOSA:  Okay.
21           MR. HENNING:  -- for speculation.  It's not
22   grounds to instruct him not to answer the question.
23           MR. DOSA:  I may do that anyway.
24           THE WITNESS:  Now, the way you phrased it --
25           MR. DOSA:  No, no.  Hang on.  He is going to
```

1       ask you a question.  If it's not objectionable, or

2       something that I think you shouldn't answer, then we'll

3       go accordingly.

4       BY MR. HENNING:

5           Q.  If the Sutherland litigation and the Baggett

6       and Young litigation raised substantively similar

7       issues, in your view, would the release be appropriate?

8             MR. DOSA:  Well, it's still a hypothetical, and

9       the question is, what are the substantively similar

10      issues, how similar are they, and how broad are they to

11      the big scope of all the issues raised by the two

12      lawsuits.  It calls for him to completely speculate on

13      what you mean.

14      BY MR. HENNING:

15          Q.  Answer the question, please.

16            MR. DOSA:  If you think you can answer it,

17      fine.  If you can't, then --

18            THE WITNESS:  The only way I can answer that

19      question that makes sense to me is that I would not

20      object to the Baggett and Young settlement if it did not

21      include in it yield claims.

22      BY MR. HENNING:

23          Q.  That's it?

24          A.  That's the main thing.

25          Q.  Is there any other thing?

1          A.  The other thing that I find objectionable is

2     that the settlement calls upon consumers to use

3     E-Credits -- in my opinion, they are coupons, but

4     E-Credits -- to purchase potentially, or with high

5     likelihood, supplies from Hewlett-Packard.  Even though

6     it might save them a tiny amount of money on the

7     purchase, it would actually further harm these consumers

8     by preventing them from obtaining their yields, and

9     their losses on average would total about 50 bucks

10    against the seven-dollar discount.

11          This type of settlement would only be

12    appropriate if HP had agreed to provide simultaneously

13    with every cartridge they sell a firmer upgrade that

14    would end the underlying software that causes this fraud

15    in the first place.

16          Q.  Is all this in your declaration?

17          A.  Give me a moment to review.

18          Q.  Let's do it this way:  Did you intend in your

19    declaration to set forth every basis upon which you

20    object to the settlement?

21          A.  To the extent that I was able to write it down

22    as a layperson, yes.

23          Q.  You knew about the E-Credits when you wrote

24    your declaration, right?

25          A.  Correct, and I commented on it in the

1    declaration.

2        Q.  So the question again is:  Did you intend for

3    that declaration to set forth every basis upon which you

4    objected?

5        A.  Yes.

6        Q.  You didn't intentionally leave anything out?

7        A.  No.

8        Q.  So every reason you know of that you are

9    objecting to the settlement is in the document?

10        A.  The most important reasons are all there.

11        Q.  Are all the reasons there?

12        A.  My recollection is that I had a very large set

13    of notes, and I focused on the ones that were the most

14    important ones, and there were some that were left out.

15        Q.  Are the ones you left out anything you care

16    about?

17        A.  I don't think it's material to the matters at

18    hand, no.

19        Q.  So anything that you think is material to the

20    matter at hand is in your declaration?

21        A.  I believe the facts are.  The arguments may not

22    be.  There may be an additional limitation that will

23    take place during the fairness hearing.

24        Q.  Well, Mr. Vlastone, I'm entitled to know your

25    objection, to know the basis of your objection.  I want

```
1     to know if I have to look anywhere else --

2          A.  I think the basis is there, yes.

3          Q.  Okay.  Anything you have to complain about the

4     settlement, I can go to your declaration and find it?

5          A.  My declaration, plus the study, plus the

6     Sutherland complaint, plus the evidence stack for the

7     settlement complaint, all of that together encompass my

8     objection.

9          Q.  Is all that other stuff attached to your

10    declaration?

11         A.  Yes, it is.  I sent this thick of a stack to

12    the court and electronically provided it to all of you.

13         Q.  I think you testified that you've read all the

14    Sutherland complaints; is that right?

15         A.  Yes.

16         Q.  You read it carefully?

17         A.  Yes.

18         Q.  Anything in there that you believe to be

19    incorrect?

20         A.  No.  I cannot think of anything that was

21    incorrect in the Sutherland complaint.

22         Q.  I mean, you have the ability to suggest changes

23    to the complaint, right?

24         A.  Yes.

25         Q.  And you would have suggested a change if you
```

1    thought anything that was in there was incorrect, right?

2         A.  Yes.

3         Q.  You testified earlier about your meeting with

4    Mr. Schultz?

5         A.  That is correct.

6         Q.  I believe that was in Palo Alto.  Do you

7    remember that?

8         A.  Yes.

9         Q.  What was Mr. Schultz's reaction to your

10   theories and claims of fraud?

11        A.  His reaction was that he agreed with my

12   theories as to what yield promises and what would

13   constitute the full delivery of the yield promise to

14   consumers, but then he disagreed with my factual

15   findings.

16             He felt that the -- I recall him saying that

17   the set of data, which was basically cartridges from

18   four families, was too small, and "There must be

19   something that they are doing wrong because our printers

20   just don't behave that way.  We tested them.  They don't

21   do what's shown in the video. That just can't happen."

22        Q.  I mean, he didn't agree with you that there was

23   anything improper going on, did he?

24        A.  Incidentally, he agreed -- from the very

25   beginning of the meeting, Mr. Schultz agreed that HP

1    made improper disclosures about the use of the override.

2    He said he immediately offered his openness in working

3    with us towards modifying those disclosures, to which I

4    responded, "That's not the problem."

5         MR. DOSA:  The question is what he said.  So

6    let's stay with that.

7         THE WITNESS:  So Mr. Schultz had agreed that

8    there were problems with HP conduct vis-a-vis the

9    override mode.  He disagreed with my assertions that HP

10   printers do not deliver yield in the way that he --

11   based on the understanding of yield promise that both of

12   us had fully agreed on in that meeting.

13   BY MR. HENNING:

14        Q.  Are you certain he agreed with you that HP

15   engaged in improper conduct with regard to the override?

16        A.  The words that I remember Mr. Schultz saying

17   were, "We didn't do a good job on that, and we've got to

18   fix that."

19        Q.  You are certain of that?

20        A.  Yes.

21        Q.  As certain as you are sitting here today?

22        A.  That is the best of my recollection of that

23   conversation.

24        Q.  It's fair to say you controlled your side of

25   that meeting, the settlement team I'll call it, that

1    side of that meeting, you led that group; is that

2    correct?

3        A.  Yes.

4        Q.  And the video you mentioned you were showing,

5    is that a video showing toner remaining in cartridges?

6        A.  That's correct.

7        Q.  Did it show anything else?

8        A.  It showed discussions of HP's commitments

9    through the standard of business conduct.  It showed HP

10    brand advertisements that made claims as to the

11    extraordinary efficiencies of HP printers and

12    replacement supplies.

13        Specifically, to the extent of the discussions

14    of HP's commitments to the standards of business conduct

15    and honesty and integrity and making full disclosures,

16    one of the aspects of the video was, of course, the

17    dishonesty of the LCD display that reports back to the

18    consumer how the toner is being consumed when in reality

19    it's consumed totally differently.

20        Aside from any legal mumbo jumbo, I believe it

21    completely and utterly violates the so-called headline

22    test that HP urges every manager and employee to apply

23    in making their decisions with regard to how products

24    are designed and advertised.

25        Q.  I'm sorry to interrupt you.  Are you done?

1    A.  Well, you asked me a broad question.  I'm

2    giving you a broad answer.

3    Q.  Okay.  Are you done?

4    A.  I can go on easily for another 20 minutes to

5    describe all the aspects of the video.

6    Q.  Is the video online still?

7    A.  It's not generally online.  It's only

8    specifically available online to yourselves, to people

9    who have the code.  I kept my promise to Mr. Schultz and

10   not post that on the internet for public consumption as

11   long as we are working to mitigate this issue.

12   Q.  Have you ever objected to a class settlement

13   before?

14   A.  No.

15   Q.  I have a couple of housekeeping matters.  I

16   understand you are represented by Mr. Dosa at your

17   deposition; is that right?

18   A.  Correct.

19   Q.  Are you represented by anybody else?

20   A.  To the extent that I'm a class member, I'm

21   represented by Tim Rumberger.

22   Q.  In any other capacity, are you represented by

23   Mr. Rumberger?

24   A.  No.

25   Q.  Mr. Kabateck asked you a lot of questions about

```
 1        your interactions with Mr. Young.  I don't have any

 2        interest in going through all that again.

 3             A.   Okay.

 4             Q.   Did you tell Mr. Young anything you now believe

 5        to be incorrect?

 6             A.   No.

 7             Q.   The same question for Mr. Baggett?

 8             A.   No.

 9             Q.   And how about for the California AG's office?

10             A.   What I told them -- do I believe that I told

11        them something that's incorrect?

12             Q.   Is there anything you told them that you now

13        believe is incorrect?

14             A.   No.

15             Q.   Have you done any studies, like you've

16        described for HP, for any other printer manufacturers?

17             A.   No, I have not.

18             Q.   Why is that?

19             A.   I do not have the funding, and --

20             Q.   Have you ever been convicted of a crime?

21                  MR. DOSA:  A felony.  Answer that question.

22                  THE WITNESS:  No.

23                  MR. HENNING:  I don't have any other questions.

24                       FURTHER EXAMINATION

25        BY MR. KABATECK:
```

1        Q.  You used the phrase "economic interest of

2    counsel" referring to the class counsel?

3        A.  Correct.

4        Q.  I assume by that you mean effectively the class

5    counsel was bought off by HP in order to enter into a

6    settlement that you view as a sweetheart deal that

7    closes down your Sutherland case?

8        A.  I believe that to be a part of what is going

9    on, yes.

10        Q.  Okay.  So do you have any evidence that the

11    fees in this case were negotiated before the class

12    settlement was entered into?  Any evidence?  I'm not

13    talking about conjecture.

14        A.  Not at all.

15        Q.  So do you have any evidence of anything to

16    support or believe that class counsel in this case were

17    bought off by HP?  I'm not talking about conjecture.

18    I'm talking about evidence.

19        A.  I do not have factual evidence, no.

20        Q.  When you talk about cy pres money and the

21    potentiality that you may recover some cy pres money --

22    you are not a nonprofit -- were you just expecting that

23    you might get kind of a grant from the court for your

24    efforts?

25        A.  My expectation was that the Integrity

 1     Capitalism Network would be properly registered as a

 2     nonprofit a long time.  Unfortunately, the 2008

 3     collapse, all the funding that I was promised by a

 4     multitude of parties, none of it materialized.  I've

 5     been completely drained financially by the work that

 6     I've been doing over the last two years, and the --

 7              MR. DOSA:  I think you've answered the

 8     question.

 9              THE WITNESS:  So --

10              MR. DOSA:  I think you've answered the

11     question, which was about you being a nonprofit, and you

12     said you are not.  You thought about it.

13              THE WITNESS:  Yes.  Okay.

14     BY MR. KABATECK:

15         Q.  So who explained the concept of cy pres to you?

16         A.  I read about it myself on the internet.

17         Q.  Okay.  I take it that no one has affirmatively

18     promised you cy pres?

19         A.  Not at all.

20         Q.  So your hope is that somehow someone will award

21     you cy pres money, even though you have not been during

22     the pendency of any part of this litigation a nonprofit.

23     Is that a correct statement, sir?

24         A.  One more time, please.

25              MR. KABATECK:  Read the question back to him,

```
 1          please.

 2                  (Record read.)

 3                  THE WITNESS:  I have certainly operated in the

 4          spirit of a nonprofit, and my actions and work were

 5          indistinguishable from what it would have been had I had

 6          that official designation.  In my view, it's completely

 7          immaterial to what had actually taken place.

 8          BY MR. KABATECK:

 9               Q.  What amount of cy pres award were you thinking

10          of?

11               A.  I really have no idea.

12               Q.  Surely you have some idea.  Have you

13          contemplated at all?

14               A.  I have done some research about this, yes.

15               Q.  And?  What's the amount?

16               A.  It varies dramatically.

17               Q.  Not the research.  I'm talking about you,

18          yourself.  What are you formulating in your mind?

19               A.  I was hoping that I would be compensated for

20          the costs that I have actually incurred in conducting

21          the research, and then, you know, a reasonable hourly

22          rate to be determined by the court based on what I

23          contributed.  My hourly rate as a consultant is $150 an

24          hour.

25               Q.  How many hours have you put into this so far?
```

1          A.  Thousands.

2          Q.  So potentially you could be looking at an award

3     in the neighborhood of a million dollars?

4          A.  I'm not sure that the amount would support

5     that.

6          Q.  Well, thousands.  It could be 1,000, 2,000,

7     3,000, 10,000?

8          A.  I would just say that it's definitely in the

9     six figures.  You know, if I had been working on just

10    conducting my normal work, the amount of money that I

11    had foregone by focusing on this work is in the six

12    figures for sure.

13         Q.  And it's true, sir, that your six-figure or

14    multiple six-figure cy pres award will all go away if

15    the Baggett and the Young case is approved?

16         A.  That is correct.

17         Q.  Counsel was asking you some questions about the

18    Sutherland case being, I think in your words, factually

19    and legally different.

20              If it's factually and legally different, why

21    don't you just opt out of this case?

22         A.  Opting -- me just opt out?

23         Q.  Sure.

24         A.  How would that serve the injured consumers?

25         Q.  I'm asking you the question.

```
 1          A.  I don't see that as a viable strategy to
 2    achieve the goals that I have, which is to end this
 3    fraud and protect everybody.
 4          Q.  Ending the fraud and protecting everybody with
 5    a California only class, you think would still
 6    sufficiently change HP's behavior?
 7          A.  I think it would have an effect not only in
 8    California, not only in the United States, but it would
 9    have a global effect.
10          Q.  Okay.  Who is Mikhail Vladin, V-l-a-d-i-n?
11          A.  It's the name that I was given upon entering
12    this country, which is my mother's last name, yeah.
13          Q.  Have you also been known as Mike Vladin?
14          A.  Yes.
15          Q.  Mikela Vlastone, is that also a name that --
16          A.  No.  Actually, it was always Michael Vladin.
17    Abbreviated, it would be Mike Vladin.  And upon
18    naturalization, I changed my name to Vlastone because I
19    didn't like how Vladin sounded, and people could not
20    spell it or pronounce it.
21          Q.  So you legally changed your name?
22          A.  Yes, absolutely.  That was done by the judge
23    granting me U.S. citizenship in 1994.
24          Q.  What is echod.com, e-c-h-o-d, Inc.?
25          A.  That was one of my failed attempts to convert
```

1     my knowledge in various inventions in the realm of

2     digital media entertainment into a viable start-up

3     corporation.

4          Q.  And Shine Networks, Inc.?

5          A.  The same exact thing, but that was in 2004.

6     Again, a failed attempt.

7          Q.  And that's now a suspended corporation,

8     correct?

9          A.  Yeah.  Nothing ever happened with that.

10    Business is viable, but not scalable.

11         Q.  Do you have a business called Westlake Union?

12         A.  No.  I've never heard that.

13         Q.  Who is Zaid Altaha?  It's Z-a-i-d --

14         A.  I've never heard of that in my life.

15         Q.  - A-l-t-a-h-a?

16         A.  I would actually be interested to know what the

17    hell that is.

18              MR. DOSA:  He just made it up to tease you.

19              MR. KABATECK:  No.  For the record, I did not.

20              THE WITNESS:  In this world where identity is

21    stolen by people to undertake illegal activities, I sure

22    would want to know about it.

23    BY MR. KABATECK:

24         Q.  Stricklin Communications, is that a name you

25    are familiar with?

1          A.  No.

2          Q.  Have you ever heard of someone named Viviana,

3     V-i-v-i-a-n-a, Alvarado --

4          A.  Never.

5          Q.  -- A-l-v-a-r-a-d-o?

6          A.  No.

7          Q.  She might be using your Social Security number?

8          A.  You are kidding me.  Would you be willing to

9     share that information out of your good will?

10         Q.  I just did.  That's all I know.

11         A.  Well, it's flushed from my memory.

12             MR. DOSA:  I got it right here.

13    BY MR. KABATECK:

14         Q.  Have you ever filed bankruptcy?

15         A.  No.

16         Q.  Did Ted Frank -- remember, we talked about him

17    earlier?

18         A.  Yes.

19         Q.  Did he ever tell you the Center for Class

20    Action Fairness is not a 501(c)(3)?

21         A.  We never discussed that matter at all.

22         Q.  Did he ever explain to you the entity that

23    apparently owns the Center for Class Action Fairness,

24    Donors Trust?  Did he ever explain that entity to you,

25    Donors Trust?

1          A.  He did not.  I saw that reference in copies of

2     communications that had occurred between the various

3     parties and filings in the court that I was cc'd on.

4          MR. KABATECK:  I have no further questions for

5     you, sir.  Does anybody else have questions for the

6     witness?

7          MR. DOSA:  No.

8          MR. RUMBERGER:  No.

9          MR. HENNING:  No.

10         MR. KABATECH:  I'll propose that the court

11    reporter be relieved of her obligation under the code.

12    I've asked that this transcript be expedited.  I believe

13    I've also told everybody off the record, but during the

14    deposition, we got notice that the hearing was continued

15    to the 14th of February 2011.  I don't know the time.

16         I've asked the court reporter to expedite the

17    transcript.  The original transcript can be sent to?

18         THE WITNESS:  Myself.  767 Bryant Street, Suite

19    410, San Francisco, California 94107.

20         MR. KABATECK:  That in the event it's not

21    signed by the time of the hearing, a copy may be used by

22    any party for any purpose.  If it is signed -- I'll

23    actually ask Mr. Vlastone to sign it, to make any

24    changes you feel are necessary to correct the transcript

25    to make it accurate.

1          Just so it's completely clear, if you make

2     changes to the transcript that change the substance of

3     your testimony, that can be commented on later by any

4     counsel or any action related to this.

5          The transcript will be sent by Mr. Vlastone to

6     my office for safekeeping unless counsel disagrees.

7          MR. DOSA:  That's fine.

8          MR. KABATECK:  You'll probably send it to me,

9     and I'll advise everybody whether or not you signed and

10    whether or not you made any changes.

11         Anything else, gentlemen?

12         MR. DOSA:  Just send it certified.  You know,

13    signature required or something like that.  So there is

14    a trail.

15         THE WITNESS:  Okay.  No disrespect to you, but

16    please can you remove the D from my name?  My name is

17    Vlastone.

18         THE COURT REPORTER:  I don't have a "d."

19         THE WITNESS:  You are not the only one who

20    makes that mistake.

21         MR. KABATECK:  I don't have anything else.

22         MR. DOSA:  Did you give the suite number?

23         THE WITNESS:  Suite 410.

24         MR. KABATECK:  Can we go off the record,

25    gentlemen?

```
 1                    MR. DOSA:  Yes.

 2                    MR. HENNING:  Yes.

 3                    MR. KABATECK:  Thank you very much.

 4                    (Time noted:  4:39 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    _____)

2    _____)

3

4

5

6

7            I, the undersigned, declare under penalty of

8    perjury that I have read the foregoing transcript, and I

9    have made any corrections, additions or deletions that I

10   was desirous of making; that the foregoing is a true and

11   correct transcript of my testimony contained therein.

12           EXECUTED this _____ day of _____,

13   _____, at _____, _____.
                      (City)              (State)
14

15           _____
16                    MICHAEL VLASTONE

17

18

19

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, JOANNE BALBONI, CSR No. 10206, Certified

 4    Shorthand Reporter, certify:

 5           That the foregoing proceedings were taken before

 6    me at the time and place therein set forth, at which

 7    time the witness was put under oath by me;

 8           That the testimony of the witness, the questions

 9    propounded, and all objections and statements made at

10    the time of the examination were recorded

11    stenographically by me and were thereafter transcribed;

12           That the foregoing is a true and correct

13    transcript of my shorthand notes so taken.

14           I further certify that I am not a relative or

15    employee of any attorney of the parties, nor financially

16    interested in the action.

17           I declare under penalty of perjury under the

18    laws of California that the foregoing is true and

19    correct.

20           Dated this 31st day of January, 2011.

21

22

23        _____
          JOANNE BALBONI, CSR No. 10206

24

25
```

165

1   KABATECK BROWN KELLNER LLP
    BRIAN S. KABATECK, SBN 152054
2   (bsk@kbklawyers.com)
    RICHARD L. KELLNER, SBN 1714146
3   (rlk@kbklawyers.com)
    KAREN LIAO, SBN 256072
4    (kliao@kbklawyers.com)
    644 South Figueroa Street
5   Los Angeles, CA 90017
    Tel: (213) 217-5000
6   Fax: (213) 217-5010

7   CHITWOOD HARLEY HARNES LLP
    GREGORY E. KELLER (admitted *Pro Hac Vice*)
8   (gkeller@chitwoodlaw.com)
    DARREN T. KAPLAN (admitted *Pro Hac Vice*)
9   (dtkaplan@chitwoodlaw.com)
    2300 Promenade II
10  1230 Peachtree Street, N.E.
    Atlanta, GA 30309
11  Tel: (404) 873-3900
    Fax: (404) 876-4476

12  Attorneys for Plaintiffs and
    the Preliminarily Certified Class
13

14

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17  | In re: HP LASER PRINTER | **CASE NO. SA CV 07-0667** |
18  | LITIGATION | |
    | | HON. ANDREW J. GUILFORD |
19

20  **NOTICE OF DEPOSITION OF MICHAEL A. VLASTONE**

21  Date: January 21, 2011
    Time: 10:00 a.m.
22  Place: Walker, Hamilton & Koenig LLP
            50 Francisco Street, Suite 460
23          San Francisco, California 94133

24

25

26

27                                          EXHIBIT

28                                          1

                        — 1 —
    NOTICE OF DEPOSITION OF MICHAEL A. VLASTONE (CASE NO. CV-07-0667 AG)

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

2        YOU ARE HEREBY NOTICED that Plaintiff Kelsea Baggett, through his counsel

3   of record, will take the deposition of Michael A. Vlastone, on January 21, 2011

4   commencing at 10:00 a.m. at the offices of Walker, Hamilton & Koenig LLP, 50

5   Francisco Street, Suite 460, San Francisco, California 94133.  The deposition will

6   continue from day to day thereafter, excluding weekends and court holidays, until

7   completed.  Attached as Exhibit A is a copy of the subpoena issued to Mr. Vlastone and

8   the Court's Order requiring Mr. Vlastone to appear for deposition.

9        NOTICE IS FURTHER GIVEN that pursuant to Federal Rules of Civil Procedure,

10  Rule 30 and Rule 45, Plaintiff may record the deposition stenographically and on

11  videotape before a video operator authorized to administer an oath.

12

13  Dated: January 13, 2011            KABATECK BROWN KELLNER, LLP

14

15                                     By:

16                                         Brian S. Kabateck
                                           Richard L. Kellner
17                                         Karen Liao

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF MICHAEL A. VLASTONE (CASE NO. CV-07-0667 AG)

**Exhibit A**

AO 88A (Rev. 01/09) Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| KELSEA BAGGETT | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. CV 07-0667 (AG) |
| HEWLETT-PACKARD COMPANY | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | ) Central District of California |

## SUBPOENA TO TESTIFY AT A DEPOSITION
## OR TO PRODUCE DOCUMENTS IN A CIVIL ACTION

To: MICHAEL A. VLASTONE

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: WALKER, HAMILTON & KOENIG LLP | Date and Time: |
|---|---|
| 50 Francisco Street, Suite 460 | 01/21/2011 10:00 A.M. |
| San Francisco, California 94133 | |

The deposition will be recorded by this method: ___Stenographically; video___

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: ___01/13/2011___

CLERK OF COURT

OR _____

Signature of Clerk or Deputy Clerk          Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ___Kelsea Baggett___
, who issues or requests this subpoena, are:

Richard L. Kellner, Karen Liao, Kabateck Brown Kellner LLP
644 S. Figueroa St., Los Angeles, California 90017
(213) 217-5000.

AO 88A (Rev. 01/09) Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action (Page 2)

Civil Action No.  CV 07-0667 (AG)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ☐ I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ☐ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ☐ I served the subpoena on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because _____ ; or

    ☐ Other *(specify):*

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

                                     _____
                                         *Server's signature*

                                     _____
                                       *Printed name and title*

                                     _____
                                       *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

1  KABATECK BROWN KELLNER LLP
   BRIAN S. KABATECK, SBN 152054
2  (bsk@kbklawyers.com)
   RICHARD L. KELLNER, SBN 1714146
3  (rlk@kbklawyers.com)
   KAREN LIAO, SBN 256072
4   (kliao@kbklawyers.com)
   644 South Figueroa Street
5  Los Angeles, CA 90017
   Tel: (213) 217-5000
6  Fax: (213) 217-5010

7  CHITWOOD HARLEY HARNES LLP
   GREGORY E. KELLER (admitted *Pro Hac Vice*)
8  (gkeller@chitwoodlaw.com)
   DARREN T. KAPLAN (admitted *Pro Hac Vice*)
9  (dtkaplan@chitwoodlaw.com)
   2300 Promenade II
10 1230 Peachtree Street, N.E.
   Atlanta, GA 30309
11 Tel: (404) 873-3900
   Fax: (404) 876-4476

12
   Attorneys for Plaintiffs and
13 the Preliminarily Certified Class

14

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17

18 | In re: HP LASER PRINTER | CASE NO.
   | LITIGATION              | SACV 07-0667-AG(RNBx)
19 |                         |
   |                         | HON. ANDREW J. GUILFORD
20 |                         |
   |                         |
21 |                         | ORDER GRANTING CLASS
   |                         | COUNSEL'S *EX PARTE*
22 |                         | APPLICATION FOR AN ORDER
   |                         | REQUIRING OBJECTOR
23 |                         | MICHAEL A. VLASTONE TO
   |                         | APPEAR FOR DEPOSITION
24

25

26

27

28

─────────────────────────────────────────────
ORDER GRANTING CLASS COUNSEL'S EX PARTE APPLICATION FOR AN ORDER REQUIRING
MICHAEL A. VLASTONE TO APPEAR FOR DEPOSITION (CASE NO. CV-07-0667 AG)

1    Upon consideration of class counsel's *ex parte* application for an order requiring

2  objector Michael A. Vlastone to appear for a deposition and good cause having been

3  shown, the Court hereby grants Class Counsel's Application and orders Michael A.

4  Vlastone to appear for a deposition to take place in the County of San Francisco,

5  California.

6                                    **IT IS SO ORDERED.**

7

8  Dated:  January 13, 2011

9                                    Hon. Andrew J. Guilford
                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 1 –

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

1

2    I am employed in the County of Los Angeles, State of California. I am over the age of 18
3    and not a party to the within action; my business address is 644 South Figueroa Street, Los
     Angeles, CA 90017.

4    On **January 14, 2011**, I served the foregoing document described as **NOTICE OF
5    DEPOSITION OF MICHAEL A. VLASTONE** on the interested parties in this action:

6    Samuel G. Liversidge
7    **GIBSON DUNN & CRUTCHER**
     333 South Grand Avenue
8    Los Angeles, CA 90071
     Telephone: (213) 229-7000
9

10   J Gordon Cooney
11   Kristofor T Henning
     **MORGAN LEWIS & BOCKIUS LLP**
12   1701 Market Street
     Philadelphia, PA 19103
13   Telephone: (215) 963-5000

14   *Attorneys for Defendant*
15   *Hewlett-Packard Company*

16
     [X]    **VIA U.S. MAIL -** As follows: I am "readily familiar" with the firm's practice of
17          collection and processing correspondence for mailing. Under that practice it would be
            deposited with U.S. postal service on that same day with postage thereon fully prepaid at
18          Los Angeles, California in the ordinary course of business. I am aware that on motion of
            the party served, service is presumed invalid if postal cancellation date or postage meter
19          date is more than one day after date of deposit for mailing in affidavit.

20
     [X]    **(FEDERAL)** – I declare that I am employed in the office of a member of the bar of this
21   Court at whose direction the service was made.

22   Executed at Los Angeles, California on **January 14, 2011** at Los Angeles, California.

23   I declare under penalty of perjury under the laws of the State of California that the above
     is true and correct.
24

25

26                                            IRMA DELEON

27

28
---
**PROOF OF SERVICE**

EXHIBIT
2
1-25-11
PENGAD 800-631-6989

1

**JAMES C. YOUNG** IN PRO PER
83 North 64th Street
Harrisburg, Pennsylvania 17111

Telephone:   (717) 561-9742
Facsimile:   (717) 561-9742

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:  **HP LASERJET PRINTER LITIGATION;** | **CASE No. CV 07-0667 AG (RNBx)** |
| | **CLASS ACTION LITIGATION** |
| **KELSEA BAGGETT** and **JAMES YOUNG,** individually and on behalf of all those similarly situated, | |
| *Plaintiffs,* | **1) DECLARATIONS BY LEAD PLAINTIFF  JAMES C. YOUNG** |
| v. | **2) REQUEST TO DISMISS CURRENT DESIGNATED COUNSEL** |
| **HEWLETT-PACKARD COMPANY,** and Does 1 through 50, | **3) OBJECTION TO SETTLEMENT** |
| *Defendants,* | **4) APPEARANCE AT HEARING** |
| **JAMES C. YOUNG,** *Lead Plaintiff* | Judge:   ANDREW J. GUILFORD Date:   January 31, 2011 Time:   10:00 a.m. |

I, James C. Young, hereby declare and state as follows:

## I.   STATEMENT OF INTEGRITY

1.   I, James C. Young, a resident of Harrisburg, Pennsylvania, am over the age of 18. I am the owner of an HP Color LaserJet 2600n printer, and I presently serve as lead plaintiff in *Young v. HP*, one of the two cases consolidated for purposes of settlement into the present action.

1    various parties that have taken part in, or colluded in such conduct.

2

3                    II.    **DECLARATION OF FACTS**

4        6.    **Designated Class Counsel and my attorneys of record through January 3, 2011**:

5    Based on the documents I reviewed, I understand that the plaintiff's attorneys who were involved in

6    litigating *Young v HP*, none of whom I had ever met in person, but only spoke with on the phone,

7    were partners and/or associates inside four (4) law firms, of which only the first two law firms were

8    actively involved in negotiating the August 25, 2010 stipulated settlement:

9

10            a) KABATECK BROWN KELLNER LLP (KBK Law)

11               Brian Kabateck, Richard Kellner, Alfredo Torrijos

12            b) CHITWOOD HARLEY HARNES LLP

13               Darren T. Kaplan, Gregory E. Kelner

14            c) LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

15               Jonathan D. Selbin, Kristen E. Law

16            d) LAW OFFICES OF CALTON & CALTON

17               Jim S. Calton, Jr.

18       7.    I no longer recall which specific attorneys I have spoken with on the rare occasions

19    we talked over the past two years, because, having never met any of them in person, their names did

20    not associate with actual individuals in my memory, other than Alfredo Torrijos of KBK law.

21       8.    In this declaration I will refer to any one or all of the above listed law firms and

22    attorneys, including all current Designated Class Counsel, as "my attorneys."

23

24

25       9.    **How I learned about the misconduct of my attorneys**:    On December 31, 2010,

26    I received a phone call from Michael Vlastone, a founder and director of the Integrity Capitalism

27    Network, and a member of the class of injured consumers who owns HP 2600n and CP1518ni Color

28

LaserJet printers. Mr. Vlastone shared with me the results of his broad investigations related to the HP color LaserJet yield fraud and he asked me about my experiences during litigation. In the course of our conversation I was shocked and dismayed to learn that the *Young v HP* case was not in fact won, as I was told by my attorneys in August 2010, but it was actually dismissed, appealed, and the appeal abandoned by my counsel in favor of a compromise settlement with HP.

10. In August 2010, I was lead to believe by my attorneys that the stipulated settlement resulted from a litigation victory and would lead to the correction of alleged HP laser printer toner frauds, when in fact it turns out to be a compromise based on a total loss and, most importantly, HP would in no way have to correct the yield delivery problems of its LaserJet printers or cartridges.

11. When my attorneys requested my signature on the stipulated settlement agreement for HP Laser Jet Printer Litigation, they did not inform me that it was my duty to carefully review the settlement terms to make sure that they were adequate and fair to the injured class, but they simply asked me to sign and fax back the signature pages as quickly as possible, having told me that they won a settlement in the case, that HP would fix the problems and consumers would get a discount on their next set of cartridges from HP. My attorneys also told me that I might receive $1,000 compensation, but they did not tell me that these funds would serve as compensation for my services to the injured class as a lead plaintiff and that I had an important responsibility to carefully review the settlement terms and that I had the power to question these terms or demand their renegotiation, or even fully reject them, if that was in the best interests of the class. Therefore, I did not print out or read, or carefully review the full text of the stipulated settlement, but simply faxed back my signature page as I was instructed to do by my attorneys.

12. I was shocked and dismayed the moment Mr. Vlastone told me that both my case and the Baggett case were lost via dismissal by summary judgment for failure to state viable legal theories, and I immediately realized that I had been lied to and manipulated by my attorneys.

13.   **Lack of preparation for my role as lead plaintiff**: My attorneys never educated me about, or prepared me for, my role, my responsibilities and my powers as lead plaintiff in a class action case. In fact, having contacted my attorneys, I did not realize that I was becoming a lead plaintiff, but instead I thought that I was joining the on-going class action litigation to make sure I would receive compensation for HP cartridges that did not deliver their stated yields. I was never explained by my attorneys that I had a duty to carefully read all the documents submitted on behalf of the class, and they had never asked me if I had read and reviewed all the documents, which I did not. My attorneys only called to obtain required signatures, and/or had asked me whether I wished to keep going, whenever the case ran into difficulties along the way, while the substance of these difficulties they never explained to me in any detail, nor tried to ascertain if I had understood.

14.   **Ignoring and Mishandling of Crucial Evidence**. I had informed my attorneys that I deliberately saved a set of a total of ten used hard-stopped cartridges from my HP 2600n, which failed to deliver their advertized yields. These cartridges clearly constitute the most crucial evidence in this case, and should have been carefully examined as the basis for any claims and causes of action. I offered to ship these cartridges to my attorneys for inspection and admission into evidence, however, there was no follow-up and the cartridges were never requested. I am disappointed that my attorneys did not even bother to study the evidence I collected and preserved at some expense, as the local stores offered $10 credits for each cartridge turned in for recycling, which I had, therefore, never taken advantage of.

15.   **Misleading complaints filed in contradiction of statements provided to my attorneys**: On December 31, 2010, Mr. Vlastone read to me the allegations as stated in the First Amended Complaint in *Young v HP*, filed in this court by my attorneys on my behalf. I was shocked and dismayed to learn that these allegations did not match the testimony I provided to my

attorneys over the phone. I had told them that I noticed that my cartridges were being consistently hard-stopped and new cartridges demanded by my HP 2600n printer, prior to delivering a substantial portion of their stated yields – i.e. I was getting far fewer pages than promised on the product packaging and in the owners manuals. I had owned HP monochrome laser printers previously, and they had always delivered, or exceeded, their promised page yields, while the 2600n was shortchanging me, time after time. I did not make any complaints, what so ever, about ample toner being left over in cartridges and blocked from use, as I had no way of observing it though the black plastic cartridges. I did not have any specific theory about why the problem was occurring, nor did I ever express one to my attorneys. I never made any statements or complaints about the blockage of available toner, but had always, and exclusively, complained about the non-delivery of stated yields. In fact I had sent my attorneys an email message showing the HP advertised yields and my notes as to what had actually been delivered to me by the various cartridges. I knew that the only promise HP made to me was to receive the stated yields, and I fully expected that my attorneys would have made claims based on HP's failure to deliver these yields as advertised.

16. My attorneys never engaged me in the process of developing the complaint and had not asked for my input or approval before it was filed, nor did they inform me that it was in fact my duty to actively engage and participate in this work, but instead they only asked me to send or fax back signed documents. Having read the complaint, I now see that it misrepresents my allegations, and that I had been manipulated into trusting my attorneys to do their job competently and honestly.

17. **Misrepresentations regarding the Stipulated Settlement**: My attorneys had never informed me that my case was dismissed by summary judgment due to their failure to allege viable legal theories. Instead, I was told that they had won a settlement benefitting the injured consumers, that I might receive $1,000, and that consumers would get their problem solved and get a discount on the next set of cartridges. I was never told that in fact HP had won, that HP would not be

obligated to fix anything, and that the e-credits offered by HP are in fact worthless because anyone could save $3 more by simply trading in used cartridges at the local stores. Neither was I told by my attorneys about the *Sutherland v HP* case, an ongoing and viable litigation, accusing HP of yield fraud at the time when *Young v HP* was dismissed; or the scientific yield study conducted by the Integrity Capitalism Network that empirically proves the HP fraud. I was not told, and had no idea, that my signature on the sham settlement would allow HP to continue defrauding consumers, businesses and government agencies that use color LaserJets, by automatically extinguishing the *Sutherland v HP* litigation that alleges and provides empirical proofs of HP yield fraud and HP's own admissions of failing to deliver stated yields. Furthermore, I did not know that my attorneys are fully informed about every detail of the ongoing fraud and that they still believe that HP is guilty of this fraud, yet they are willing to settle in order to collect $2.75 million for allowing HP to permanently escape responsibility, and they also agree to never disclose the truth to anyone, while knowingly exposing the class to purchasing more fraudulent products and losing more money as a result.

### III.   REQUEST TO DISMISS CURRENT DESIGNATED COUNSEL

18.   **Request to dismiss Current Designated Class Counsel and allocate time and assistance to secure Alternate Designated Counsel for the Injured Class**: Based on the information that I had uncovered in the past four days, as well as my recollections about my previous interactions and experiences with my attorneys, I must declare that as a lead plaintiff for the class of injured consumers who were defrauded by HP color laser printers, I have made a determination that my attorneys in fact:

  a)   did not conduct themselves professionally or ethically on behalf of the class throughout their work on *Young v HP* litigation;

  b)   had conspired to use me as a pawn of their own agendas, instead of educating and

**DECLARATION & OBJECTION OF JAMES C. YOUNG**, Case No. CV 07-0667 AG (RNBx)

enabling me to independently and actively perform most of my duties as a lead

plaintiff, from the filing of the complaint through the settlement negotiations;

c) had betrayed the interests of the injured class in favor of own interests;

d) had jeopardized and damaged not only the ability to recover for damages, but had

subjected the injured class of consumers to the very real danger of further losses

through the use of settlement e-coupons;

e) are attempting to pocket $2.75MM cash for their failed litigation efforts, in exchange

for releasing claims against HP, they know with certainty to be valid and provable,

and for class benefits they fully know to be worthless and/or injurious to the class;

f) can not be trusted to represent the interests of the class moving forward, but would

likely act to serve the interests of HP, because

g) they would be paid $2.75MM by HP, only if HP succeeds with its settlement ploy

aimed at covering up the toner frauds, dismissing other viable and valuable cases and

using the settlement terms to silence the plaintiffs, including myself, thus preventing

those of us most knowledgeable about the alleged fraud from exposing it and

educating the public via the internet video, blogs and emails.

19.    Based on the above findings, I also declare my determination that the interests of the

injured class of plaintiffs would be best served by immediately dismissing my attorneys, including

all of the current designated counsel listed in paragraph 6 above, from further representation of the

relevant injured classes in this case.

20.    At the present time, due to these "last-minute" revelations and pending a tight

deadline, as well as my being located in Pennsylvania and having very limited resources, I have

only been able to secure limited representation counsel for the purpose of completing this

declaration and objection, reviewed on my behalf by a California attorney, Reece Halpern, who has

not agreed to represent me or the class at the pending fairness hearing. I am presently seeking to

secure appropriate full representation for myself and the injured class, as required to best protect its

interests, and I request this court to allocate time and assistance in accomplishing this goal.

21.     Meanwhile, based on all the information known to me at this time about the *Young v*

*HP* litigation history and its pending appeal, it appears to be hopeless due to the past conduct and a

failed litigation strategy undertaken by my attorneys, without my knowledge or understanding, as

well as the dismissal rulings of multiple other courts in related cases.  Therefore, having also

learned about the viable *Sutherland v HP* litigation and the results of the scientific HP Yield Study

conducted for that case (that empirically proves HP yield fraud), I declare my conclusion that

attorney Timothy P. Rumberger appears best positioned to protect the interests of the class of

injured consumers by diligently prosecuting the *Sutherland v HP* case, even though Mr. Rumberger

had declined my request for representation due to a potential conflict of interest.  Importantly,

*Sutherland v HP* complaint states causes of action based on HP's proven and admitted ***failure to***

***deliver stated yields*** – exactly the allegations of fraud that I had originally made to my attorneys,

but they had failed to accurately and competently present in this court.  I am willing and able to act

as one of the witnesses and/or plaintiffs in *Sutherland v HP*, and consider it to be the best available

vehicle for fully alerting, educating, recovering for and protecting the defrauded consumers.


### IV.     OBJECTION TO STIPULATED SETTLEMENT

22.     **Rescinding a signature obtained by fraud and misrepresentation**:  I hereby

declare that effective immediately I rescind my signature recorded on the stipulated settlement

agreement of August 25, 2010 for reasons that my consent to settlement and my signature were

obtained through misrepresentation and manipulation, as amply described above.

23.     **Objection to settlement:**  I further declare my vehement objection to the stipulated

settlement in its entirety, as further stated below.  Although I am quite late in learning about the

1   pervasive corruption of this class action litigation process, I will not sell out the injured consumers

2   for $1,000, or any other price.

3

4

**V.   NOTICE OF INTENT TO APPEAR AND TESTIFY AT HEARING**

5

6   24.   These objections also serve as notice that lead plaintiff and settlement objector

7   *James C. Young* intends to appear, in person, or via electronic video conferencing, or through his

8   counsel (to be designated at a later date), at the January 31, 2011 fairness hearing on behalf of

9   himself and the injured class and he reserves the right to cross-examine any witnesses presented in

10  support of the settlement.

11

12

**VI.   SUMMARY OF ARGUMENTS IN SUPPORT OF OBJECTION**

13

14  25.   Not having full representation of counsel required to develop and state a

15  comprehensive objection to stipulated settlement, I rely on the wisdom of this court to reflect on the

16  truthful testimony in my declarations stated above under the penalty of perjury, in order to prevent

17  the miscarriage of justice and the corruption and misuse of the class action litigation process.

18  26.   In addition to relying on my own declarations stated above, I have learned about the

19  intent and the substance of the Objection to Proposed Settlement filed in this case by Theodore H.

20  Frank of the Center for Class Action Fairness, attorney for objectors Theodore H. Frank; as well as

21  the Objection to Proposed Settlement filed in this case by Timothy Rumberger, attorney for

22  objectors Martha Sutherland, and numerous others; as well as the Objection to Proposed Settlement

23  filed in this case by Michael Vlastone of the Integrity Capitalism Network, representing himself,

24

25  and I would like to join their objections as well.

26  27.   Finally, in addition to summarizing my own declarations, I would like to highlight a

27  number of key facts that might be well known to this court already:

28

a) Designated counsel did not properly educate or enable me in my role as lead plaintiff for the injured class of consumers, thus conducting litigation and negotiations substantially without any oversight by an active and able lead plaintiff;

b) Designated counsel disregarded and misrepresented to this court my own statements regarding the facts and allegations of the case and either ignored or failed to study and disclose to this court ample evidence I had secured and made readily available;

c) Designated counsel pursued this litigation based on their own selfish agendas rather than stating a legal theory based on the true facts and the real evidence in this case;

d) Designated counsel had subsequently lost this case to summary judgment as a result of repeatedly failing to modify their case strategy to fully and honestly state the allegations based on my actual complaints of undelivered yields, despite the earlier dismissal of the *Baggett v HP* case, lost by the very same counsel in this same court;

e) Designated counsel failed to fully advise me of their final loss, and had proceeded with settlement negotiations under a cloud of their total failure to make legally sound claims, all dismissed by this court in favor of the defendant, effectively rendering these presently consolidated cases powerless in negotiation and utterly worthless;

f) The terms of stipulated settlement are unjust, insufficient, unreasonable and entirely worthless to myself or any typical consumer, because we can achieve greater savings than by using $7 HP e-coupons requiring a waste of much valuable time, by simply purchasing HP replacement cartridges on sale from the web-based retailers, or better yet switching to any number of honest brands of laser printers that can be purchased for less than a full set of HP replacement cartridges from the HP website;

g) The terms of the stipulated settlement are actually likely to cause substantial additional losses through purchases of replacement cartridges from HP that fail to deliver stated yields, rather than recover value previously lost by the members of the class, because settlement terms do not require HP to either fix the problem or to stop selling fraudulent replacement supplies that fail to deliver stated yields;

h) The settlement terms prevent a computer consultant like myself from educating

DECLARATION & OBJECTION OF JAMES C. YOUNG, Case No. CV 07-0667 AG (RNBx)

11

consumers, including my own clients, about the ongoing HP yield fraud;

i)  A viable *Sutherland v. HP* case is being litigated to address the same HP yield fraud, based on alternative legal theories and claims (i.e. proven failure to deliver advertised yields), which this and other courts have already indicated in their rulings and opinions as preferable to those dismissed in both the *Baggett* and *Young* cases;

j)  Both my designated counsel and HP failed to disclose, and deliberately concealed the *Sutherland v HP* case from this court and from myself, thus leading me to unknowingly sign off on an inadequate settlement, which creates a very strong appearance of collusion and betrayal of the interests of the class by its attorneys;

k)  This settlement releases claims entirely beyond the scope of the original lawsuits, and in doing so it extinguishes the apparently viable and highly valuable claims of *Sutherland v. HP* litigation, which would benefit me more, even if I am not a California resident, because while the $7 e-credits are entirely worthless, I could at least improve my reputation as a consultant by educating my clients and all other consumers about ways to avoid being defrauded by HP on the ongoing basis;

l)  Finally, I have just learned that *Sutherland v HP* is supported by a scientific yield delivery study, endorsed by a world-renowned Stanford University professor Dr. Phil Zimbardo, that provides empirical proof of the alleged HP yield frauds. *Sutherland* yield fraud claims also appear to be validated by HP's own testimony in this court, as well as HP's published and stated admissions already placed into evidence. While I am not an attorney, even from the layman's perspective, *Sutherland v. HP* litigation appears to be based on sound legal theories and strategies that will likely achieve both a substantially greater recovery for the injured consumers and, most importantly, might obtain comprehensive injunctive relief to end the yield fraud, which will otherwise be allowed to continue injuring consumers indefinitely;

m) If *Sutherland v HP* case were to prevail, *Young v HP* designated counsel would receive no compensation for their entirely failed litigation efforts, while HP might have to pay out very substantial damages and, at the very least, HP's misconduct will

1  be fully exposed to the public by the hearings related to the scientific yield study.

2  Therefore, there are very good reasons to believe that, and there is a very strong

3  appearance of, designated counsel and HP in fact colluding to extinguish *Sutherland*

4  *v HP* litigation in order to maximize each other's economic outcomes, while

5  completely and totally sacrificing the interests of the injured consumers.

6

7  28.    I urge this court to protect consumers from this travesty, in which I had been

8  manipulated into becoming an ignorant accomplice, and not reward the failed attorneys for their

9  reckless disregard of fiduciary responsibilities as well as numerous and grievous breaches of

10  professional ethics.  Based on the facts revealed and arguments made in this brief, final approval to

11  the stipulated settlement should be denied entirely, and I hope that investigations will be undertaken

12  by appropriate authorities to expose those individuals who colluded and attempted to pull off this

13  double injustice against American individual consumers, businesses and offices of government.

14

15

16                                        Respectfully submitted,

16  DATED:  January 4, 2011

17

18

19

20  BY: *James C. Young*

21  James C. Young

22  Lead Plaintiff for the injured classes of consumers
    in *Young v HP*

23

24

25

26

27

28

# JAMES C. YOUNG

83 North 64th Street, Harrisburg, Pennsylvania 17111

Telephone: (717) 561-9742  Facsimile: (717) 561-9742
E-mail: chris1217young@verizon.net

TO:

January 4, 2011

Counsel for Class
Richard L. Kellner
KABATECK BROWN KELLNER, LLP
644 S. Figueroa Street
Los Angeles, CA 90017
E-mail:  rlk@kbklawyers.com

Mr. Kellner,

Based on the information I discovered over the past few days, and based on my own experiences over the past two years that only now fall into context, I am shocked, dismayed and deeply disappointed with the manner in which the *Young v. HP* class action litigation was carried out and how the injured class of consumers was mislead and ill served by your representation.

I am hereby giving you notice that effective immediately, I am dismissing yourself and all the other members of the current designated counsel for the class from representing myself in the *Young v. HP* class action litigation and the *HP LaserJet Litigation*, consolidated for purposes of settlement, for reasons that you will find spelled out in detail in the declarations supporting my objection to settlement that will be served on you later today.  I am rescinding my signature from the settlement agreement effective immediately, and I will also be making a request that the court dismiss and replace the entire current designated class counsel for the same reasons.

I expect that you and the rest of the designated counsel team might experience strong emotions with regards to your dismissal and my vehement objection to the stipulated settlement. Therefore, I request that yourself and all the members of the current designated counsel team abstain from contacting, pressuring or threatening me in any manner or by any means.

I have presently secured only limited representation counsel and am in the process of securing full representation in all related matters, and my new counsel will contact you as soon as one is available.

James C. Young
James C. Young
Lead Plaintiff for the injured classes of consumers
in *Young v HP*

## PROOF OF SERVICE

I declare that:

I reside and work in the state of Pennsylvania. I am over the age of 18 years and my office address is  83 North 64th Street, Harrisburg, Pennsylvania 17111, and my email address is:  chris1217young@verizon.net.

On January 4, 2010, I served the attached:  OBJECTION TO PROPOSED SETTLEMENT

 X  By electronic mail in that I e-mailed a PDF of this brief to the following parties, bolded below.

 X  By First-Class Registered Mail in that I caused such envelope(s) to be delivered via First-Class Mail to the addressee(s) bolded below, by first forwarding the PDF of this brief via e-mail to Michael Vlastone, who contracted to print and mail said documents.

| | |
|---|---|
| Settlement Administrator<br>In re: HP LaserJet Printer Litigation<br>Settlement Administrator<br>P.O. Box 5270<br>Portland, OR 97208-5270<br>Facsimile: (877) 341-4607<br>**Email:info@HPLaserJetPrinterSettlement.com** | Counsel for Class<br>Richard L. Kellner<br>KABATECK BROWN<br>KELLNER, LLP<br>644 S. Figueroa Street<br>Los Angeles, CA 90017<br>**E-mail:rlk@kbklawyers.com** |
| Counsel for HP<br>Kristofor T. Henning<br>Franco A. Corrado<br>MORGAN LEWIS & BOCKIUS, LLP<br>1701 Market Street<br>Philadelphia, PA 19103<br>**E-mail:Khenning@morganlewis.com**<br>**Fcorrado@morganlewis.com** | **Clerk of Court U.S. District Court,**<br>**Central District of California**<br>**411 West Fourth Street, Room 1053**<br>**Santa Ana, CA 92701-4516** |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2011

BY: *James C. Young*

James C. Young
Lead Plaintiff for the injured classes of consumers
in *Young v HP*

---

DECLARATION & OBJECTION OF JAMES C. YOUNG, Case No. CV 07-0667 AG (RNBx)

14



1   Kristen Law Sagafi (State Bar No. 222249)
    ksagafi@lchb.com
2   LIEFF CABRASER HEIMANN &
      BERNSTEIN, LLP
3   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
4   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
5
    Attorneys for Plaintiffs and the Class
6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                     SANTA ANA DIVISION

11

12  In re: HP LASERJET PRINTER            Case No. CV 07-00667 AG (RNBX)
    LITIGATION;
13                                        **DECLARATION OF KRISTEN LAW
    KELSEA BAGGETT and JAMES              SAGAFI IN RESPONSE TO
14  YOUNG, individually and on behalf     OBJECTION BY MICHAEL
    of all those similarly situated,      VLASTONE**
15
        *Plaintiffs,*
16
17  v.

18  HEWLETT-PACKARD
    COMPANY, and Does 1 through 50,
19
        *Defendants.*
20

21      I, Kristen Law Sagafi, declare as follows:

22          1.      I am a partner with the law firm of Lieff, Cabraser, Heimann &

23  Bernstein, LLP ("LCHB") and a member in good standing of the bar of the State of

24  California. I am admitted to practice in this Court and respectfully submit this

25  declaration in response to the objection submitted by Michael Vlastone. Except as

26  otherwise noted, I have personal knowledge of the facts set forth in this declaration,

27  and could testify competently to them if called upon to do so.

28

1    2.    LCHB was approached on August 8, 2008 by attorney Jim S.

2   Calton, Jr. of Eufala, Alabama with regard to the defect alleged in the above-

3   captioned matter. In the days that followed, Mr. Calton informed my law partner,

4   Jonathan Selbin, and me that he had a client whose 1600 model printer ceased

5   printing and displayed a message to replace the toner cartridges before toner in the

6   cartridges was depleted.

7    3.    Thereafter, Mr. Selbin and I commenced an investigation of the

8   issue. During the course of that investigation, we discovered that two cases

9   alleging similar defects were already on file:

10        *Sutherland v. Hewlett-Packard Co.*, San Francisco Sup. Ct., case

11        number CGC-08-478150

12        *Baggett v. Hewlett Packard Co.*, C.D. Cal., case number 07CV667

13    4.    Plaintiffs in the *Baggett* matter were represented by Brian

14   Kabateck of Kabateck Brown & Kellner.

15    5.    Mr. Selbin approached the Kabateck firm to discuss working

16   together to prosecute a case involving the 1600 model.

17    6.    After some discussion, it was agreed among counsel that LCHB

18   and Mr. Calton would co-counsel with the Kabateck firm on the matter that was

19   originally filed December 18, 2008 as *Young v. Hewlett Packard, Co.*, N.D. Cal.,

20   case number CV08-5662. It was further agreed that LCHB and Mr. Calton would

21   have a limited role in the litigation.

22    7.    When LCHB and Mr. Calton joined the case team, the Kabateck

23   firm had already invested considerable time and resources in the successful

24   prosecution of the *Baggett* matter. Due to their well-developed knowledge of the

25   issues, the Kabateck firm took the lead in all strategic aspects of *Young*. Mr. Young

26   had retained the Kabateck firm to represent him in the matter, and neither LCHB

27   nor Mr. Calton had any contact with the named plaintiff. Neither LCHB nor Calton

28   participated in the settlement negotiations. At all times, my role personally,

907144.1                                    - 2 -                    DECL OF KRISTEN LAW SAGAFI IN RESPONSE TO
                                                                    OBJECTION BY MICHAEL VLASTONE
                                                                    CASE NO. CV 07-00667 AG (RNBX)

1    LCHB's role, and Mr. Calton's role in the above-captioned matter has been
2    peripheral.

3       8.    At paragraph 18 of his declaration, Mr. Vlastone opines that I
4    mishandled evidence provided to me by Mr. Calton. The following paragraphs of
5    this declaration address that assertion.

6       9.    In an email dated August 12, 2008, Mr. Calton indicated that he
7    would send to me his client's "original HP CLJ 1600 ink [*sic*] cartridges, CD
8    promotional/installation disk, and schematic on installing the printer." A redacted
9    copy of that email is attached hereto as Exhibit A.

10       10.    I have no record or recollection that Mr. Calton sent those
11    materials to me in August 2008. Indeed, further correspondence indicates that he
12    did not. In an email to me dated September 16, 2008, Mr. Calton wrote, "I still have
13    the installation CD and picture diagram for installation. I've got the actual
14    cartridges too if you need those." A redacted copy of this email is attached as
15    Exhibit B. In the same email, Mr. Calton provided technical specifications from the
16    toner cartridges, which I then shared with co-counsel via email. I did not request
17    that Mr. Calton send the physical materials, and I have no record or recollection of
18    receiving those items.

19       11.    In a telephone conversation on November 6, 2008, Mr. Calton
20    informed me that his client did not wish to proceed as a named plaintiff. Because
21    the client was not serving as a class representative, his particular cartridges were
22    not important to the prosecution of the case. Moreover, in light of the extensive
23    investigation undertaken by the Kabateck firm, examination of these cartridges in
24    particular was not necessary.

25       12.    In an email dated February 7, 2010, Mr. Calton requested that I
26    send the cartridges and any other materials I had that related to his client's printer to
27    Mr. Vlastone. Mr. Vlastone was copied on that email request.

28

DECL OF KRISTEN LAW SAGAFI IN RESPONSE TO
OBJECTION BY MICHAEL VLASTONE
CASE NO. CV 07-00667 AG (RNBX)

1  13. I replied to Messrs. Calton and Vlastone via email on February

2 9, 2010, explaining my belief that I had never received the requested items. A true

3 and correct copy of my reply, which includes the February 7 request, is attached as

4 Exhibit C.

5  14. Mr. Vlastone declares that I "revealed" to him that I had

6 "misplaced and lost these cartridges during office relocation." I have no record or

7 recollection of any communication with Mr. Vlastone to that effect. However, it is

8 true that my firm underwent a major renovation and office relocation in the time

9 that elapsed between September 2008 (when Mr. Calton offered to send the

10 materials to me) and February 2010 (when he requested that I send those materials

11 to Mr. Vlastone). In addition to the explanation I provided in my email of February

12 9, 2010, I may have mentioned the possibility that the items—if I ever had them,

13 and I believe I did not—were lost in the renovation and move.

14  15. In paragraph 6 of his declaration, Mr. Vlastone indicates that he

15 and I have met in person. I have no record or recollection of such a meeting.

16  I declare under penalty of perjury under the law of the United States that the

17 foregoing is true and correct.

18  Executed on January 7, 2011 in San Francisco, CA.

19

20     /s/ Kristen Law Sagafi

21     Kristen Law Sagafi

22

23

24

25

26

27

28

# Exhibit A

| From: | Michael Vlastone |
|---|---|
| To: | info@HPLaserJetPrinterSettlement.com; Richard Kellner; Khenning@morganlewis.com; Fcorrado@morganlewis.com |
| Cc: | Michael Vlastone |
| Subject: | Michael Vlastone OBJECTION re. CV 07-0667 AG 2011-01-04 |
| Date: | Tuesday, January 04, 2011 11:20:36 PM |
| Attachments: | Michael Vlastone OBJECTION re. CV 07-0667 AG 2011-01-04.pdf |
| | ATT00001.htm |
| | ATT00002.htm |
| | ATT00003.htm |
| | ATT00004.htm |
| | ATT00005.htm |
| | ATT00006.htm |

My objection is contained in the enclosed PDF file.



MICHAEL A. VLASTONE, IN PRO PER
*Director of the Integrity Capitalism Network*

767 Bryant Street, #410
San Francisco, CA 94107

Telephone:      (415) 957-8703
Facsimile:      (415) 957-8703  (requires manual activation via voice call)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:   **HP LASERJET PRINTER LITIGATION;**<br><br>**KELSEA BAGGETT** and **JAMES YOUNG**, individually and on behalf of all those similarly situated,<br>    *Plaintiffs,*<br><br>    v.<br><br>**HEWLETT-PACKARD COMPANY**, and Does 1 through 50,<br>    *Defendants,*<br><br>MICHAEL A. VLASTONE,<br>    *Objector* | **CASE No. CV 07-0667 AG (RNBx)**<br><br><u>**CLASS ACTION LITIGATION**</u><br><br>**1) DECLARATIONS BY CLASS MEMBER Michael A. Vlastone**<br><br>**2) OBJECTION TO SETTLEMENT**<br><br>**3) APPEARANCE AT HEARING**<br><br>Judge:   ANDREW J. GUILFORD<br>Date:    January 31, 2011<br>Time:    10:00 a.m. |

I, Michael A. Vlastone, hereby declare and state as follows:

## I.    <u>STATEMENT OF INTEGRITY</u>

1.      I, Michael A. Vlastone, a resident of San Francisco, CA, am over the age of 18.

I am the owner of an HP Color LaserJet 2600n and CP1518ni printers, giving me standing as a

member of the class, and I am the founder and director of the Integrity Capitalism Network (ICN),

an organization dedicated to developing systemic solutions to ending fraud.

2.     I have not been threatened, coerced or manipulated in any way to come forward with the revelations contained in this declaration; I have not been offered any incentives, payments, rewards or bonuses of any kind for exposing the misconduct and frauds that I've become aware of during the course of investigating the conduct of current designated counsel's class action litigation, as well as the deliberately fraudulent design of HP color LaserJet printers and cartridges.

3.     I have not been contacted or recruited by counsel for any party to the present litigation, but have independently determined that I must address this court directly in order to prevent the miscarriage of justice, having learned about the unethical conduct by the designated class counsel, a determination I made based on my own investigations, direct discussions with class counsel and other information known to me directly.

4.     I am making this declaration to this court in order to fulfill my responsibilities as a citizen of the United States and a 29-year resident of the State of California. Having learned of the extensive wrongdoings, costing millions not only to the US and California consumers but also the tax-payer-funded institutions including but not limited to public schools, universities, hospitals and the various offices of the State and Federal Governments, as well as the US military and national Guard, that all own and operate HP color LaserJet printers and cartridges, I am taking a stand to protect the wealth of all citizens and the integrity of American business and government institutions from the systemic corruption that undermines our freedoms, our economy and our legal system.

5.     I hereby swear under the penalty of perjury under the laws of the state of California that all the facts contained in this declaration are based on my personal knowledge (unless otherwise specified), to the best of my understanding and recollections, and if called upon to do so, I could and would testify competently hereto, and I am further willing and able to provide testimony and full cooperation with any related inquiries and investigations that might be undertaken by the appropriate agencies of government to end and prosecute the alleged misconduct and frauds by the various parties that have taken part in, or colluded in such conduct.

1    **II.**    <u>**DECLARATION OF FACTS & ARGUMENTS IN SUPPORT OF OBJECTION**</u>

2    6.    <u>**Designated Class Counsel and attorneys of record through January 3, 2011**</u>:

3 I understand that the plaintiff's attorneys who were involved in litigating *Young v HP*, some of

4 whom I had met in person (names of these individuals bolded below), and some others I spoke with

5 on the phone or communicated with via e-mail, are partners and/or associates inside four (4) law

6 firms, of which only the first two law firms were actively involved in negotiating the August 25,

7

8 2010 stipulated settlement:

9      a) KABATECK BROWN KELLNER LLP (KBK Law)

10        **Brian Kabateck, Richard Kellner, Alfredo Torrijos**

11      b) CHITWOOD HARLEY HARNES LLP

12        **Darren T. Kaplan**, Gregory E. Kelner

13      c) LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

14        Jonathan D. Selbin, **Kristen E. Law**

15      d) LAW OFFICES OF CALTON & CALTON

16        **Jim S. Calton, Jr.**

17    7.    In this declaration, unless identified by name, I will refer to any one or all of the

18 above listed law firms and attorneys as "the Designated Counsel," or as "the attorneys."

19

20

21    8.    <u>*Sutherland v. HP* – a viable and valuable case on behalf of the injured classes</u>:

22 A class action case is currently pending against HP in California court, described in great detail in

23 the <u>***objection of Martha Sutherland, by attorney Tim Rumberger***</u>. Unlike the Baggett and Young

24 dismissed by summary judgment for failure to state viable legal theories, at this time, *Sutherland v.*

25 *HP* is a strong, viable class action case, based on the ***scientific proof of HP's deliberate***

26 ***programming of its products to grossly under-deliver advertised yields***, as can be seen in the

27

28 attached *Sutherland v. HP* second amended complaint, the extensive evidence exhibits,

the "HP - SureSupply or Sure Fraud?" video documentary and the HP Yield Study Report, endorsed by a world-renowned Stanford University professor Dr. Phil Zimbardo, that provides empirical proof of the alleged HP yield fraud. Sutherland's yield-based causes of action are further bolstered by HP's own arguments in this court that stated: ***"Having made the disclosure it did regarding page yield, HP is bound to that promise, and HP's conduct must be judged against that disclosure…"*** In addition, publicly available HP documents, as well as HP statements made to Sutherland, ***fully admit that HP printers are known to cause premature replacement of printing supplies*** (i.e. hard-stopping cartridges prior to delivering their full advertised yields) in violation of CLRA statutes. Finally, Sutherland uncovered scientifically derived evidence and stated a legal theory that the so-called "override mode," if activated prior to the full delivery of advertised yields, ***renders HP laser printers crippled and defective*** from both the practical and legal perspectives, thus making a distinction between non-override and override printer models moot and irrelevant and enabling Sutherland litigation to encompass all HP laser printers that under-deliver advertised yields. Based on its extensive and indisputable body of evidence, including the above mentioned scientific yield delivery study, and based on HP's own written admissions, the Sutherland case is very likely to prevail and to achieve a substantial recovery for consumers, estimated at orders of magnitude greater that the Baggett and Young stipulated settlement (based on each individual incident of deliberate failure to deliver stated yields for color cartridges causing up to $280 of losses for each consumer). Most importantly, Sutherland case is on track to obtain comprehensive injunctive relief that will fully protect consumers from continued yield fraud that will otherwise continue to take advantage of HP printer owners for many years to come – for the life of the installed base of HP Color LaserJet printers and HP's upcoming printer models.

9. Therefore, evaluations of the present settlement (that would extinguish Sutherland v HP), should be made in the context of knowing that consumers still have a viable tool for substantial recovery and meaningful injunctive relief, as compared to the present settlement that

only gives $2.75MM cash to the Designated Counsel, while providing "up to $5MM" of nearly worthless coupons to the injured class and no injunctive relief from the ongoing fraud.

10.     **Misconduct of the Designated Counsel**:   On December 31, 2010, I had tracked down via Google and via the name and phone number contained on the settlement signature page, Mr. James C. Young, and a fellow member of the class and a lead plaintiff for the injured class of consumers who own HP 2600n and other LaserJet printers containing hard-stopping and override mechanisms.  I shared with Mr. Young the results of my broad investigations related to the HP color LaserJet yield fraud and I asked him to share his relevant experiences.  In the course of our conversation I heard very disturbing information from Mr. Young related to the conduct of the Designated Counsel, including the fact that even despite my extensive conversations with and documentary disclosures made to the attorneys over the past few weeks, they still had failed to notify Mr. Young about *Sutherland v HP* case, of which they had known for at least two years through our personal meetings, calls and correspondence, or the HP yield study conducted by the Integrity Capitalism Network.

11.     I understand that Mr. Young is providing a declaration for this court that will fully reveal the disturbing truth about his experiences as a lead plaintiff, therefore, I shall not engage in hearsay within my declaration and instead urge this court to first inspect Mr. Young's declaration, before evaluating mine.

12.     Having learned of attorney conduct that I knew to be unlawful and unethical, I expressed my opinion that Mr. Young had an opportunity to prevent a miscarriage of justice and I also expressed an opinion that he might want to obtain independent counsel.  On Mr. Young's request I had tried to introduce him to three different attorneys, two of whom declined, stating conflict of interest (Tim Rumberger and Ted Frank), while the third attorney (Reece Halpern) agreed to provide limited representation for Mr. Young's declarations to this court.

13.     In sum, Mr. Young's testimony to this court shows that he was prevented and disabled by the Designated Counsel from properly engaging in his role as the lead plaintiff, and had neither read nor evaluated the merits of the stipulated settlement before providing the attorneys with the coveted signature page, having done so relying on their vague statements that they won a settlement and that HP would fix the problems, pay him $1,000 and give meaningful discounts to the other consumers.

14.     These findings elevated my concerns about what appeared more and more to be an entirely sham, collusive settlement.  On the same day, I then proceeded to contact Mr. Kelsea Baggett, the lead plaintiff in *Baggett v HP* by means of a phone number found using the Bing search engine.  His wife answered the phone and then put him on.  I introduced myself and shared my related findings with Mr. Baggett.  He had told me that he too was never informed in any way about the *Sutherland v. HP* case or the HP yield study, to which I provided e-mailed download links.  Mr. Baggett appeared to have read the stipulated settlement document, but did not share with me if he had scrutinized it to make sure the settlement served the best interests of the injured class.  He expressed concerns about my findings, but then stated that he had suffered a number of heart attacks in 2010, and that his condition and prognosis were grave: he was presently attached to medical devices keeping him alive and did not expect to live very much longer.  Mr. Baggett expressed his regrets that he would not be able to executed his role as a lead plaintiff and scrutinize my revelations in order to determine if he is required by his duty as a lead plaintiff to take any appropriate actions on behalf of the class.  He explained that he wishes to spend the last few months of his life with his family rather than fighting on behalf of defrauded consumers.  Having learned of this heartbreaking situation, I immediately wished him well and promised Mr. Baggett that he will not be disturbed with regards to this matter in the future.

15.     While Mr. Baggett certainly appeared better informed about the case than Mr. Young (who was not informed or engaged in it at all until December 31, 2010), based on Mr. Baggett's

revelations about his state of health, which I urge this court to verify independently of my present statements, he has not been a fully willing or able lead plaintiff working on behalf of the class for some time, and he is certainly in no position to provide this service moving forward, including during the fairness hearings or appeals. While I am not an attorney, I must declare my concern that this consolidated action appears to not have been fully and rigorously scrutinized by either lead plaintiff, particularly at the time of settlement negotiations and prior to the preliminary approval, as required by the class action litigation process. Further, Mr. Young, has today dismissed the designated counsel and is now vigorously objecting to this settlement, while Mr. Baggett admits that he is fully and permanently incapacitated from effectively serving as a lead plaintiff.

16.     All together, we have direct testimony from one of the two lead plaintiffs that the stipulated settlement appears to have been a sham driven by the designated counsel for their private gain and against the interests of the class, combined with the inability of another lead plaintiff to make a rigorous examination of the disturbing allegations in this case, or to speak with a strong voice on behalf of injured consumers. Both lead plaintiffs state that they were prevented by designated counsel from learning about the still viable *Sutherland v HP* case (and the empirical yield study that supports its claims), that appears on track to bring meaningful relief to the same injured classes. Either separately or jointly these revelations should urge this court to reject the settlement in its entirety. For both the protection of the class and out of compassion for Mr. Baggett, I urge this court to immediately relieve him of his responsibilities and obligations as a lead plaintiff, and order that another eligible lead plaintiff, who is willing and able to serve in that capacity fully and without conflicts of interest, be appointed.

17.     Based on the extensive misconduct of the designated counsel, it is clear that the present stipulated settlement they got past the ineffective lead plaintiffs can not possibly be trusted as a fair and reasonable settlement for the consumers. Taking into the account the still viable and valuable claims of the *Sutherland v HP* case, that this worthless settlement will extinguish, it should

1    be rejected in its entirety by this court.

2

3        18.    **Ignoring and Mishandling of Crucial Evidence**.  There was a disturbing trend in

4    the Young case to ignore or mishandle evidence by the designated counsel.  In addition to the

5    revelations made by Mr. Young, I have personally been in contact with attorney Jim Colton Jr., who

6    had complained that attorney Kristen Law had not collected all of his samples and appears to not

7

8    have investigated the one set of hard-stopped but entirely full of unspent "full-yield-toner-weight"

9    cartridges in her possession in San Francisco.  Upon my request to furnish this evidence for the

10   *Sutherland* case, just after *Young* was dismissed by summary judgment, attorney Kirsten Law

11   revealed that she had misplaced and lost these cartridges during office relocation, never having

12   inspected, measured, or "dissected" them.  Such consistent disregard for evidence appears to

13   demonstrate that designated counsel had been substantially unprepared for and lacking the focus to

14

15   uncover, fully understand and competently litigate this case.  I also have reasons to believe, as

16   suggested by their stubborn but failed strategies that they might have attempted to cover up

17   evidence in order to avoid having to admit substantial variability in the damages suffered by

18   individual class members due to the variability of full yield delivery, proven by the HP yield study

19   conducted by ICN.  Admission of such variability would require complex and expensive research in

20   order to successfully develop viable class certification strategies, compatible with the true facts of

21   the HP yield fraud.  Designated counsel appears to have been determined to avoid these costly

22   investments on behalf of the class, which they failed to adequately represent.  Therefore, having lost

23

24   these cases through negligence and incompetence, designated counsel have driven the case into

25   highly compromised settlement to benefit themselves and without engaging the lead plaintiffs in

26   evaluating the fairness of the settlement or its true impact on consumers, as described below.

27   Taking into the account the still viable and valuable claims of the *Sutherland v HP* case, that this

28

DECLARATION & OBJECTION OF JAMES C. YOUNG, Case No. CV 07-0667 AG (RNBx)

8

worthless settlement will extinguish, it should be rejected in its entirety by this court.

19. **Designated Counsel knows that the HP toner fraud is ongoing and pervasive, yet they are willing to accept $2.75MM payoff in exchange for a gag order and recommend that consumers continue buying products that counsel knows will defraud them for years to come** : I have personally engaged in exhaustive conversations and exchanges of email with the designated counsel over the past two weeks, during the course of which they have expressed their passionate belief that HP is getting away with a huge crime. However, instead of taking responsibility for their failed litigation strategy, against which I had explicitly warned them in September 2008, based on my research and expert knowledge, they persist in blaming a supposedly conservative, pro-corporate judge who is indifferent to the plight of defrauded consumers – an excuse that appears to me as utterly baseless. Despite being an injured plaintiff in this case, I must still completely agree with Judge Guilford's rulings in both *Baggett* and *Young*, because the failed and unreasonable legal theory promoted by the designated counsel had enabled enterprising class action attorneys (some among the current group), to sue a completely innocent manufacturer, Brother, based on the leftover toner claims – that have no legal or practical meaning outside of the advertised yield delivery by the printer/cartridge mechanism.

20. The only measure of honest performance of a laser printer and/or cartridge is the delivery of advertized projected yields based on coverage – a formula that allows consumers to accurately estimate how many actual pages they might get based on their average coverage per page. Thus a stated yield promise provides a variable actual page yield: fewer pages for heavy toner users, more pages for the light toner users. HP has programmed its printers to falsely accelerate the appearance of actual yield utilization – as described in much detail in the enclosed HP Yield Study, which furnishes an empirical proof of the yield fraud alleged in the *Sutherland v. HP* case. Designated counsel is fully aware of this fact, and they admitted to me personally that

**DECLARATION & OBJECTION OF JAMES C. YOUNG**, Case No. CV 07-0667 AG (RNBx)

consumers will be shortchanged by HP LaserJet printers and cartridges of their advertized yields, thus costing typical consumers as much as $200 per incident. However, designated counsel are presently advising these same consumers to accept a worthless $7 coupon to purchase these same HP replacement supplies that, absent injunctive relief that designated counsel failed to litigate or negotiate into the settlement, will most likely cause the already injured consumers to lose more money, multiple times per year.

21.    To make matters worse, designated counsel have agreed to a gag order (page 30 of the stipulated settlement), willing to be silent about the facts they fully know, and making it virtually certain that many consumers will lose $200 to the ongoing fraud by continuing to purchase replacement supplies for their HP printers – when they could spend exactly the same amount of money on alternate printer brands that do not block the full use of advertised yields. Having lost their cases, designated counsel could have simply walked away from the worthless settlement and publicized the facts fully known to them, in order to protect the consumers from the fraud they believe to be ongoing, yet they choose to accept an undeserved $2.75MM payoff for themselves and remain silent about HP fraud in exchange. This stipulated settlement is a second fraud against consumers that will injure them even further – this time by the unethical actions of their own designated counsel – and it should be rejected in its entirety by this court.

22.    **Judicial Efficiency in the context of pending investigations and likely action by the California Attorney General:** Having learned of the substantial misconduct by the designated counsel aimed at collusion with HP to extinguish the *Sutherland v HP* case in exchange for what amounts to a pay-off, over the last two days I have made efforts to establish contact with the office of the California Attorney General, to urge the AG to either object, or opt out of the settlement on behalf of all the tax-payer funded institutions of the State of California that have lost vast amounts of money as a result of the HP yield fraud. Despite the great difficulty presented by the January 3,

**DECLARATION & OBJECTION OF JAMES C. YOUNG,** Case No. CV 07-0667 AG (RNBx)

2011 inauguration of the new AG, Kamala Harris, and the internal reshuffling at the AG's office, at about 4:45 pm today, on January 4, 2011, I was finally able to track down and establish a working relationship with a head of Consumer Fraud Investigations, Frances Grunder, operating out of the San Francisco office of CA AG. I made a full disclosure of the summary of ICN investigations and Ms. Grunder assured me that there was no rush for the AG to file an opt-out, as the CA AG is able to override any and all state and federal civil class action settlements, if the AG investigation were to determine that California consumers and/or State Government institutions are being deliberately defrauded and the relief provided by a settlement fails to end the fraud or fails to fully pay for the damages caused. She expressed great interest in the ICN findings and their endorsements, and we agreed to effectuate a transfer of the ICN digital archive dedicated to the HP yield fraud to the AG office as early as tomorrow, as a first step towards the launch of the AG investigation. I understand that based on a scientific proof of fraud, rather than just the ad-hock reports of frustrated consumers, CA AG action would be imminent, should HP fail to voluntarily initiate mitigation of the fraud.

23.     While AG's office might take some time to confirm the results of ICN investigation and proceed with its independent action, out of consideration of judicial efficiency, it is yet another reason for this court to presently reject the sham settlement (rejected even by the lead plaintiff James Young after learning of its true costs to consumers). Such outcome would forgo the costly and time consuming appeals of the settlement approval and allow the *Sutherland* litigation to proceed on track and in full cooperation with the CA AG. This process will likely leading to a rapid, country wide, uniform mitigation of the HP yield fraud, serving the best interests of HP and the injured consumers. If, on the other hand this settlement were to be approved, the defendant HP would still likely face the actions of the State AGs, in California as well as the other states, clogging up the courts for years. The rejection of this sham settlement at this time would only hurt one party – the unethical designated counsel who created it in the first place by betraying their class.

## III.   SUMMARY OF ARGUMENTS IN SUPPORT OF OBJECTION

24.    Not having representation of counsel required to develop and state a more comprehensive objection to stipulated settlement, I rely on the wisdom of this court to reflect on the truthful testimony in my declarations stated above under the penalty of perjury, in order to prevent the miscarriage of justice and the corruption and misuse of the class action litigation process.

25.    In addition to relying on my own declarations stated above, I have learned about the intent and the substance of the Objection to Proposed Settlement filed in this case by Theodore H. Frank of the Center for Class Action Fairness; as well as the Objection to Proposed Settlement filed in this case by Timothy Rumberger, attorney for objectors Martha Sutherland, and the class of injured consumers she represents; as well as the Objection to Proposed Settlement and Declarations filed in this case by James C. Young, the lead plaintiff of Young v. HP, representing himself, and I would like to join their objections as well.

26.    Finally, in addition to summarizing my own declarations, I would like to highlight a number of key facts that might be well known to this court already:

   a)   Designated counsel pursued this litigation based on their own selfish agendas rather than stating a legal theory based on the true facts and the real evidence in this case;

   b)   The terms of stipulated settlement are unjust, insufficient, unreasonable and entirely worthless to myself or any typical consumer, because we can achieve greater savings than by using $7 HP e-coupons, requiring a waste of much valuable time, by simply purchasing HP replacement cartridges on sale from web-based retailers, or better yet, switching to any number of honest brands of laser printers that can be purchased for less than a full set of HP replacement cartridges from the HP website;

   c)   The terms of the stipulated settlement are actually likely to cause substantial additional losses through purchases of replacement cartridges from HP that fail to deliver stated yields, rather than recover value previously lost by the members of the

class, because settlement terms do not require HP to either fix the problem or to stop selling fraudulent replacement supplies that fail to deliver stated yields;

d) A viable *Sutherland v. HP* case is being litigated to address the same HP yield fraud, based on alternative legal theories and claims (i.e. proven failure to deliver advertised yields), which this and other courts have already indicated in their rulings and opinions as preferable to those dismissed in both the *Baggett* and *Young* cases;

e) *Sutherland v HP* is supported by a scientific yield delivery study by ICN, endorsed by a world-renowned Stanford University professor Dr. Phil Zimbardo, that provides empirical proof of the alleged HP yield frauds. *Sutherland* yield fraud claims also appear to be validated by HP's own testimony in this court, as well as HP's published and stated admissions already placed into evidence. While I am not an attorney, even from the layman's perspective, *Sutherland v. HP* litigation appears to be based on sound legal theories and strategies that will likely achieve both a substantially greater recovery for the injured consumers and, most importantly, might obtain comprehensive injunctive relief to end the yield fraud, which will otherwise be allowed to continue injuring consumers indefinitely;

f) Both the designated counsel and HP failed to disclose, and deliberately concealed the *Sutherland v HP* case from this court and from lead plaintiffs Kelsea Baggett and James Young, thus leading them to unknowingly sign off on an inadequate settlement, which creates a very strong appearance of collusion and betrayal of the interests of the class by its attorneys;

g) If *Sutherland v HP* case were to prevail, *Young v HP* designated counsel would receive no compensation for their entirely failed litigation efforts, while HP might have to pay out very substantial damages and, at the very least, HP's misconduct will be fully exposed to the public by the hearings related to the scientific yield study. Therefore, there are very good reasons to believe that, and there is a very strong appearance of, designated counsel and HP in fact colluding to extinguish *Sutherland v HP* litigation in order to maximize each other's economic outcomes, while

completely and totally sacrificing the interests of the injured consumers;

h) Rejection of the stipulated settlement would serve the purpose of judicial efficiency by rendering it unnecessary for HP to face actions by multiple AGs in the different states, clogging up courts for years, and most likely lead to a streamlined investigation and mitigation process.

27.    Based on the facts revealed and arguments made in this brief, final approval to the stipulated settlement should be rejected entirely.

## IV.    NOTICE OF INTENT TO APPEAR AND TESTIFY AT HEARING

28.    These objections also serve as notice that settlement objector *Michael Vlastone* intends to appear, in person, or via electronic video conferencing, or through his counsel (to be designated at a later date), at the January 31, 2011 fairness hearing on behalf of himself and the injured class and he reserves the right to cross-examine any witnesses presented in support of the settlement.

Respectfully submitted,

DATED:  January 4, 2011

BY:_____
        Michael A. Vlastone,
        Founder and Director of the Integrity Capitalism Network
        Class member and objector

## PROOF OF SERVICE

I declare that:

I reside and work in the state of California. I am over the age of 18 years and my office address is  767 Bryant Street #410, San Francisco, CA 94107, and my email address is: vlastone@aol.com.

On January 4, 2010, I served the attached:  OBJECTION TO PROPOSED SETTLEMENT

 X   By electronic mail in that I e-mailed a PDF of this brief to the following parties, bolded below.
 X   By First-Class Registered Mail in that I caused such envelope(s) to be delivered via First-Class Mail to the addressee(s) bolded below.

| | |
|---|---|
| Settlement Administrator<br>In re: HP LaserJet Printer Litigation<br>Settlement Administrator<br>P.O. Box 5270<br>Portland, OR 97208-5270<br>Facsimile: (877) 341-4607<br>**Email:info@HPLaserJetPrinterSettlement.com** | Counsel for Class<br>Richard L. Kellner<br>KABATECK BROWN<br>KELLNER, LLP<br>644 S. Figueroa Street<br>Los Angeles, CA 90017<br>**E-mail:rlk@kbklawyers.com** |
| Counsel for HP<br>Kristofor T. Henning<br>Franco A. Corrado<br>MORGAN LEWIS & BOCKIUS, LLP<br>1701 Market Street<br>Philadelphia, PA 19103<br>**E-mail:Khenning@morganlewis.com**<br>**Fcorrado@morganlewis.com** | **Clerk of Court U.S. District Court,**<br>**Central District of California**<br>**411 West Fourth Street, Room 1053**<br>**Santa Ana, CA 92701-4516** |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2011

BY:_____
          Michael A. Vlastone,
          Founder and Director of the Integrity Capitalism Network
          Class member and objector

| From: | Michael Vlastone |
|---|---|
| To: | info@HPLaserJetPrinterSettlement.com; Richard Kellner; Khenning@morganlewis.com; Fcorrado@morganlewis.com |
| Cc: | Michael Vlastone |
| Subject: | CORRECTION - Michael Vlastone OBJECTION re. CV 07-0667 AG 2011-01-04 |
| Date: | Wednesday, January 05, 2011 12:59:25 AM |
| Attachments: | Michael Vlastone OBJECTION re. CV 07-0667 AG 2011-01-04.pdf<br>ATT00001.htm<br>ATT00002.htm |

I would like to recall the PDF file previously submitted within the stipulated deadline, due to an error (caused by my failure to update the footer label of a shared template file), which might cause confusion in handling documents by the parties, and I request to substitute it with a corrected PDF file.

I declare under the penalty of perjury that the textual content of the corrected file is otherwise faithful to the original file submitted within the stipulated deadline of January 4, 2011.

I apologize to all for the inconvenience caused by this error.

Michael Vlastone

**My objection is contained in the enclosed PDF file** and the previously submitted file can be discarded.



EXHIBIT
5
1-25-11

MICHAEL A. VLASTONE, IN PRO PER
*Director of the Integrity Capitalism Network*

767 Bryant Street, #410
San Francisco, CA 94107

Telephone: (415) 957-8703
Facsimile: (415) 957-8703 (requires manual activation via voice call)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: **HP LASERJET PRINTER LITIGATION**; | **CASE No. CV 07-0667 AG (RNBx)** |
| | **CLASS ACTION LITIGATION** |
| **KELSEA BAGGETT** and **JAMES YOUNG**, individually and on behalf of all those similarly situated, *Plaintiffs*, | **1) DECLARATIONS BY CLASS MEMBER Michael A. Vlastone** |
| | **2) OBJECTION TO SETTLEMENT** |
| v. | **3) APPEARANCE AT HEARING** |
| **HEWLETT-PACKARD COMPANY**, and Does 1 through 50, *Defendants*, | Judge: ANDREW J. GUILFORD Date: January 31, 2011 Time: 10:00 a.m. |
| **MICHAEL A. VLASTONE**, *Objector* | |

I, Michael A. Vlastone, hereby declare and state as follows:

## I.    STATEMENT OF INTEGRITY

1.    I, Michael A. Vlastone, a resident of San Francisco, CA, am over the age of 18. I am the owner of an HP Color LaserJet 2600n and CP1518ni printers, giving me standing as a member of the class, and I am the founder and director of the Integrity Capitalism Network (ICN), an organization dedicated to developing systemic solutions to ending fraud.

2.      I have not been threatened, coerced or manipulated in any way to come forward with the revelations contained in this declaration;  I have not been offered any incentives, payments, rewards or bonuses of any kind for exposing the misconduct and frauds that I've become aware of during the course of investigating the conduct of current designated counsel's class action litigation, as well as the deliberately fraudulent design of HP color LaserJet printers and cartridges.

3.      I have not been contacted or recruited by counsel for any party to the present litigation, but have independently determined that I must address this court directly in order to prevent the miscarriage of justice, having learned about the unethical conduct by the designated class counsel, a determination I made based on my own investigations, direct discussions with class counsel and other information known to me directly.

4.      I am making this declaration to this court in order to fulfill my responsibilities as a citizen of the United States and a 29-year resident of the State of California.  Having learned of the extensive wrongdoings, costing millions not only to the US and California consumers but also the tax-payer-funded institutions including but not limited to public schools, universities, hospitals and the various offices of the State and Federal Governments, as well as the US military and national Guard, that all own and operate HP color LaserJet printers and cartridges,  I am taking a stand to protect the wealth of all citizens and the integrity of American business and government institutions from the systemic corruption that undermines our freedoms, our economy and our legal system.

5.      I hereby swear under the penalty of perjury under the laws of the state of California that all the facts contained in this declaration are based on my personal knowledge (unless otherwise specified), to the best of my understanding and recollections, and if called upon to do so, I could and would testify competently hereto, and I am further willing and able to provide testimony and full cooperation with any related inquiries and investigations that might be undertaken by the appropriate agencies of government to end and prosecute the alleged misconduct and frauds by the various parties that have taken part in, or colluded in such conduct.

2

**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE,** Case No. CV 07-0667 AG (RNBx)

## II.   DECLARATION OF FACTS & ARGUMENTS IN SUPPORT OF OBJECTION

6.   **Designated Class Counsel and attorneys of record through January 3, 2011**:

I understand that the plaintiff's attorneys who were involved in litigating *Young v HP*, some of whom I had met in person (names of these individuals bolded below), and some others I spoke with on the phone or communicated with via e-mail, are partners and/or associates inside four (4) law firms, of which only the first two law firms were actively involved in negotiating the August 25, 2010 stipulated settlement:

a) KABATECK BROWN KELLNER LLP (KBK Law)

   **Brian Kabateck**, **Richard Kellner**, **Alfredo Torrijos**

b) CHITWOOD HARLEY HARNES LLP

   **Darren T. Kaplan**, Gregory E. Kelner

c) LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

   Jonathan D. Selbin, **Kristen E. Law**

d) LAW OFFICES OF CALTON & CALTON

   **Jim S. Calton, Jr.**

7.   In this declaration, unless identified by name, I will refer to any one or all of the above listed law firms and attorneys as "the Designated Counsel," or as "the attorneys."

8.   *Sutherland v. HP – a viable and valuable case on behalf of the injured classes*:

A class action case is currently pending against HP in California court, described in great detail in the ***objection of Martha Sutherland, by attorney Tim Rumberger***.  Unlike the Baggett and Young dismissed by summary judgment for failure to state viable legal theories, at this time, *Sutherland v. HP* is a strong, viable class action case, based on the ***scientific proof of HP's deliberate programming of its products to grossly under-deliver advertised yields***, as can be seen in the attached *Sutherland v. HP* second amended complaint, the extensive evidence exhibits,

DECLARATION & OBJECTION OF MICHAEL A. VLASTONE, Case No. CV 07-0667 AG (RNBx)

3

the "HP - SureSupply or Sure Fraud?" video documentary and the HP Yield Study Report, endorsed by a world-renowned Stanford University professor Dr. Phil Zimbardo, that provides empirical proof of the alleged HP yield fraud. Sutherland's yield-based causes of action are further bolstered by HP's own arguments in this court that stated: *"Having made the disclosure it did regarding page yield, HP is bound to that promise, and HP's conduct must be judged against that disclosure…"* In addition, publicly available HP documents, as well as HP statements made to Sutherland, *fully admit that HP printers are known to cause premature replacement of printing supplies* (i.e. hard-stopping cartridges prior to delivering their full advertised yields) in violation of CLRA statutes. Finally, Sutherland uncovered scientifically derived evidence and stated a legal theory that the so-called "override mode," if activated prior to the full delivery of advertised yields, *renders HP laser printers crippled and defective* from both the practical and legal perspectives, thus making a distinction between non-override and override printer models moot and irrelevant and enabling Sutherland litigation to encompass all HP laser printers that under-deliver advertised yields. Based on its extensive and indisputable body of evidence, including the above mentioned scientific yield delivery study, and based on HP's own written admissions, the Sutherland case is very likely to prevail and to achieve a substantial recovery for consumers, estimated at orders of magnitude greater that the Baggett and Young stipulated settlement (based on each individual incident of deliberate failure to deliver stated yields for color cartridges causing up to $280 of losses for each consumer). Most importantly, Sutherland case is on track to obtain comprehensive injunctive relief that will fully protect consumers from continued yield fraud that will otherwise continue to take advantage of HP printer owners for many years to come – for the life of the installed base of HP Color LaserJet printers and HP's upcoming printer models.

9. Therefore, evaluations of the present settlement (that would extinguish Sutherland v HP), should be made in the context of knowing that consumers still have a viable tool for substantial recovery and meaningful injunctive relief, as compared to the present settlement that

1   only gives $2.75MM cash to the Designated Counsel, while providing "up to $5MM" of nearly

2   worthless coupons to the injured class and no injunctive relief from the ongoing fraud.

3

4       10.    **Misconduct of the Designated Counsel**:  On December 31, 2010, I had tracked

5   down via Google and via the name and phone number contained on the settlement signature page,

6   Mr. James C. Young, and a fellow member of the class and a lead plaintiff for the injured class of

7   consumers who own HP 2600n and other LaserJet printers containing hard-stopping and override

8   mechanisms.  I shared with Mr. Young the results of my broad investigations related to the HP color

9   LaserJet yield fraud and I asked him to share his relevant experiences.  In the course of our

10  conversation I heard very disturbing information from Mr. Young related to the conduct of the

11  Designated Counsel, including the fact that even despite my extensive conversations with and

12  documentary disclosures made to the attorneys over the past few weeks, they still had failed to

13

14  notify Mr. Young about *Sutherland v HP* case, of which they had known for at least two years

15  through our personal meetings, calls and correspondence, or the HP yield study conducted by the

16  Integrity Capitalism Network.

17

18      11.    I understand that Mr. Young is providing a declaration for this court that will fully

19  reveal the disturbing truth about his experiences as a lead plaintiff, therefore, I shall not engage in

20  hearsay within my declaration and instead urge this court to first inspect Mr. Young's declaration,

21  before evaluating mine.

22

23      12.    Having learned of attorney conduct that I knew to be unlawful and unethical, I

24  expressed my opinion that Mr. Young had an opportunity to prevent a miscarriage of justice and I

25  also expressed an opinion that he might want to obtain independent counsel.  On Mr. Young's

26  request I had tried to introduce him to three different attorneys, two of whom declined, stating

27  conflict of interest (Tim Rumberger and Ted Frank), while the third attorney (Reece Halpern)

28  agreed to provide limited representation for Mr. Young's declarations to this court.

13.     In sum, Mr. Young's testimony to this court shows that he was prevented and disabled by the Designated Counsel from properly engaging in his role as the lead plaintiff, and had neither read nor evaluated the merits of the stipulated settlement before providing the attorneys with the coveted signature page, having done so relying on their vague statements that they won a settlement and that HP would fix the problems, pay him $1,000 and give meaningful discounts to the other consumers.

14.     These findings elevated my concerns about what appeared more and more to be an entirely sham, collusive settlement. On the same day, I then proceeded to contact Mr. Kelsea Baggett, the lead plaintiff in *Baggett v HP* by means of a phone number found using the Bing search engine. His wife answered the phone and then put him on. I introduced myself and shared my related findings with Mr. Baggett. He had told me that he too was never informed in any way about the *Sutherland v. HP* case or the HP yield study, to which I provided e-mailed download links. Mr. Baggett appeared to have read the stipulated settlement document, but did not share with me if he had scrutinized it to make sure the settlement served the best interests of the injured class. He expressed concerns about my findings, but then stated that he had suffered a number of heart attacks in 2010, and that his condition and prognosis were grave: he was presently attached to medical devices keeping him alive and did not expect to live very much longer. Mr. Baggett expressed his regrets that he would not be able to executed his role as a lead plaintiff and scrutinize my revelations in order to determine if he is required by his duty as a lead plaintiff to take any appropriate actions on behalf of the class. He explained that he wishes to spend the last few months of his life with his family rather than fighting on behalf of defrauded consumers. Having learned of this heartbreaking situation, I immediately wished him well and promised Mr. Baggett that he will not be disturbed with regards to this matter in the future.

15.     While Mr. Baggett certainly appeared better informed about the case than Mr. Young (who was not informed or engaged in it at all until December 31, 2010), based on Mr. Baggett's

DECLARATION & OBJECTION OF MICHAEL A. VLASTONE, Case No. CV 07-0667 AG (RNBx)

6

revelations about his state of health, which I urge this court to verify independently of my present statements, he has not been a fully willing or able lead plaintiff working on behalf of the class for some time, and he is certainly in no position to provide this service moving forward, including during the fairness hearings or appeals. While I am not an attorney, I must declare my concern that this consolidated action appears to not have been fully and rigorously scrutinized by either lead plaintiff, particularly at the time of settlement negotiations and prior to the preliminary approval, as required by the class action litigation process. Further, Mr. Young, has today dismissed the designated counsel and is now vigorously objecting to this settlement, while Mr. Baggett admits that he is fully and permanently incapacitated from effectively serving as a lead plaintiff.

16.     All together, we have direct testimony from one of the two lead plaintiffs that the stipulated settlement appears to have been a sham driven by the designated counsel for their private gain and against the interests of the class, combined with the inability of another lead plaintiff to make a rigorous examination of the disturbing allegations in this case, or to speak with a strong voice on behalf of injured consumers. Both lead plaintiffs state that they were prevented by designated counsel from learning about the still viable *Sutherland v HP* case (and the empirical yield study that supports its claims), that appears on track to bring meaningful relief to the same injured classes. Either separately or jointly these revelations should urge this court to reject the settlement in its entirety. For both the protection of the class and out of compassion for Mr. Baggett, I urge this court to immediately relieve him of his responsibilities and obligations as a lead plaintiff, and order that another eligible lead plaintiff, who is willing and able to serve in that capacity fully and without conflicts of interest, be appointed.

17.     Based on the extensive misconduct of the designated counsel, it is clear that the present stipulated settlement they got past the ineffective lead plaintiffs can not possibly be trusted as a fair and reasonable settlement for the consumers. Taking into the account the still viable and valuable claims of the *Sutherland v HP* case, that this worthless settlement will extinguish, it should

7

DECLARATION & OBJECTION OF MICHAEL A. VLASTONE, Case No. CV 07-0667 AG (RNBx)

1    be rejected in its entirety by this court.

2

3        18.    **Ignoring and Mishandling of Crucial Evidence**. There was a disturbing trend in

4    the Young case to ignore or mishandle evidence by the designated counsel. In addition to the

5    revelations made by Mr. Young, I have personally been in contact with attorney Jim Colton Jr., who

6    had complained that attorney Kristen Law had not collected all of his samples and appears to not

7    have investigated the one set of hard-stopped but entirely full of unspent "full-yield-toner-weight"

8    cartridges in her possession in San Francisco. Upon my request to furnish this evidence for the

9    *Sutherland* case, just after *Young* was dismissed by summary judgment, attorney Kirsten Law

10   revealed that she had misplaced and lost these cartridges during office relocation, never having

11   inspected, measured, or "dissected" them. Such consistent disregard for evidence appears to

12   demonstrate that designated counsel had been substantially unprepared for and lacking the focus to

13   uncover, fully understand and competently litigate this case. I also have reasons to believe, as

14   suggested by their stubborn but failed strategies that they might have attempted to cover up

15   evidence in order to avoid having to admit substantial variability in the damages suffered by

16   individual class members due to the variability of full yield delivery, proven by the HP yield study

17   conducted by ICN. Admission of such variability would require complex and expensive research in

18   order to successfully develop viable class certification strategies, compatible with the true facts of

19   the HP yield fraud. Designated counsel appears to have been determined to avoid these costly

20   investments on behalf of the class, which they failed to adequately represent. Therefore, having lost

21   these cases through negligence and incompetence, designated counsel have driven the case into

22   highly compromised settlement to benefit themselves and without engaging the lead plaintiffs in

23   evaluating the fairness of the settlement or its true impact on consumers, as described below.

24   Taking into the account the still viable and valuable claims of the *Sutherland v HP* case, that this

25

26

27

28

1   worthless settlement will extinguish, it should be rejected in its entirety by this court.

2

3       19.    **Designated Counsel knows that the HP toner fraud is ongoing and pervasive,**

4  **yet they are willing to accept $2.75MM payoff in exchange for a gag order and recommend**

5

6  **that consumers continue buying products that counsel knows will defraud them for years to**

7  **come** : I have personally engaged in exhaustive conversations and exchanges of email with the

8  designated counsel over the past two weeks, during the course of which they have expressed their

9  passionate belief that HP is getting away with a huge crime.  However, instead of taking

10  responsibility for their failed litigation strategy, against which I had explicitly warned them in

11  September 2008, based on my research and expert knowledge, they persist in blaming a supposedly

12  conservative, pro-corporate judge who is indifferent to the plight of defrauded consumers – an

13

14  excuse that appears to me as utterly baseless.  Despite being an injured plaintiff in this case, I must

15  still completely agree with Judge Guilford's rulings in both *Baggett* and *Young*, because the failed

16  and unreasonable legal theory promoted by the designated counsel had enabled enterprising class

17  action attorneys (some among the current group), to sue a completely innocent manufacturer,

18  Brother, based on the leftover toner claims – that have no legal or practical meaning outside of the

19  advertised yield delivery by the printer/cartridge mechanism.

20       20.    The only measure of honest performance of a laser printer and/or cartridge is the

21  delivery of advertized projected yields based on coverage – a formula that allows consumers to

22  accurately estimate how many actual pages they might get based on their average coverage per

23  page.  Thus a stated yield promise provides a variable actual page yield: fewer pages for heavy

24  toner users, more pages for the light toner users.  HP has programmed its printers to falsely

25  accelerate the appearance of actual yield utilization – as described in much detail in the enclosed HP

26  Yield Study, which furnishes an empirical proof of the yield fraud alleged in the *Sutherland v. HP*

27

28  case.  Designated counsel is fully aware of this fact, and they admitted to me personally that

**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE,** Case No. CV 07-0667 AG (RNBx)

9

1   consumers will be shortchanged by HP LaserJet printers and cartridges of their advertized yields,

2   thus costing typical consumers as much as $200 per incident. However, designated counsel are

3   presently advising these same consumers to accept a worthless $7 coupon to purchase these same

4   HP replacement supplies that, absent injunctive relief that designated counsel failed to litigate or

5   negotiate into the settlement, will most likely cause the already injured consumers to lose more

6   money, multiple times per year.

7    

8       21.    To make matters worse, designated counsel have agreed to a gag order (page 30 of

9   the stipulated settlement), willing to be silent about the facts they fully know, and making it

10  virtually certain that many consumers will lose $200 to the ongoing fraud by continuing to purchase

11  replacement supplies for their HP printers – when they could spend exactly the same amount of

12  money on alternate printer brands that do not block the full use of advertised yields. Having lost

13  their cases, designated counsel could have simply walked away from the worthless settlement and

14  publicized the facts fully known to them, in order to protect the consumers from the fraud they

15  believe to be ongoing, yet they choose to accept an undeserved $2.75MM payoff for themselves and

16  remain silent about HP fraud in exchange. This stipulated settlement is a second fraud against

17  consumers that will injure them even further – this time by the unethical actions of their own

18  designated counsel – and it should be rejected in its entirety by this court.

19   

20   

21   

22      22.    **Judicial Efficiency in the context of pending investigations and likely action by**

23  **the California Attorney General:** Having learned of the substantial misconduct by the designated

24  counsel aimed at collusion with HP to extinguish the *Sutherland v HP* case in exchange for what

25  amounts to a pay-off, over the last two days I have made efforts to establish contact with the office

26  of the California Attorney General, to urge the AG to either object, or opt out of the settlement on

27  behalf of all the tax-payer funded institutions of the State of California that have lost vast amounts

28  of money as a result of the HP yield fraud. Despite the great difficulty presented by the January 3,

10

**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE**, Case No. CV 07-0667 AG (RNBx)

2011 inauguration of the new AG, Kamala Harris, and the internal reshuffling at the AG's office, at about 4:45 pm today, on January 4, 2011, I was finally able to track down and establish a working relationship with a head of Consumer Fraud Investigations, Frances Grunder, operating out of the San Francisco office of CA AG. I made a full disclosure of the summary of ICN investigations and Ms. Grunder assured me that there was no rush for the AG to file an opt-out, as the CA AG is able to override any and all state and federal civil class action settlements, if the AG investigation were to determine that California consumers and/or State Government institutions are being deliberately defrauded and the relief provided by a settlement fails to end the fraud or fails to fully pay for the damages caused. She expressed great interest in the ICN findings and their endorsements, and we agreed to effectuate a transfer of the ICN digital archive dedicated to the HP yield fraud to the AG office as early as tomorrow, as a first step towards the launch of the AG investigation. I understand that based on a scientific proof of fraud, rather than just the ad-hock reports of frustrated consumers, CA AG action would be imminent, should HP fail to voluntarily initiate mitigation of the fraud.

23.     While AG's office might take some time to confirm the results of ICN investigation and proceed with its independent action, out of consideration of judicial efficiency, it is yet another reason for this court to presently reject the sham settlement (rejected even by the lead plaintiff James Young after learning of its true costs to consumers). Such outcome would forgo the costly and time consuming appeals of the settlement approval and allow the *Sutherland* litigation to proceed on track and in full cooperation with the CA AG. This process will likely lead to a rapid, country wide, uniform mitigation of the HP yield fraud, serving the best interests of HP and the injured consumers. If, on the other hand this settlement were to be approved, the defendant HP would still likely face the actions of the State AGs, in California as well as the other states, clogging up the courts for years. The rejection of this sham settlement at this time would only hurt one party – the unethical designated counsel who created it in the first place by betraying their class.

III.   **SUMMARY OF ARGUMENTS IN SUPPORT OF OBJECTION**

24.    Not having representation of counsel required to develop and state a more comprehensive objection to stipulated settlement, I rely on the wisdom of this court to reflect on the truthful testimony in my declarations stated above under the penalty of perjury, in order to prevent the miscarriage of justice and the corruption and misuse of the class action litigation process.

25.    In addition to relying on my own declarations stated above, I have learned about the intent and the substance of the Objection to Proposed Settlement filed in this case by Theodore H. Frank of the Center for Class Action Fairness; as well as the Objection to Proposed Settlement filed in this case by Timothy Rumberger, attorney for objectors Martha Sutherland, and the class of injured consumers she represents; as well as the Objection to Proposed Settlement and Declarations filed in this case by James C. Young, the lead plaintiff of Young v. HP, representing himself, and I would like to join their objections as well.

26.    Finally, in addition to summarizing my own declarations, I would like to highlight a number of key facts that might be well known to this court already:

   a)   Designated counsel pursued this litigation based on their own selfish agendas rather than stating a legal theory based on the true facts and the real evidence in this case;

   b)   The terms of stipulated settlement are unjust, insufficient, unreasonable and entirely worthless to myself or any typical consumer, because we can achieve greater savings than by using $7 HP e-coupons, requiring a waste of much valuable time, by simply purchasing HP replacement cartridges on sale from web-based retailers, or better yet, switching to any number of honest brands of laser printers that can be purchased for less than a full set of HP replacement cartridges from the HP website;

   c)   The terms of the stipulated settlement are actually likely to cause substantial additional losses through purchases of replacement cartridges from HP that fail to deliver stated yields, rather than recover value previously lost by the members of the

**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE**, Case No. CV 07-0667 AG (RNBx)

class, because settlement terms do not require HP to either fix the problem or to stop selling fraudulent replacement supplies that fail to deliver stated yields;

d) A viable *Sutherland v. HP* case is being litigated to address the same HP yield fraud, based on alternative legal theories and claims (i.e. proven failure to deliver advertised yields), which this and other courts have already indicated in their rulings and opinions as preferable to those dismissed in both the *Baggett* and *Young* cases;

e) *Sutherland v HP* is supported by a scientific yield delivery study by ICN, endorsed by a world-renowned Stanford University professor Dr. Phil Zimbardo, that provides empirical proof of the alleged HP yield frauds. *Sutherland* yield fraud claims also appear to be validated by HP's own testimony in this court, as well as HP's published and stated admissions already placed into evidence. While I am not an attorney, even from the layman's perspective, *Sutherland v. HP* litigation appears to be based on sound legal theories and strategies that will likely achieve both a substantially greater recovery for the injured consumers and, most importantly, might obtain comprehensive injunctive relief to end the yield fraud, which will otherwise be allowed to continue injuring consumers indefinitely;

f) Both the designated counsel and HP failed to disclose, and deliberately concealed the *Sutherland v HP* case from this court and from lead plaintiffs Kelsea Baggett and James Young, thus leading them to unknowingly sign off on an inadequate settlement, which creates a very strong appearance of collusion and betrayal of the interests of the class by its attorneys;

g) If *Sutherland v HP* case were to prevail, *Young v HP* designated counsel would receive no compensation for their entirely failed litigation efforts, while HP might have to pay out very substantial damages and, at the very least, HP's misconduct will be fully exposed to the public by the hearings related to the scientific yield study. Therefore, there are very good reasons to believe that, and there is a very strong appearance of, designated counsel and HP in fact colluding to extinguish *Sutherland v HP* litigation in order to maximize each other's economic outcomes, while

13
**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE,** Case No. CV 07-0667 AG (RNBx)

completely and totally sacrificing the interests of the injured consumers;

h) Rejection of the stipulated settlement would serve the purpose of judicial efficiency by rendering it unnecessary for HP to face actions by multiple AGs in the different states, clogging up courts for years, and most likely lead to a streamlined investigation and mitigation process.

27.  Based on the facts revealed and arguments made in this brief, final approval to the stipulated settlement should be rejected entirely.

### IV.  NOTICE OF INTENT TO APPEAR AND TESTIFY AT HEARING

28.  These objections also serve as notice that settlement objector *Michael Vlastone* intends to appear, in person, or via electronic video conferencing, or through his counsel (to be designated at a later date), at the January 31, 2011 fairness hearing on behalf of himself and the injured class and he reserves the right to cross-examine any witnesses presented in support of the settlement.

Respectfully submitted,

DATED:  January 4, 2011

BY:_____

Michael A. Vlastone,
Founder and Director of the Integrity Capitalism Network
Class member and objector

---

**DECLARATION & OBJECTION OF MICHAEL A. VLASTONE,** Case No. CV 07-0667 AG (RNBx)

14

|  |  |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | |
| 3 | I declare that: |
| 4 | I reside and work in the state of California. I am over the age of 18 years and my office address is <u>767 Bryant Street #410, San Francisco, CA 94107,</u> |
| 5 | and my email address is: <u>vlastone@aol.com.</u> |
| 6 | On January 4, 2010, I served the attached: <u>OBJECTION TO PROPOSED SETTLEMENT</u> |
| 7 | <u>X</u>  By electronic mail in that I e-mailed a PDF of this brief to the following parties, bolded |
| 8 | below. <br> <u>X</u>  By First-Class Registered Mail in that I caused such envelope(s) to be delivered via First- |
| 9 | Class Mail to the addressee(s) bolded below. |

| 10 | Settlement Administrator | Counsel for Class |
|---|---|---|
| 11 | In re: HP LaserJet Printer Litigation <br> Settlement Administrator | Richard L. Kellner <br> KABATECK BROWN |
| 12 | P.O. Box 5270 | KELLNER, LLP |
| 13 | Portland, OR 97208-5270 <br> Facsimile: (877) 341-4607 | 644 S. Figueroa Street <br> Los Angeles, CA 90017 |
| 14 | **Email:info@HPLaserJetPrinterSettlement.com** | **E-mail:rlk@kbklawyers.com** |
| 15 | Counsel for HP | **Clerk of Court U.S. District Court,** |
| 16 | Kristofor T. Henning <br> Franco A. Corrado | **Central District of California** <br> **411 West Fourth Street, Room 1053** |
| 17 | MORGAN LEWIS & BOCKIUS, LLP <br> 1701 Market Street | **Santa Ana, CA 92701-4516** |
| 18 | Philadelphia, PA 19103 <br> **E-mail:Khenning@morganlewis.com** | |
| 19 | **Fcorrado@morganlewis.com** | |

|  |  |
|---|---|
| 20 | |
| 21 | I declare under penalty of perjury that the foregoing is true and correct. |
| 22 | Executed on January 4, 2011 |
| 23 | |
| 24 | |
| 25 | BY: _____ |
| 26 | Michael A. Vlastone, <br> Founder and Director of the Integrity Capitalism Network <br> Class member and objector |
| 27 | |
| 28 | |



**KAMALA D. HARRIS**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5389
Facsimile: (415) 703-5480
E-Mail: Sheldon.Jaffe@doj.ca.gov

January 21, 2011

The Honorable Andrew J. Guilford
U.S. District Court for the Central District of California
411 West Fourth Street
Room 10-160
Los Angeles, CA 92701

*Via Golden State Overnight*

RE:     *In re: HP LasreJet Printer Litigation,*
        Case No. CV -7-00667 AG

Dear Judge Guilford:

        I am writing on behalf of the Office of the Attorney General regarding assertions
contained within the Declaration of Michael Vlastone concerning the position of this office in the
above referenced litigation.[1]  We want to make clear that this office has not taken any position
regarding the above referenced action or the proposed settlement, though we retain the right to
do so in the future.  Further, while we did speak with Mr. Vlastone, it appears that he may have
misunderstood our position.  To clarify some of the points contained in Mr. Vlastone's
declaration:

- It is not the position of this office that the Attorney General of the State of California has the
  authority to "override" any federal or state class action settlement.  However, the Attorney
  General is not a member of the class, and any settlement would neither bind the Attorney
  General nor preclude her from bringing an action in the name of the People of the State of
  California against Hewlett-Packard Company (HP) or any other person, even if such an
  action was predicated in part or in whole upon facts asserted in the complaint in this action or
  any related action.
- Mr. Vlastone came to us as a concerned consumer, and we therefore listened to his concerns
  and accepted the materials he provided to us.  While our office is always interested in hearing

---

[1] We note that this declaration does not appear in the on-line docket in this action.  However,
according to Plaintiffs' counsel, the declaration has been "filed and served."  Memorandum of
Points and Authorities accompanying Class Counsel's *Ex Parte* Application for an Order
Requiring Objector Michael A. Vlastone to Appear for Deposition (Document 225, Filed
01/10/11) at 5:7-8.



EXHIBIT
6
1-25-11

January 20, 2011
Page 2

from concerned consumers, and while we take all consumer complaints seriously, that does not mean that we have a "working relationship" with the consumer who brings the complaint to us.

- Investigations and planned actions of this office are not public information. We can neither confirm nor deny that we are investigating or will investigate HP or any other person in regards to the claims made by plaintiffs in this action or that as a result of any such investigation that we would take action against HP or any other person.

We thank the Court for its time.

Respectfully,

SHELDON H. JAFFE
Deputy Attorney General

For        KAMALA D. HARRIS
           Attorney General

cc:    Kristofor T. Henning, Esq., *via e-mail only*
       Brian S. Kabateck, Esq., *via e-mail only*
       Darren T. Kaplan, Esq., *via e-mail only*
       John Patrick McNicholas, IV, Esq., *via e-mail only*
       Samuel G. Liversidge, Esq., *via e-mail only*
       Jim S. Calton, Jr., *via facsimile only*
       Jonathan D. Selbin, *via e-mail only*
       Michael A. Vlastone, *via e-mail only*

LA2007601306
20397443.doc

Case 8:07-cv-00667-AG-RNB Document 230-5 Filed 02/04/11 Page 232 of 251 Page ID
#:5294
Case 8:07-cv-00667-AG-RNB   Document 230-5   Filed 01/14/11   Page 2 of 4   Page ID
#:4523

1   Daniel Berko - SBN 94912
    **LAW OFFICE OF DANIEL BERKO**
2   819 Eddy Street
    San Francisco, CA 94109
3   Telephone: 415-771-6174
    Facsimile: 415-474-3748
4   E-mail: BerkoLaw@SBCglobal.net

5
    Attorneys for Plaintiff,
6   MARTHA SUTHERLAND on
    Behalf of herself and all others similarly situated
7

8

9                  **SUPERIOR COURT OF CALIFORNIA**

10      **IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO**

11              **UNLIMITED CIVIL JURISDICTION**

12   MARTHA SUTHERLAND, on behalf of       )   Case No.  08-478150
     herself and all others similarly situated,  )
13                                         )   **PLAINTIFF'S RESPONSE TO ORDER**
                                           )   **TO SHOW CAUSE**
14            Plaintiffs,                  )
                                           )
15   vs.                                   )
                                           )   Date: September 14, 2009
16   HEWLETT PACKARD COMPANY, a            )   Time: 1:30 p.m.
     Delaware corporation., DOES 1 THROUGH )   Dpt. 212
17   50, inclusive.                        )
                                           )
18            Defendants.                  )

19

20          Plaintiff expects to file an amended complaint in this action.  However, a federal court

21   action (*Badgett v. Hewlett Packard* SA CV 07-667-AG filed in the United States District Court

22   for the Central District of California) raises some similar issues (although the actual legal theory

23   of liability, and certain facts (i.e. the specific printers and certain of the features are different).  In

24   that case, the court has under submission Defendant HP's Motion for Summary Judgment as well

25   as Plaintiffs' Motion for Class Certification).  Plaintiffs are awaiting the federal court's ruling

26   because it is likely to affect the nature of the amendment they seek to file.

27          Because Plaintiff intends to file an amended complaint, the parties have agreed that HP is

28   need not respond to Plaintiff's existing complaint.  Plaintiff also anticipates seeking complex

     designation upon filing the amended complaint (or motion re same).  Also, depending on the

                    PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE
                                        -1-



**ENDORSED**
**F I L E D**
Superior Court of California
County of San Francisco

SEP 1 1 2009

GORDON PARK-LI, Clerk
BY: _____
                Deputy Clerk

Case 8:07-cv-00667-AG-RNB Document 230-5 Filed 01/14/11 Page 233 of 251 Page ID
#:5295
Case 8:07-cv-00667-AG-RNB   Document 230-5   Filed 01/14/11   Page 3 of 4   Page ID
#:4524

1  class alleged in the amended pleading, HP may seek to remove the case to federal court.

2  Plaintiff requests that the Court postpone the OSC for 60 days. Plaintiff intends to move

3  forward with a motion or an amended complaint within the sixty day period even if the federal

4  court has not ruled. The parties also engaged in a settlement conference on the issues raised in

5  this case. Plaintiff anticipates that the negotiations will continue during the next 60 days.

6  Date: September 11, 2009

7  _____

8  Daniel Berko,
   Attorney for Plaintiff MARTHA SUTHERLAND on
9  behalf of herself and all other similarly situated.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARTHA SUTHERLAND v. HEWLETT PACKARD COMPANY
Superior Court of California, San Francisco C#08-478150

## PROOF OF SERVICE

I am a resident of the State of California, over the age of 18 years, and not a party to the within action. My business address is 819 Eddy Street, San Francisco, CA 94109. On **Sep 11, 2009** I served a true copy of the following document(s):

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE

☐ By transmitting **via facsimile** the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ By causing to be **personally delivered** the documents listed above by a messenger service, at the addresses set forth below on this date.

☐ By placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for **overnight delivery** on next business day, addressed as set forth below.

☒ By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in **United States mail** at San Francisco, California, addressed as set forth below.

| AARON S. DUTRA Morgan Lewis & Bockius One Market, Spear St. Tower San Francisco, CA 94103 fax. (415) 442-1001 | |
|---|---|
| | |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on **Sep 11, 2009** at San Francisco, California.

Carlos Jato

PROOF OF SERVICE

| | |
|---|---|
| **From:** | Michael Vlastone |
| **To:** | Brian Kabateck; Darren Kaplan; Richard Kellner; Alfredo Torrijos |
| **Cc:** | Timothy P. Rumberger |
| **Subject:** | RE: Status of HP Laser Printer Litigation: pending objection & offer of cooperation |
| **Date:** | Thursday, December 16, 2010 2:19:30 AM |
| **Attachments:** | Pasted Graphic 1.pdf |
| | ATT00001.htm |
| **Importance:** | High |

Dear Brian, Darren, Richard, and Alfredo,

Over the past year the **Sutherland vs. HP** litigation team made a few attempts to establish a dialog with your firm, but it was fruitless up until today.

Fortunately, this afternoon Brian personally answered a call from myself and Tim Rumberger (the new lead Sutherland attorney), and we had a short but very productive conversation.

I would like to express my appreciation for Brian's total openness and candor, and for both starting and concluding our discussion with an offer to cooperate fully in protecting consumers from what is likely the greatest fraud by dollar value in the history of consumer products.

Below is a brief summary of the content of our conversation with Brian.

It provides a bit of additional background, and is intended to facilitate a clean-slate approach towards a productive relationship moving forward.

It will also lay out some suggestions for immediate actions to accomplish our common goals - which are to **truly stop and mitigate the enormous HP toner fraud and to maximize your compensation for the years of difficult work on the Baggett and Young cases**.

In short:

1) When we met in September 2008, your entire team (excluding Alfredo who was not present) was convinced that yield was irrelevant and you rejected taking over the Sutherland case when it was offered free and clear. At that time you felt that the judge was likely to rule against HP, following in the tracks of the Epson litigation you so expertly concluded. Unfortunately it did not work out that way and my prediction materialized: while your toner fraud legal theories had 100% valid moral grounds, only yield claims could survive because they are the only advertised promises made by HP. I wish I had more credibility or had been more persuasive in my communication, but I did not yet have the documentary film or the yield fraud study available to share with your team at that time.

2) Meanwhile, by this summer, Sutherland team completed and vetted a thorough scientific study of yield delivery by HP's consumer color laser printers, endorsed by a world-reknowned Stanford University professor, Dr. Phil Zimbardo. We obtained definitive proof of HP yield fraud and showed that a typical consumer would be ripped off about $240 every year of owning the 2600n printer, or almost $1000 over its minimum expected lifetime.

3) In June, at long last Sutherland was able to retain a qualified class action



**EXHIBIT**
8
1-25-11
PENGAD 800-631-6989

attorney to take over from Dan Berko, and in August, we filed a rock-solid 2nd amended complaint at almost the same time you were wrapping up negotiations with HP – which stopped us cold.

4) A we understand it, the lead plaintiff's experiences in the Baggett and Young cases did not provide factual foundation for yield claims. Furthermore, your computer expert failed to uncover the real nature and the evidence of the yield fraud. While your team did not prevail in litigation due to your legal theories being rejected by the court, you did accomplish something of great value for the Sutherland case: you cleared the way by litigating the issues we would have had to address at great expense if you had not, which allowed us to focus 100% on yield fraud as the foundation for all claims and causes of action.
More importantly, you tripped up HP to testify under oath that yield is the only promise that matters and that HP should be held accountable for their yield promises as stated in the owners manuals.
Sutherland also has a slam-dunk opening for CLRA claims you were not able to pursue in the Young case, due to Pensilvania origins of his claims, while we uncovered multiple HP written admissions of premature cartridge termination. Combined with our plaintiff's testimony which you will see is 100% yield fraud based, and our study that empirically proves it, Sutherland case should allow us to recover billions that HP stole from consumers and to also obtain a rock solid injunction against future fraud as well as a software recall for the existing printers. We also have additional quality lead plaintiffs available to re-file on federal level and within the proper statutes of limitations.

5) At this point we will be objecting to the pending settlement, and we believe that there is a way for your consortium of law firms to join us in a way that would fully protect your business interests and fulfill your fiduciary obligations to the injured classes.
I understand from Brian that HP failed to notify either you or judge Guilford that Sutherland case was fully in play, or that they were provided with an advance copy of the study proving yield fraud. This appears to be a potential breach of ethics and would perhaps allow you to request that judge Guilford stay the settlement process pending a review of this matter.

6) Time is of the essence, due to the tight approaching deadlines and the holidays. We respectfully request that you study the below documentation and schedule a conference call some time this week, or perhaps over the weekend, to see how we can establish a common platform.
The volume of information you will need to absorb and process is substantial and meanwhile I will be glad to provide however much guidance over the phone or email that might be required to help Richard, Darren and Alfredo navigate through the most important parts and get a clear understanding of the Sutherland legal theories, the evidence and the yield study report.
We have much additional non-traditional ammunition to help us win this case for consumers, but from the purely class action litigation perspective it appears that we have an airtight case. Obviously any critique or exposure of blind-spots would be of great value at this time.

Below please find links for downloading the following essential documents:

1) A ZIPPED archive containing folders with the Second Amended Complaint and the Evidence Exhibits filed in the Sutherland case along with the final report of the HP

Yield Study conducted by the Integrity Capitalism Network.

## https://files.me.com/vlastone/llywcn

2) An 18 minute QuickTime video documentary and consumer interviews about the HP SureSupply fraud, produced by the Integrity Capitalism Network. I should note that it does not talk about yield issues, as it was not intended for the court, but rather for publicity utilization so we judged that issue too technical for inclusion in version 1.0.

When I shared this video with HP's deputy general counsel, John Schultz, at the HP Palo Alto headquarters on May 13, 2009, he almost had a heart attack, and then we spent over an hour discussing yield issues. Our conversation lead me to believe that HP legal team actually was not a part of the fraud and had not yet figured it out themselves, as they lacked any defensive strategy for it. My surmise is that HP legal had been lied to by HP printer engineering and business teams, who have every reason in the world to cover it up at this point. This is a pure speculation of course, as I have no proof of what they knew and when.

(requires QuickTIme - please download at quicktime.com)

## https://files.me.com/vlastone/pzldqt.mov

## https://files.me.com/vlastone/xotf5m.mov

(Please note that the full study report and the video documentary are copyrighted works being provided for the use inside your firms for the purpose of our ongoing discussions, and they may not be re-published or shared with other organizations without prior permission.)

Thank you for taking your time to study the Sutherland materials.   Tim and I are looking forward to transforming what has probably been a bitter disappointment for you and a very difficult road for the Sutherland team, into a breakthrough success for all of us.

Sincerely,


Michael Vlastone

Founder, Program Director
Integrity Capitalism Network,
 a project of the iShine Foundation

767 Bryant Street, Suite 410
San Francisco, CA 94107

O: 415-957-8703  [ preferred ]
M: 415-794-5112

www.IntegrityCapitalism.com
www.iShine.org

E: VLASTONE@MAC.COM

<u>Audio & Video Chat</u>
Skype ID: vlastone
iChat ID: <u>vlastone@mac.com</u>

| From: | Michael Vlastone |
|---|---|
| To: | Richard Kellner; Darren Kaplan; Alfredo Torrijos |
| Cc: | Amalia Najarro; Timothy P. Rumberger |
| Subject: | Re: HP Laser case - FEEDBACK & FRESH IDEAS - UPDATE |
| Date: | Friday, December 24, 2010 1:47:27 AM |
| Attachments: | KBK - discussion of Sutherland compared to B&Y cases.docx |
| | ATT00001.txt |
| | Removing Hurdles To Class Certification For Victims Of Mass Fraud (Aggregate Reliance And Overcharges).pdf |
| | ATT00002.txt |
| Importance: | High |

Gentlemen,

I was in a rush to make it to a Christmas event held by a good friend of Tom Perkins (of Kleiner Perkins Caufield & Byers),
and unfortunately did not have time to poof read my letter before emailing it.

Upon my return I discovered it to contain inexcusable number of typos, grammatical errors and unclear sentences.
Please accept my apologies for a deficient document and discard the previous copy if you had downloaded it already.

An updated copy is enclosed and I hope it will make for an easier and more helpful read.

Reagards to all,


Michael Vlastone


EXHIBIT
9
1-25-11

### ESCAPING THE TRAP OF A WORTHLESS HP LASERJET SETTLEMENT

1)  **YIELD-FRAUD BASED STRATEGIES COMPARED TO "BLOCKED AVAILABLE TONER" LITIGATION**

Richard described our yield-based strategy in Sutherland as "myopic" (which just added a new word to my vocabulary)…

Unfortunately, it was the KBK strategy that proved shortsighted, while the predictions I made in September 2008 proved to be insightful, far reaching and correct. You might not recall these details, but the thoughts I left your team with at the end of that meeting were:

a)  While blocking leftover toner might be wasteful, not focusing on yield fraud, your cases will likely run into trouble, because full delivery of advertised yields is the only legally binding promise made by HP;

b)  Lacking a professional technology consultant who has substantial experience with actual consumers of HP products, a comprehensive understanding of a broad range of underlying technologies and skills to communicate complex technical issues in a language that judges and news reporters can understand will substantially weaken your cases;

c)  When Darren boasted of also going after Brother laser printers, I warned that my experiences with numerous clients indicated that Brother monochrome printers are completely honest, while Brother color laser printers are either substantially honest, or are far less aggregious than HP printers when it comes to delivering full advertised yields.

While outcomes speak for themselves, it is also important to consider the causes, which leads to this question:

2)  **HAVE JUDGES REALLY BEEN UNREASONABLE IN EVALUATING "BLOCKED AVAILABLE TONER" CLAIMS?**

Another part of our recent call left me with a concern: your team continues to feel strongly that all the judges simply made bad calls. It was difficult to discern any openness to hearing my message that your frustration with the judges and their rulings – i.e. suspecting them of conservative, pro-corporate bias – appears to be substantially misplaced.

Over the past two years I have meticulously read, studied and annotated every motion, pleading and opinion related to every HP, Brother and Samsung case (including Arcand) as they became available online. Having a solid understanding of the "average projected yield based on 5% coverage" from the technology, business and consumer perspective I saw a very different problem – litigation based on hard-stopping of usable leftover toner is only legitimate to the extent that advertised yield had not been fully delivered. Yield is indeed the only truly useful measure of printer performance - as long as it is not being gamed by a dishonest manufacturer.

In reading the judges' rulings and opinions, I was actually surprised with the patience they demonstrated, providing your team every opportunity and encouragement to plead causes of action that might be legally viable - i.e. violations of actual promises made by the manufacturers that are based on a clearly defined international standard (that only needed to be properly explained to the judges because it is quite technical).

While I am 100% on the side of stopping HP yield fraud, if I were a judge, I would have no other choice but to rule exactly the same way, because alleging fraud based strictly on the blockage of available toner is plain WRONG, not only from a legal but also a practical perspective. As I tried to explain in our call, preloading extra toner, beyond that required to deliver full advertised yields, is a valid design strategy that serves consumers by lowering the cost of cartridges and improving the reliability and quality of printing. Hard-stopping (as long as it can be disabled without too much difficulty) is also a valid and useful feature, particularly for the networked, shared printers in the office or the home. Most consumers prefer not to waste time and paper on gradually faded-out printouts – as used to happen with the laser printers back in the 1990s.

Not having a technology consultant aboard to help your team fully understand and appreciate the implications of these technical issues led you into dead ends in the case of real HP fraud, and also lead to a lawsuit against a manufacturer, Brother, innocent of any fraud (if anything, Brother should have simply provided additional information in their manuals to alleviate consumer concerns about wasted toner).

It is essential that your team come to terms with this reality, because continuing to be in denial will lead to more self-defeating, costly mistakes down the line. If you operate from the perspective that all the judges are bad, you then lose all your power to overcome the obstacles, because you can't just get rid of these judges. Then you give up and cave into a bad settlement that hurts rather than helps consumers, because there is no injunctive relief and they might use e-credits to purchase cartridges that will further defraud them. On the other hand, re-evaluating your own cognitive perceptions and recognizing the blind spota allows you to regain power and look for and find an innovative approach for overcoming challenges you expected to face with the class certification based on yield fraud claims.

*One of the best lessons I learned in life is to never feel mad or disappointed in myself for making a mistake based on a blind spot, and to also reward rather than reject or punish the messenger who helps you become aware of it...  :)*

## 3)    LONG TERM VIABILITY OF YIELD-FRAUD BASED STRATEGIES

Now, you are absolutely correct, that under the traditional model of class action litigation, variability in the experiences of the defrauded class would present a problem – IF class certification were to be vigorously contested by the defense counsel.

However, this potential difficulty with class certification is real only if you don't take advantage of the innovation proposed by the *Integrity Capitalism Network* and assume that HP Board Of Directors would not be motivated to cooperate in the settlement and mitigation process once the other smoking gun was found during discovery – i.e. the identity of the fraud perpetrators (the smoking gun we already have is our study that proves that the yield fraud exists and exposes its primary mechanism).

As attorneys for the injured consumers, you do not have any way of reaching out to HP board or HP management, because professional rules of conduct restrict you to communicating with the defendant's counsel – who have no interest in recommending to the Board that your evidence should be evaluated. In fact, part of their job is to provide a shield of plausible deniability to the board and the management.

On the other hand, the Integrity Capitalism Network (ICN) and its advisors and supporters in the Silicon Valley, being neither the plaintiffs nor the attorneys for the plaintiff, are not bound by such limitations. Having access to a complete set of well documented evidence, ICN would be free to reach out directly to the individuals on the HP board, as well as individual members of the executive team, such as the new CEO. These key decision makers to this day remain in the dark about any details of the LaserJet litigation, the yield fraud charges or the conduct of a relatively small group of managers and employees who developed this fraud to benefit themselves while jeopardizing the reputation and the long term financial health and competitiveness of their employer - HP corporation. While HP pocketed tons of money unlawfully through this fraud, the corporation could have earned even more profits by developing super-efficient toner delivery technologies and business models, making laser printing affordable for every family and small business. Further below, I will lay out the evidence of how and why reaching out to HP BOD will help settle this fraud.

As a side note, you might doubt that Sutherland team would have obtained any additional evidence of yield fraud beyond the scientific yield delivery study. Being focused on the leftover toner, it is inevitable that your team's discovery did not quite look for the right evidence or ask the right questions during the depositions to follow the tracks of the yield fraud. This is not for lack of intelligence or diligence, rather it is a completely normal outcome that, for example, leads astray many police investigations that pre-judge the guilt or innocence of certain parties and then focus on looking for the wrong evidence, failing to notice or recognize the significance of many facts as they become visible. Just because you did not find evidence of "who, how, and when" the yield fraud was developed, does not mean that our team will miss it. For example, if you had conducted a study that empirically proved yield fraud, it would have lead you to learn that it is accomplished by tweaking firmware in order to over-estimate the percent coverage for each color that's not used heavily. In turn, you could have inquired who wrote the software that evaluates average per page toner coverage, etc, etc....

Setting aside doubts about uncovering additional evidence of fraud, how can we formulate a viable strategy towards settlement and mitigation? Is our focus on yield-fraud "myopic" or does it have a viable endgoal?

Sutherland strategy has always been and continues to be based on a novel approach: first conducting a thorough and unbiased investigation, including discovery, followed by giving ICN a chance to establish dialog and cooperation with HP BOD towards reaching an agreement for mitigation of toner fraud – including the class certification, and only applying media campaign pressure if necessary. HP BOD repeatedly pledged in a public SBC contract that, if shown evidence of any misconduct by HP or its employees, they would never try to deny it through legal loopholes or cover it up, but would immediately take steps to stop and mitigate such misconduct, as they have decisively demonstrated in the 2006 pretexting and the 2010 Mark Hurd scandals – regardless of the short term embarrassment or costs.

With regards to the toner yield fraud, the pressure on the HP BOD would be even greater than in the previous two instances, because, upon full exposure of this misconduct in the media, consumers would have a clear and cost-free pathway to liberate themselves from further fraud and to walk away from HP products, thus damaging HP's revenue streams. One full set of HP replacement cartridges costs the equivalent, for example, of one "same or better quality" Brother color laser printer with cartridges included, that will not defraud consumers of full yield delivery. HP BOD, if presented with credible proof of fraud (that the Sutherland litigation had already mostly achieved, short of the names of HP employees who implemented it), would be under the pressure of not only avoiding the long term damage to HP's reputation, but of also protecting its immediate revenues. Furthermore, they would be exposed to personal liability for failure to enforce the HP SBC and as a result getting sued by HP stockholders when the stock might fluctuate downwards following the exposure of the scandal.

Based on their track record over the past 5 years, having seen a well documented body of evidence provided by ICN, the HP BOD would then likely instruct HP Legal and HP's outside counsel to investigate further and hold the responsible employees accountable, have their PR firms structure a public apology for the mistakes made, and then move forward with, rather than oppose, the class certification process in order to establish a fair and comprehensive process for compensating the victims of this fraud, followed by releasing the software and firmware updates that remove fraudulent software from HP printers.

It is understandable that not having seen ICN achieve such an outcome, you might think that it is not realistic, however, you have not even given it a chance, and such pessimism is contradicted by the only known facts, which are that HP BOD followed the guidelines of HP SBC even when it was costly and embarrassing to do so. And it is logical that they did – their personal interests are not at all the same as those of HP Legal department or HP's upper management team, including the executives in charge of the Printing and Imaging Group.

I hope that in hindsight, you can recognize that perhaps you should given ICN a chance, as both your litigation team and US consumers would have certainly not been worse off than they are right now. On the up-side, you would have achieved a great victory for yourselves and the consumers and also built a long term relationship with a competent, resourceful and relentless ally. The body of work I've shared with you might not have achieved the ultimate result yet, but it should give you a hint of what I was able to develop with virtually no resources or access to outstanding and highly experienced legal minds of your team. Our actions should also have demonstrated to you the discipline and professional courtesy we've exhibited – in 2008 Darren asked me to make sure we don't get the Sutherland case into the hands of an attorney who will negotiate and accept a "bullshit coupon settlement" – and we did not, even though HP offered us a pathway to doing so in May 2009. You can imagine how shocked we were to learn about the stipulated settlement, having expected you to stick with the appeal process, while we would pursue Sutherland case. We still very much hope that you will re-evaluate your position and work with us to look for a real solution to stop this fraud.

However, lets also consider the pessimistic side - what do we do if Sutherland

proceeds with discovery, but then HP BOD fails to fulfill the obligations spelled out in the SBC, and Sutherland is then faced with vigorous opposition to class certification based on the variability of individual losses to yield fraud?

## 4)    ADDRESSING THE CLASS ACTION CERTIFICATION DILEMMA

Having taken your admonitions to heart re. "class certification hurdle," I've been doing some research on out-of-the-box ideas that might overcome this potential difficulty.

Enclosed in the email, please find a paper by a very bright student of law that might be applicable to our circumstances:  **"Aggregate Reliance And Overcharges: Removing Hurdles To Class Certification For Victims Of Mass Fraud"** by Shawn S. Ledingham, Jr.  I tracked Shawn down and spoke with him late on Tuesday night, and he thinks the HP case would be a most appropriate test scenario for his theory.

Please skim through his note to get a general feel for how the ideas might be applicable.

In short, after getting past the motion to dismiss and conducting discovery, *Sutherland* could amend the complaint based on the findings of that discovery (i.e. individuals who colluded in designing the technology of toner yield fraud, rather than the actual technology that implemented it, which is what we have so far).  Alternately, we have a number of ready-to-go 2600n plaintiffs, as good as Martha, who can file a fresh Federal case based on the 2008-2010 starting dates for the statute of limitations, while Martha would remain a very helpful witness.  The new causes of action could be based on yield fraud as evidence of the actual fraud, and civil RICO statutes, while the uniform damages to all the members of the injured class would be the price differential of HP printers and cartridges, in the context of fraudulent advertisement vs. accurate disclosure of performance characteristics.  In other words, had HP honestly advertised its wasteful printers based on how they were actually programmed to perform (including their true operating costs over a 4-year lifetime), HP would have had to reduce their prices on these printers and cartridges by perhaps as much as 75% for consumers to still want to buy them compared to other printer brands that don't steal toner or require you to give up warranties and toner-out notifications by having to use the override mode.  This price differential, or "fraudulent overcharge" can be claimed by every single member of the class, even if they never opened or used their HP 2600n "toner thief printer."

What are your thoughts? Could this be the "class-cert" solution we've been looking for to bring both a reasonable recovery and the injunctive relief to consumers?

Lastly I would like to take this opportunity to discuss the use of media to move proven fraud cases towards settlement and mitigation…

5) **CREATING INCENTIVES FOR MITIGATION OF DAMAGES IN MASS CONSUMER FRAUD CASES AT THE INTERSECTION OF LITIGATION AND MEDIA CAMPAIGNS**

This is just a very brief comment, and if time permits, we really should have a much longer discussion about ICN integrated media campaigns methodology.

Per his request, I've read up on Darren's work on the Dell case and the recent coverage it was able to get in the mainstream media. While he deserves much credit for pushing the Dell story as far and wide as he did, getting initial coverage in a multitude of national publications and news reports is just one small part of what I was looking to create with ICN.

While Dell management hates this kind of bad publicity, it is not what they actually fear. Their actions are primarily driven by vectors that have an actual impact on their private economic interests - as exposed by the internal Dell documents you've been able to uncover. Dell management took preventive mitigating action only in those cases where it stood to lose important high-volume customers who would switch to other brands. **Tangible incentives are key.**

A great result in that case would be to get Michael Dell to hold a press conference to apologize to all Dell customers and announce a full recall of the potentially defective computers and make a promise that from now on Dell will immediately recall any future equipment found to have systemic problems. *To gain the kind of leverage that would result in such an unlikely outcome, a news blast is entirely insufficient...*

Rather, it requires a pervasive, ongoing *"action and communication"* campaign that creates ever escalating news events, beyond the mostly boring court activity, until Dell management begins to see measurable damage to their sales and their brand that potentially far exceeds the cost of a fair and reasonable settlement and full mitigation of the original fraud they are now trying so hard to avoid.

To accomplish that level of media coverage and public participation you must build up a powerful media brand. A lawyer or a law firm can never own or manage that type of compelling brand because, rightly or wrongly, most people dislike and distrust lawyers, and at best are bored by the complexity of their work. An average American has never heard of Tom Girardi, but everyone knows Erin Brockovich. If Erin was not there to build trust and community cohesion around common goals in Hinckley, that case would have never come together through brilliant litigation alone.

In the most simplistic terms, the long term goal of the Integrity Capitalism Network has been and remains to become an entertaining, passionate and irreverent media brand that ordinary Americans would relate to, trust, and follow when called on to act in support of protecting their own interests. As the numbers show, the public follows both Michael Moore's and Paris Hilton's antics and they love to follow and participate in competitions, like Celebrity Apprentice. Litigation, on the other hand is BORING most of the time.

That is why you need an outside organization working on many simultaneous cases to enable weekly episodic content in video and print, that coordinates its activities

with the litigation process, allowing attorneys to do what they do best in the court rooms, while they allow the ICN brand and its media celebrities to entertain and engage the public using the formula we call:

• IRRESISTIBLE FUN • IMPOSSIBLE CHALLENGES • NOBLE CAUSES ™

Right now we still have a golden opportunity to do this with the HP case without much risk, as you've already lost both the battles and the war, and HP is settling only because they need to kill the Sutherland case. We can also spend our time cooperating on a launch of a number of additional worthy class action cases which have been lingering on the shelf for some time, for lack of visionary attorneys who are willing to at least try fixing a broken system, rather that make compromises with it, as unfortunately you appear to have done with the present settlement, which we have no choice but to vigorously oppose.

Sincerely,


Michael Vlastone

Founder, Program Director
Integrity Capitalism Network, a project of the iShine Foundation

767 Bryant Street, Suite 410
San Francisco, CA 94107

O: 415-957-8703 [ preferred ]   M: 415-794-5112

E: VLASTONE@MAC.COM



Developing scalable solutions that hold accountable
business, government and independent professionals
using the tools of journalism, litigation, new-media and the social-web

| | |
|---|---|
| **From:** | Michael Vlastone |
| **To:** | Richard Kellner |
| **Cc:** | Timothy P. Rumberger |
| **Subject:** | Re: HP Laser case - FEEDBACK & FRESH IDEAS - UPDATE |
| **Date:** | Monday, December 27, 2010 12:17:18 PM |

Darren,

I appreciate your concern - for the record I'm consulting for the case and all decisions for the injured class will be made by Tim.

As for discussions with your team, Tim and I made an early determination that we will at least attempt to do all our work within an open-source / full disclosure / total integrity framework, even when it appears strategically disadvantageous in the short term.

I'll be calling you shortly, and have Tim join us during his break.

Michael

On Dec 27, 2010, at 11:48 AM, Richard Kellner wrote:

> Michael,
>
> Darren is unavailable, but Alfredo and I are available. Once concern that I have is the fact that you are represented by counsel and it would not be ethically appropriate for me to discuss the cases/strategy with you if your counsel is not present.
>
> Please discuss with Mr. Rumberger, and then we can schedule a call.
>
> Alfredo and I will make ourselves available for you today.
>
> Respectfully,
>
> Rich
>
> <image001.png>
>
> **From:** Michael Vlastone [mailto:vlastone@mac.com]
> **Sent:** Monday, December 27, 2010 4:03 AM
> **To:** Richard Kellner; Darren Kaplan; Alfredo Torrijos
> **Cc:** Timothy P. Rumberger; Amalia Najarro
> **Subject:** Re: HP Laser case - FEEDBACK & FRESH IDEAS - UPDATE
>
> Hi Richard and all,



EXHIBIT
10

## 1) MONDAY RE-CONNECT / CONFERENCE CALL

On Dec 26, 2010, at 8:15 PM, Richard Kellner wrote:

Michael,

I will try to reach out to Darren tomorrow.   Unfortunately, I have family commitments this evening and will be unable to talk with you tonite.  I can speak with you tomorrow (after I get back from a morning court appearance).

Rich

Richard - GREAT - THANK YOU.

Whatever might be the schedule limitations of all the other parties, please do ring me when you're back from court on Monday.
If we can coordinate an all around call that would be even better, but there may be a few things we can get out of the way one-on-one.
If you have an ETA, please advise so I can plan...

My office - 415-957-8703, any time after 10:30 am (I'm a night owl, working into the morning on most days)

## 2) NEED FOR DIVERGENT THINKING

Before we bite into the meat of complex issues, please enjoy this quick vitamin for the mind that might be helpful in our quest to resolve the HP yield fraud dilemma:  Sir Ken Robinson thoughts on Divergent Thinking, about 40 seconds long (requires QuickTime to view)

| From: | Michael Vlastone |
|---|---|
| To: | Ted Frank |
| Cc: | Richard Kellner; info@HPLaserJetPrinterSettlement.com; Khenning@morganlewis.com; Fcorrado@morganlewis.com; Timothy P. Rumberger |
| Subject: | Re: In re: HP LaserJet Printer Litigation Settlement, Case No. CV 07-0667 AG (C.D. Cal.) |
| Date: | Tuesday, January 04, 2011 2:43:27 AM |
| Attachments: | Pasted Graphic.pdf |
| | ATT00001.htm |

Dear Mr. Frank,

I would like to thank you very much for the absolutely transparent, total integrity approach you have taken.

In my long three year journey to fully understand, uncover and stop the HP yield fraud I had met only two attorneys as selflessly dedicated to their craft and having an unconditional commitment to justice.

The facts are indeed accurate as you stated them in the present disclosure to all the related parties, and I apologize if my referral of Mr.Young to yourself had caused stress or distraction. I now fully understand the ethical limitations on your ability to help him and the injured class of consumers, who are apparently being ripped off and betrayed at the same time.

As you know, I am an independent computer consultant who used to actively recommend HP products to my clients.

I am also a citizen journalist, a social entrepreneur and a member of the injured class (through my ownership of an HP 2600n and a CP1518ni HP Color LaserJet printers). I should add, that I am neither employed by, nor have any kind of partnership or business arrangement with any parties in this matter, including attorney Timothy Rumberger.

I do provide periodic independent paid computer consulting services to my long time client Martha Sutherland, as fully disclosed to HP on numerous occasions, and I also share with Ms. Sutherland and Mr. Rumberger regular updates of my investigative findings and my thoughts about the related matters which I consider privileged information, but I am not in any way compensated for this consulting by either, and all my work is absolutely independent. I also receive periodic free legal advice from Mr. Rumberger. As one of the members of the injured class, and a citizen journalist I am determined to keep all the parties honest and their work and negotiations transparent towards the mediation of the alleged frauds.

Lastly, it has always been a stated goal of the Integrity Capitalism Network, to mitigate the alleged frauds without causing damage to the HP corporation and its stockholders, who are also unknowingly being endangered and victimized by the misconduct of a limited group of HP employees and outside contract professionals who have no respect for HP Standards of Business Conduct or the long-term reputation and profitability of their employer. Therefore, I have tempered my patience, this being the first major case for ICN, and made sure that every possible avenue of outreach and cooperation has been employed to facilitate mediation.

In light of the latest unexpected developments and the rather shocking revelations, these opportunities might well be running out.

EXHIBIT
1-25-11
PENGAD 800-631-6989

As I mentioned, turns out, Mr. James C. Young, the lead plaintiff in **Young v HP** is also a computer consultant who used to recommend HP products. Given your present disclosure, I feel it entirely appropriate to share the following with everyone, based on Mr. Young's stated intent to fully disclose all the facts known to him, to all the relevant parties and to the court. Later today, I will also be making filings with all the appropriate parties in this matter that reveal the full range of my disturbing findings and I will seek the fullest possible disclosure and a formal investigation of all the related facts and parties in order to expose and finally bring an end to the multiple aspects of systemic corruption discovered during the course of my investigations.

During my conversation on December 31, 2010 with Mr. Young, I unexpectedly learned of truly egregious, consistent attorney misconduct, while Mr.Young had for the first time learned about the **Sutherland v HP** case, the HP yield study and, most importantly, the total loss and dismissal of his case, which he was told had been won and settled, with HP being required to correct the yield issues.

And this is just the tip of the iceberg.

I could not fathom a misrepresentation of such scale, and I now recognize the naiveté of my recent attempts to persuade the designated counsel in the HP LaserJet litigation to not proceed with the self-serving, sham settlement of this pervasive fraud.

Having mutually learned about the different sets of most scandalous facts at such a late time before the objection deadline, I've been struggling to help Mr. Young find and retain counsel that would faithfully protect him and the injured class, based on his request for such assistance.

Mr. Rumberger, the attorney for **Sutherland v. HP** had already refused, on ethics grounds similar to those sighted by yourself, including potential conflict of interest.

I have already submitted a three-inch thick file on this matter to a staff member of the California Attorney General's office.
In addition, on the morning of Monday, January the 3rd at 9:35 am, I had sent an email to be forwarded to the incoming CA AG, Ms. Kamala Harris, requesting most urgent assistance in this matter. I've intended to communicate to Ms. Harris my factual knowledge that in addition to the betrayal of the injured class, including the California public schools, universities and offices of government that use thousands of HP Color LaserJet printers that defraud their users, more serious crimes appear to have been committed in this case, that I am simply not equipped to protect the public from with the tools available to me.

However, the timing is once again most unfortunate, and being an incoming AG, Ms. Harris had just been sworn into her office yesterday. Her entire staff is overwhelmed with the inauguration festivities and organizational issues, therefore, my plea for help had not been answered as of yet.

Not having access to any other trusted and skilled attorneys, I had advised Mr. Young to contact yourself.
Again, I apologize if my referral was in any way inappropriate or distracting.
If you should think of potential suitable representation candidates I hope that you might find an ethical and appropriate way to share this information, as I am

completely tapped out of such resources at this time.

The informal advice and insights that you shared with me, that I never took as legal advice, have been invaluable for my very difficult work and I thank you for continuing to take a firm and uncompromising stand for justice, transparency and integrity. I am looking forward to meeting you in person at, or after the upcoming hearing.

Very truly yours,

Michael Vlastone

Founder, Program Director
Integrity Capitalism Network,
 a project of the **iShine Foundation**

767 Bryant Street, Suite 410
San Francisco, CA 94107

O: 415-957-8703  [ preferred, after 10 am PST]
M: 415-794-5112  [ 24/7 ]

www.IntegrityCapitalism.com
www.iShine.org

E: VLASTONE@MAC.COM

Audio & Video Chat
Skype ID: vlastone
iChat ID: vlastone@mac.com